# NIXON *v.* ADMINISTRATOR OF GENERAL SERVICES ET AL.

No. 75–1605.   Argued April 20, 1977—Decided June 28, 1977

426

428

BRENNAN, J., delivered the opinion of the Court, in which STEWART, MARSHALL, and STEVENS, JJ., joined; in all but Part VII of which WHITE, J., joined; in all but Parts IV and V of which POWELL, J., joined; and in Part VII of which BLACKMUN, J., joined. STEVENS, J., filed a concurring opinion, *post,* p. 484. WHITE, J., *post,* p. 487, BLACKMUN, J., *post,* p. 491, and POWELL, J., *post,* p. 492, filed opinions concurring in part and concurring in the judgment. BURGER, C. J., *post,* p. 504, and REHNQUIST, J., *post,* p. 545, filed dissenting opinions.

*Herbert J. Miller, Jr.,* and *Nathan Lewin* argued the cause

for appellant. With them on the briefs were *R. Stan Mortenson, Raymond G. Larroca, Martin D. Minsker,* and *William H. Jeffress, Jr.*

*Solicitor General McCree* argued the cause for the federal appellees. On the brief were former *Acting Solicitor General Friedman, Acting Assistant Attorney General Babcock, Deputy Assistant Attorney General Goldbloom, Robert E. Kopp,* and *Anthony J. Steinmeyer. Robert E. Herzstein* argued the cause for appellees Reporters Committee for Freedom of the Press et al. With him on the brief were *Andrew S. Krulwich, Mark J. Spooner, Peter T. Grossi, Jr.,* and *Leonard B. Simon. Leon Friedman, John H. F. Shattuck,* and *Joel M. Gora* filed a brief for appellees Hellman et al. *William A. Dobrovir* and *Andra N. Oakes* filed a brief for appellee Anderson.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Title I of Pub. L. 93–526, 88 Stat. 1695, note following 44 U. S. C. § 2107 (1970 ed., Supp. V), the Presidential Recordings and Materials Preservation Act (hereafter Act), directs the Administrator of General Services, an official of the Executive Branch, to take custody of the Presidential papers and tape recordings of appellant, former President Richard M. Nixon, and promulgate regulations that (1) provide for the orderly processing and screening by Executive Branch archivists of such materials for the purpose of returning to appellant those that are personal and private in nature, and (2) determine the terms and conditions upon which public access may eventually be had to those materials that are retained. The question for decision is whether Title I is unconstitutional on its face as a violation of (1) the separation of powers; (2) Presidential privilege doctrines; (3) appellant's privacy interests; (4) appellant's First Amendment associational rights; or (5) the Bill of Attainder Clause.

On December 19, 1974, four months after appellant resigned as President of the United States, his successor, President Gerald R. Ford, signed Pub. L. 93–526 into law. The next

day, December 20, 1974, appellant filed this action in the District Court for the District of Columbia, which under § 105 (a) of the Act has exclusive jurisdiction to entertain complaints challenging the Act's legal or constitutional validity, or that of any regulation promulgated by the Administrator. Appellant's complaint challenged the Act's constitutionality on a number of grounds and sought declaratory and injunctive relief against its enforcement. A three-judge District Court was convened pursuant to 28 U. S. C. §§ 2282, 2284.[1] Because regulations required by § 104 of the Act governing public access to the materials were not yet effective, the District Court held that questions going to the possibility of future public release under regulations yet to be published were not ripe for review. It found that there was "no need and no justification for this court now to reach constitutional claims directed at the regulations . . . the promulgation of [which] might eliminate, limit, or cast [the constitutional claims] in a different light." 408 F. Supp. 321, 336 (1976). Accordingly, the District Court limited review "to consideration of the propriety of injunctive relief against the alleged facial unconstitutionality of the statute," *id.*, at 335, and held that the challenges to the facial constitutionality of the Act were without merit. It therefore dismissed the complaint. *Id.*, at 374–375. We noted probable jurisdiction, 429 U. S. 976 (1976). We affirm.

## I

### *The Background*

The materials at issue consist of some 42 million pages of documents and some 880 tape recordings of conversations. Upon his resignation, appellant directed Government archivists to pack and ship the materials to him in California. This

---

[1] For proceedings prior to convention of the three-judge court, see *Nixon* v. *Richey*, 168 U. S. App. D. C. 169, 513 F. 2d 427, on reconsideration, 168 U. S. App. D. C. 172, 513 F. 2d 430 (1975). See also *Nixon* v. *Sampson*, 389 F. Supp. 107 (DC 1975).

shipment was delayed when the Watergate Special Prosecutor advised President Ford of his continuing need for the materials. At the same time, President Ford requested that the Attorney General give his opinion respecting ownership of the materials. The Attorney General advised that the historical practice of former Presidents and the absence of any governing statute to the contrary supported ownership in the appellant, with a possible limited exception.[2] 43 Op. Atty. Gen. No. 1 (1974), App. 220–230. The Attorney General's opinion emphasized, however:

> "Historically, there has been consistent acknowledgement that Presidential materials are peculiarly affected by a public interest which may justify subjecting the absolute ownership rights of the ex-President to certain limitations directly related to the character of the documents as records of government activity." *Id.,* at 226.

On September 8, 1974, after issuance of the Attorney General's opinion, the Administrator of General Services, Arthur F. Sampson, announced that he had signed a depository agreement with appellant under the authority of 44 U. S. C. § 2107. 10 Weekly Comp. of Pres. Doc. 1104 (1974). We shall also refer to the agreement as the Nixon-Sampson agreement. See *Nixon* v. *Sampson,* 389 F. Supp. 107, 160–162 (DC 1975) (App. A). The agreement recited that appellant retained "all legal and equitable title to the Materials, including all literary property rights," and that the materials accordingly were to be "deposited temporarily" near appellant's California home in an "existing facility belonging to the United States." *Id.,* at 160. The agreement stated further that appellant's purpose was "to donate" the materials to the United States "with appropriate

---

[2] No opinion was given respecting ownership of certain permanent files retained by the Chief Executive Clerk of the White House from administration to administration. The Attorney General was unable definitively to determine their status on the basis of then-available information. 43 Op. Atty. Gen. No. 1 (1974), App. 228.

restrictions." *Ibid.* It was provided that all of the materials "shall be placed within secure storage areas to which access can be gained only by use of two keys," one in appellant's possession and the other in the possession of the Archivist of the United States or members of his staff. With exceptions not material here, appellant agreed "not to withdraw from deposit any originals of the materials" for a period of three years, but reserved the right to "make reproductions" and to authorize other persons to have access on conditions prescribed by him. After three years, appellant might exercise the "right to withdraw from deposit without formality any or all of the Materials . . . and to retain . . . [them] for any purpose . . ." determined by him. *Id.,* at 161.

The Nixon-Sampson agreement treated the tape recordings separately. They were donated to the United States "effective September 1, 1979," and meanwhile "shall remain on deposit." It was provided however that "[s]ubsequent to September 1, 1979 the Administrator shall destroy such tapes as [Mr. Nixon] may direct" and in any event the tapes "shall be destroyed at the time of [his] death or on September 1, 1984, whichever event shall first occur." *Ibid.* Otherwise the tapes were not to be withdrawn, and reproductions would be made only by "mutual agreement." *Id.,* at 162. Access until September 1, 1979, was expressly reserved to appellant, except as he might authorize access by others on terms prescribed by him.

Public announcement of the agreement was followed 10 days later, September 18, by the introduction of S. 4016 by 13 Senators in the United States Senate. The bill, which became Pub. L. 93–526 and was designed, *inter alia,* to abrogate the Nixon-Sampson agreement, passed the Senate on October 4, 1974. It was awaiting action in the House of Representatives when on October 17, 1974, appellant filed suit in the District Court seeking specific enforcement of the Nixon-Sampson agreement. That action was consolidated with other suits seeking access to Presidential materials pur-

suant to the Freedom of Information Act, 5 U. S. C. § 552 (1970 ed. and Supp. V), and also seeking injunctive relief against enforcement of the agreement. *Nixon* v. *Sampson, supra.*[3] The House passed its version of the Senate bill on December 3, 1974. The final version of S. 4016 was passed on December 9, 1974, and President Ford signed it into law on December 19.

## II

### *The Act*

Public Law 93–526 has two Titles. Title I, the challenged Presidential Recordings and Materials·Preservation Act, consists of §§ 101 through 106. Title II, the Public Documents Act, amends Chapter 33 of Title 44, United States Code, to add §§ 3315 through 3324 thereto, and establish the National Study Commission on Records and Documents of Federal Officials.

Section 101 (a) of Title I directs that the Administrator of General Services, notwithstanding any other law or agreement or understanding (*e. g.,* the Nixon-Sampson agreement), "shall receive, obtain, or retain, complete possession and control of all original tape recordings of conversations which were recorded or caused to be recorded by any officer or employee of the Federal Government and which—

"(1) involve former President Richard M. Nixon or other individuals who, at the time of the conversation, were employed by the Federal Government;

---

[3] The Court of Appeals for the District of Columbia Circuit stayed any order effectuating the decision in *Nixon* v. *Sampson* pending decision of the three-judge court whether under §105 (a) the instant case was to "have priority on the docket of [the District] court over other cases," *Nixon* v. *Richey,* 168 U. S. App. D. C., at 173, 177, 188–190, 513 F. 2d, at 431, 435, 446–448. The three-judge court was of the view that "the central purpose of Congress, in relation to all pending litigation, is to have an early and prior determination of the Act's constitutionality" and therefore did not request dissolution of the stay until entry of judgment. 408 F. Supp., at 333–334, n. 10.

434

"(2) were recorded in the White House or in the office of the President in the Executive Office Buildings located in Washington, District of Columbia; Camp David, Maryland; Key Biscayne, Florida; or San Clemente, California; and

"(3) were recorded during the period beginning January 20, 1969, and ending August 9, 1974."

Section 101 (b) provides that notwithstanding any such agreement or understanding, the Administrator also "shall receive, retain, or make reasonable efforts to obtain, complete possession and control of all papers, documents, memorandums, transcripts, and other objects and materials which constitute the Presidential historical materials [as defined by 44 U. S. C. § 2101] of Richard M. Nixon, covering the period beginning January 20, 1969, and ending August 9, 1974."

Section 102 (a) prohibits destruction of the tapes or materials except as may be provided by law, and § 102 (b) makes them available (giving priority of access to the Office of the Watergate Special Prosecutor) in response to court subpoena or other legal process, or for use in judicial proceedings. This was made subject, however, "to any rights, defenses, or privileges which the Federal Government or any person may invoke . . . ." Section 102 (c) affords appellant, or any person designated by him in writing, access to the recordings and materials for any purpose consistent with the Act "subsequent and subject to the regulations" issued by the Administrator under § 103. See n. 46, *infra.* Section 102 (d) provides for access according to § 103 regulations by any agency or department in the Executive Branch for lawful Government use. Section 103 requires custody of the tape recordings and materials to be maintained in Washington except as may otherwise be necessary to carry out the Act, and directs that the Administrator promulgate regulations necessary to assure their protection from loss or destruction and to prevent access to them by unauthorized persons.

Section 104, in pertinent part, directs the Administrator to promulgate regulations governing public access to the tape recordings and materials. Section 104 (a) requires submission of proposed regulations to each House of Congress, the regulations to take effect under § 104 (b)(1) at the end of 90 legislative days unless either the House or the Senate adopts a resolution disapproving them. The regulations must take into account seven factors specified in § 104 (a), namely:

"(1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term 'Watergate';

"(2) the need to make such recordings and materials available for use in judicial proceedings;

"(3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings to information relating to the Nation's security;

"(4) the need to protect every individual's right to a fair and impartial trial;

"(5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;

"(6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1); and

"(7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance."

Section 105 (a) vests the District Court for the District of Columbia with exclusive jurisdiction not only to hear

constitutional challenges to the Act, but also to hear challenges to the validity of any regulation, and to decide actions involving questions of title, ownership, custody, possession, or control of any tape or materials, or involving payment of any award of just compensation required by § 105 (c) when a decision of that court holds that any individual has been deprived by the Act of private property without just compensation. Section 105 (b) is a severability provision providing that any decision invalidating a provision of the Act or a regulation shall not affect the validity or enforcement of any other provision or regulation. Section 106 authorizes appropriation of such sums as may be necessary to carry out the provisions of the Title.

## III

### *The Scope of the Inquiry*

The District Court correctly focused on the Act's requirement that the Administrator of General Services administer the tape recordings and materials placed in his custody only under regulations promulgated by him providing for the orderly processing of such materials for the purpose of returning to appellant such of them as are personal and private in nature, and of determining the terms and conditions upon which public access may eventually be had to those remaining in the Government's possession. The District Court also noted that in designing the regulations, the Administrator must consider the need to protect the constitutional rights of appellant and other individuals against infringement by the processing itself or, ultimately, by public access to the materials retained. 408 F. Supp., at 334–340. This construction is plainly required by the wording of §§ 103 and 104.[4]

---

[4] This interpretation has abundant support in the legislative history of the Act. Senator Javits, one of the sponsors of S. 4016, stated:

"[The criteria of § 104 (a)] endeavor to protect due process for individ-

Regulations implementing §§ 102 and 103, which did not require submission to Congress, and which regulate access and screening by Government archivists, have been promulgated, 41 CFR § 105–63 (1976). Public-access regulations that must be submitted to Congress under § 104 (a) have not, however, become effective. The initial set proposed by the Administrator was disapproved pursuant to § 104 (b) (1) by Senate Resolution. S. Res. 244, 94th Cong., 1st Sess. (1975); 121 Cong. Rec. 28609–28614 (1975). The Senate also disapproved seven provisions of a proposed second set, although that set had been withdrawn. S. Res. 428, 94th Cong., 2d Sess. (1976); 122 Cong. Rec. 10159–10160 (1976). The House disapproved six provisions of a third set. H. R. Res. 1505, 94th Cong., 2d Sess. (1976). The Administrator is of the view that regulations cannot become effective except as a package and consequently is preparing a fourth set for submission to Congress. Brief for Federal Appellees 8–9, n. 4.

---

uals who may be named in the papers as well as any privilege which may be involved in the papers, and of course the necessary access of the former President himself.

"In short, the argument that the bill authorizes absolute unrestricted public access does not stand up in the face of the criteria and the requirement for the regulations which we have inserted in the bill today." 120 Cong. Rec. 33860 (1974).

Senator Nelson, the bill's draftsman, agreed that the primary purpose to provide for the American people a historical record of the Watergate events "should not override all regard for the rights of the individual to privacy and a fair trial." Id., at 33851. Senator Ervin, also a sponsor and floor manager of the bill, stated:

"Nobody's right is affected by this bill, because it provides, as far as privacy is concerned, that the regulations of the Administrator shall take into account . . . [the] opportunity to assert any legally or constitutionally based right which would prevent or otherwise limit access to the tape recordings and other materials." Id., at 33969.

See also id., at 33960 (remarks of Sen. Ervin); id., at 37902–37903 (remarks of Rep. Brademas).

The District Court therefore concluded that as no regulations under § 104 had yet taken effect, and as such regulations once effective were explicitly made subject to judicial review under § 105, the court could consider only the injury to appellant's constitutionally protected interests allegedly worked by the taking of his Presidential materials into custody for screening by Government archivists. 408 F. Supp., at 339–340. Judge McGowan, writing for the District Court, quoted the following from *Watson* v. *Buck,* 313 U. S. 387, 402 (1941):

"No one can foresee the varying applications of these separate provisions which conceivably might be made. A law which is constitutional as applied in one manner may still contravene the Constitution as applied in another. Since all contingencies of attempted enforcement cannot be envisioned in advance of those applications, courts have in the main found it wiser to delay passing upon the constitutionality of all the separate phases of a comprehensive statute until faced with cases involving particular provisions as specifically applied to persons who claim to be injured. Passing upon the possible significance of the manifold provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case." 408 F. Supp., at 336.

Only this Term we applied this principle in an analogous situation in declining to adjudicate the constitutionality of regulations of the Administrator of the Environmental Protection Agency that were in process of revision, stating: "For [the Court] to review regulations not yet promulgated, the final form of which has been only hinted at, would be wholly novel." *EPA* v. *Brown,* 431 U. S. 99, 104 (1977). See also *Thorpe* v. *Housing Authority,* 393 U. S. 268, 283–284 (1969); *Rosenberg* v. *Fleuti,* 374 U. S. 449, 451 (1963); *United States* v. *Raines,* 362 U. S. 17, 20–22 (1960); *Harmon* v. *Brucker,* 355

U. S. 579 (1958). We too, therefore, limit our consideration of the merits of appellant's several constitutional claims to those addressing the facial validity of the provisions of the Act requiring the Administrator to take the recordings and materials into the Government's custody subject to screening by Government archivists.

The constitutional questions to be decided are, of course, of considerable importance. They touch the relationship between two of the three coordinate branches of the Federal Government, the Executive and the Legislative, and the relationship of appellant to his Government. They arise in a context unique in the history of the Presidency and present issues that this Court has had no occasion heretofore to address. Judge McGowan, speaking for the District Court, comprehensively canvassed all the claims, and in a thorough opinion, concluded that none had merit. Our independent examination of the issues brings us to the same conclusion, although our analysis differs somewhat on some questions.

## IV

### Claims Concerning the Autonomy of the Executive Branch

The Act was the product of joint action by the Congress and President Ford, who signed the bill into law. It is therefore urged by intervenor-appellees that, in this circumstance, the case does not truly present a controversy concerning the separation of powers, or a controversy concerning the Presidential privilege of confidentiality, because, it is argued, such claims may be asserted only by incumbents who are presently responsible to the American people for their action. We reject the argument that only an incumbent President may assert such claims and hold that appellant, as a former President, may also be heard to assert them. We further hold, however, that neither his separation-of-powers claim nor his claim of breach of constitutional privilege has merit.

Appellant argues broadly that the Act encroaches upon the

Presidential prerogative to control internal operations of the Presidential office and therefore offends the autonomy of the Executive Branch. The argument is divided into separate but interrelated parts.

First, appellant contends that Congress is without power to delegate to a subordinate officer of the Executive Branch the decision whether to disclose Presidential materials and to prescribe the terms that govern any disclosure. To do so, appellant contends, constitutes, without more, an impermissible interference by the Legislative Branch into matters inherently the business solely of the Executive Branch.

Second, appellant contends, somewhat more narrowly, that by authorizing the Administrator to take custody of all Presidential materials in a "broad, undifferentiated" manner, and authorizing future publication except where a privilege is affirmatively established, the Act offends the presumptive confidentiality of Presidential communications recognized in *United States* v. *Nixon,* 418 U. S. 683 (1974). He argues that the District Court erred in two respects in rejecting this contention. Initially, he contends that the District Court erred in distinguishing incumbent from former Presidents in evaluating appellant's claim of confidentiality. Appellant asserts that, unlike the very specific privilege protecting against disclosure of state secrets and sensitive information concerning military or diplomatic matters, which appellant concedes may be asserted only by an incumbent President, a more generalized Presidential privilege survives the termination of the President-adviser relationship much as the attorney-client privilege survives the relationship that creates it. Appellant further argues that the District Court erred in applying a balancing test to his claim of Presidential privilege and in concluding that, notwithstanding the fact that some of the materials might legitimately be included within a claim of Presidential confidentiality, substantial public interests outweighed and justified the limited

inroads on Presidential confidentiality necessitated by the Act's provision for Government custody and screening of the materials. Finally, appellant contends that the Act's authorization of the process of screening the materials itself violates the privilege and will chill the future exercise of constitutionally protected executive functions, thereby impairing the ability of future Presidents to obtain the candid advice necessary to the conduct of their constitutionally imposed duties.

## A

### Separation of Powers

We reject at the outset appellant's argument that the Act's regulation of the disposition of Presidential materials within the Executive Branch constitutes, without more, a violation of the principle of separation of powers. Neither President Ford nor President Carter supports this claim. The Executive Branch became a party to the Act's regulation when President Ford signed the Act into law, and the administration of President Carter, acting through the Solicitor General, vigorously supports affirmance of the District Court's judgment sustaining its constitutionality. Moreover, the control over the materials remains in the Executive Branch. The Administrator of General Services, who must promulgate and administer the regulations that are the keystone of the statutory scheme, is himself an official of the Executive Branch, appointed by the President. The career archivists appointed to do the initial screening for the purpose of selecting out and returning to appellant his private and personal papers similarly are Executive Branch employees.

Appellant's argument is in any event based on an interpretation of the separation-of-powers doctrine inconsistent with the origins of that doctrine, recent decisions of the Court, and the contemporary realities of our political system. True, it has been said that "each of the three general departments of government [must remain] entirely free from the control or

coercive influence, direct or indirect, of either of the others . . . ," *Humphrey's Executor* v. *United States,* 295 U. S. 602, 629 (1935), and that "[t]he sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there." *Id.,* at 630. See also *O'Donoghue* v. *United States,* 289 U. S. 516 (1933); *Springer* v. *Philippine Islands,* 277 U. S. 189, 201 (1928).

But the more pragmatic, flexible approach of Madison in the Federalist Papers and later of Mr. Justice Story[5] was expressly affirmed by this Court only three years ago in *United States* v. *Nixon, supra.* There the same broad argument concerning the separation of powers was made by appellant in the context of opposition to a subpoena *duces tecum* of the Watergate Special Prosecutor for certain Presidential tapes and documents of value to a pending criminal investigation. Although acknowledging that each branch of the Government has the duty initially to interpret the Constitution for itself, and that its interpretation of its powers is due

---

[5] Madison in The Federalist No. 47, reviewing the origin of the separation-of-powers doctrine, remarked that Montesquieu, the "oracle" always consulted on the subject,

"did not mean that these departments ought to have no *partial agency* in, or no *controul* over the acts of each other. His meaning, as his own words import . . . can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted." The Federalist No. 47, pp. 325–326 (J. Cooke ed. 1961) (emphasis in original).

Similarly, Mr. Justice Story wrote:

"[W]hen we speak of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree." 1 J. Story, Commentaries on the Constitution § 525 (M. Bigelow, 5th ed. 1905).

great respect from the other branches, 418 U. S., at 703, the Court squarely rejected the argument that the Constitution contemplates a complete division of authority between the three branches. Rather, the unanimous Court essentially embraced Mr. Justice Jackson's view, expressed in his concurrence in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635 (1952).

> "In designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, *but the separate powers were not intended to operate with absolute independence.*" 418 U. S., at 707 (emphasis supplied).

Like the District Court, we therefore find that appellant's argument rests upon an "archaic view of the separation of powers as requiring three airtight departments of government," 408 F. Supp., at 342.[6] Rather, in determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States* v. *Nixon,* 418 U. S., at 711–712. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress. *Ibid.*

It is therefore highly relevant that the Act provides for custody of the materials in officials of the Executive Branch and that employees of that branch have access to the materials only "for lawful Government use, subject to the [Adminis-

---

[6] See also, *e. g.,* 1 K. Davis, Administrative Law Treatise § 1.09 (1958); G. Gunther, Cases and Materials on Constitutional Law 400 (9th ed. 1975); L. Jaffe, Judicial Control of Administrative Action 28–30 (1965); Cox, Executive Privilege, 122 U. Pa. L. Rev. 1383, 1387–1391 (1974); Ratner, Executive Privilege, Self Incrimination, and the Separation of Powers Illusion, 22 UCLA L. Rev. 92–93 (1974).

trator's] regulations." § 102 (d); 41 CFR §§ 105–63.205, 105–63.206, and 105–63.302 (1976). For it is clearly less intrusive to place custody and screening of the materials within the Executive Branch itself than to have Congress or some outside agency perform the screening function. While the materials may also be made available for use in judicial proceedings, this provision is expressly qualified by any rights, defense, or privileges that any person may invoke including, of course, a valid claim of executive privilege. *United States* v. *Nixon, supra.* Similarly, although some of the materials may eventually be made available for public access, the Act expressly recognizes the need both "to protect any party's opportunity to assert any legally or constitutionally based right or privilege," § 104 (a)(5), and to return purely private materials to appellant, § 104 (a)(7). These provisions plainly guard against disclosures barred by any defenses or privileges available to appellant or the Executive Branch.[7] And appellant himself concedes that the Act "does not make the presidential materials available to the Congress—except insofar as Congressmen are members of the public and entitled to access when the public has it." Brief for Appellant 119. The Executive Branch remains in full control of the Presidential materials, and the Act facially is designed to ensure that the materials can be released only when release is not barred by some applicable privilege inherent in that branch.

Thus, whatever are the future possibilities for constitutional

---

[7] The District Court correctly interpreted the Act to require meaningful notice to appellant of archival decisions that might bring into play rights secured by § 104 (a)(5). 408 F. Supp., at 340 n. 23. Such notice is required by the Administrator's regulations, 41 CFR § 105–63.205 (1976), which provide: "The Administrator of General Services or his designated agent will provide former President Nixon or his designated attorney or agent prior notice of, and allow him to be present during, each authorized access."

conflict in the promulgation of regulations respecting public access to particular documents, nothing contained in the Act renders it unduly disruptive of the Executive Branch and, therefore, unconstitutional on its face. And, of course, there is abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch. See, *e. g.*, the Freedom of Information Act, 5 U. S. C. § 552 (1970 ed. and Supp. V); the Privacy Act of 1974, 5 U. S. C. § 552 (a) (1970 ed., Supp. V); the Government in the Sunshine Act, 5 U. S. C. § 552b (1976 ed.); the Federal Records Act, 44 U. S. C. § 2101 *et seq.;* and a variety of other statutes, *e. g.*, 13 U. S. C. §§ 8–9 (census data); 26 U. S. C. § 6103 (tax returns). Such regulation of material generated in the Executive Branch has never been considered invalid as an invasion of its autonomy. Cf. *EPA* v. *Mink,* 410 U. S. 73, 83 (1973); *FAA Administrator* v. *Robertson,* 422 U. S. 255 (1975).[8] Similar congressional power

---

[8] We see no reason to engage in the debate whether appellant has legal title to the materials. See Brief for Appellant 90. Such an inquiry is irrelevant for present purposes because § 105 (c) assures appellant of just compensation if his economic interests are invaded, and, even if legal title is his, the materials are not thereby immune from regulation. It has been accepted at least since Mr. Justice Story's opinion in *Folsom* v. *Marsh,* 9 F. Cas. 342, 347 (No. 4,901) (CC Mass. 1841), that regardless of where legal title lies, "from the nature of the public service, or the character of the documents, embracing historical, military, or diplomatic information, it may be the right, and even the duty, of the government, to give them publicity, even against the will of the writers." Appellant's suggestion that the *Folsom* principle does not go beyond materials concerning national security and current Government business is negated by Mr. Justice Story's emphasis that it also extended to materials "embracing *historical* . . . information." *Ibid.* (Emphasis added.) Significantly, no such limitation was suggested in the Attorney General's opinion to President Ford. Although indicating a view that the materials belonged to appellant, the opinion acknowledged that "Presidential materials" without qualification "are peculiarly affected by a public interest" which may justify subjecting "the absolute ownership rights" to certain

to regulate Executive Branch documents exists in this instance, a power that is augmented by the important interests that the Act seeks to attain. See *infra,* at 452–454.

## B

### *Presidential Privilege*

Having concluded that the separation-of-powers principle is not necessarily violated by the Administrator's taking custody of and screening appellant's papers, we next consider appellant's more narrowly defined claim that the Presidential privilege shields these records from archival scrutiny. We start with what was established in *United States* v. *Nixon, supra*—that the privilege is a qualified one.[9] Appellant had argued in that case that *in camera* inspection by the District Court of Presidential documents and materials subpoenaed by the Special Prosecutor would itself violate the privilege without regard to whether the documents were protected from public disclosure. The Court disagreed, stating that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege . . . ." [10]

---

"limitations directly related to the character of the documents as records of government activity." 43 Op. Atty. Gen. No. 1 (1974), App. 220–230.

On the other hand, even if legal title rests in the Government, appellant is not thereby foreclosed from asserting under § 105 (a) a claim for return of private materials retained by the Administrator in contravention of appellant's rights and privileges as specified in § 104 (a) (5).

[9] Like the District Court, we do not distinguish between the qualified "executive" privilege recognized in *United States* v. *Nixon* and the "Presidential" privilege to which appellant refers, except to note that appellant does not argue that the privilege he claims extends beyond the privilege recognized in that case. See 408 F. Supp., at 343 n. 24.

[10] *United States* v. *Nixon* recognized that there is a legitimate governmental interest in the confidentiality of communications between high Government officials, *e. g.,* those who advise the President, and that "[h]uman experience teaches that those who expect public dissemination

418 U. S., at 706. The Court recognized that the privilege of confidentiality of Presidential communications derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities,[11] but distinguished a President's "broad, undifferentiated claim of public interest in the confidentiality of such [communications]" from the more particularized and less qualified privilege relating to the need "to protect military, diplomatic, or sensitive national security secrets . . . ." *Ibid.* The Court held that in the case of the general privilege of confidentiality of Presidential communications, its importance must be balanced against the inroads of the privilege upon the effective functioning of the Judicial Branch. This balance was struck against the claim of privilege in that case because the Court determined that the intrusion into the confidentiality of Presidential communications resulting from *in camera* inspection by the District Court, "with all the protection that a district court will be obliged to provide," would be minimal and therefore that the claim was outweighed by "[t]he impediment that an absolute, unqualified privilege would place in the way of the primary constitutional duty of the Judicial Branch . . . ." *Id.,* at 706–707.

Unlike *United States* v. *Nixon,* in which appellant asserted a claim of absolute Presidential privilege against inquiry by the coordinate Judicial Branch, this case initially involves appellant's assertion of a privilege against the very

of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." 418 U. S., at 705.

[11] Indeed, the opinion noted, *id.,* at 705 n. 15, that Government confidentiality has been a concern from the time of the Constitutional Convention in 1787, the meetings of which were conducted in private, 1 M. Farrand, The Records of the Federal Convention of 1787, pp. xi–xxv (1911), and the records of which were sealed for more than 30 years after the Convention. See 3 Stat. 475, 15th Cong., 1st Sess., Res. 8 (1818). See generally C. Warren, The Making of the Constitution 134–139 (1937).

Executive Branch in whose name the privilege is invoked. The nonfederal appellees rely on this apparent anomaly to contend that only an incumbent President can assert the privilege of the Presidency. Acceptance of that proposition would, of course, end this inquiry. The contention draws on *United States* v. *Reynolds,* 345 U. S. 1, 7–8 (1953), where it was said that the privilege "belongs to the Government and must be asserted by it: it can neither be claimed nor waived by a private party." The District Court believed that this statement was strong support for the contention, but found resolution of the issue unnecessary. 408 F. Supp., at 343–345. It sufficed, said the District Court, that the privilege, if available to a former President, was at least one that "carries much less weight than a claim asserted by the incumbent himself." *Id.,* at 345.

It is true that only the incumbent is charged with performance of the executive duty under the Constitution. And an incumbent may be inhibited in disclosing confidences of a predecessor when he believes that the effect may be to discourage candid presentation of views by his contemporary advisers. Moreover, to the extent that the privilege serves as a shield for executive officials against burdensome requests for information which might interfere with the proper performance of their duties, see *United States* v. *Nixon,* 418 U. S., at 714; cf. *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491, 501–503 (1975); *Dombrowski* v. *Eastland,* 387 U. S. 82, 84–85 (1967) (*per curiam*), a former President is in less need of it than an incumbent. In addition, there are obvious political checks against an incumbent's abuse of the privilege.

Nevertheless, we think that the Solicitor General states the sounder view, and we adopt it:

"This Court held in *United States* v. *Nixon* . . . that the privilege is necessary to provide the confidentiality required for the President's conduct of office. Unless he

can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore the privilege survives the individual President's tenure." Brief for Federal Appellees 33.

At the same time, however, the fact that neither President Ford nor President Carter supports appellant's claim detracts from the weight of his contention that the Act impermissibly intrudes into the executive function and the needs of the Executive Branch. This necessarily follows, for it must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly.

The appellant may legitimately assert the Presidential privilege, of course, only as to those materials whose contents fall within the scope of the privilege recognized in *United States* v. *Nixon, supra.* In that case the Court held that the privilege is limited to communications "in performance of [a President's] responsibilities," 418 U. S., at 711, "of his office," *id.,* at 713, and made "in the process of shaping policies and making decisions," *id.,* at 708. Of the estimated 42 million pages of documents and 880 tape recordings whose custody is at stake, the District Court concluded that the appellant's claim of Presidential privilege could apply at most to the 200,000 items with which the appellant was personally familiar.

The appellant bases his claim of Presidential privilege in this case on the assertion that the potential disclosure of

communications given to the appellant in confidence would adversely affect the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking. We are called upon to adjudicate that claim, however, only with respect to the process by which the materials will be screened and catalogued by professional archivists. For any eventual public access will be governed by the guidelines of § 104, which direct the Administrator to take into account "the need to protect any party's opportunity to assert any . . . constitutionally based right or privilege," § 104 (a) (5), and the need to return purely private materials to the appellant, § 104 (a) (7).

In view of these specific directions, there is no reason to believe that the restriction on public access ultimately established by regulation will not be adequate to preserve executive confidentiality. An absolute barrier to all outside disclosure is not practically or constitutionally necessary. As the careful research by the District Court clearly demonstrates, there has never been an expectation that the confidences of the Executive Office are absolute and unyielding. All former Presidents from President Hoover to President Johnson have deposited their papers in Presidential libraries (an example appellant has said he intended to follow) for governmental preservation and eventual disclosure.[12] The

---

[12] The District Court found that in the Hoover Library there are no restrictions on Presidential papers, although some restrictions exist with respect to personal and private materials, and in the Roosevelt Library, less than 0.5% of the materials is restricted. There is no evidence in the record as to the percentage of materials currently under restriction in the Truman or Eisenhower Libraries, but in the Kennedy Library, 85% of the materials has been processed, and of the processed materials, only 0.6% is under donor (as distinguished from security-related) restriction. In the Johnson Library, review of nonclassified materials is virtually complete, and more than 99% of all nonsecurity classified materials is unrestricted. In each of the Presidential libraries, provision has been made for the removal of the restrictions with the passage of time. 408 F. Supp., at 346 n. 31.

screening processes for sorting materials for lodgment in these libraries also involved comprehensive review by archivists, often involving materials upon which access restrictions ultimately have been imposed. 408 F. Supp., at 347. The expectation of the confidentiality of executive communications thus has always been limited and subject to erosion over time after an administration leaves office.

We are thus left with the bare claim that the mere screening of the materials by the archivists will impermissibly interfere with candid communication of views by Presidential advisers.[13] We agree with the District Court that, thus framed, the question is readily resolved. The screening constitutes a very limited intrusion by personnel in the Executive Branch sensitive to executive concerns. These very personnel have performed the identical task in each of the Presidential

---

[13] Aside from the public access eventually to be provided under § 104, the Act mandates two other access routes to the materials. First, under § 102(b), access is available in accordance with lawful process served upon the Administrator. As we have noted, see n. 7, *supra,* the appellant is to be advised prior to any access to the materials, and he is thereafter free to review the specific materials at issue, see § 102 (c); 41 CFR § 105–63.301 (1976), in order to determine whether to assert any rights, privileges, or defenses. Section 102 (b) expressly conditions ultimate access by way of lawful process upon the right of appellant to invoke any rights, defenses, or privileges.

Second, § 102 (d) of the Act states: "Any agency or department in the executive branch of the Federal Government shall at all times have access to the tape recordings and other materials . . . for lawful Government use . . . ." The District Court eschewed a broad reading of that section as permitting wholesale access by any executive official for any conceivable executive purpose. Instead, it construed § 102 (d) in light of Congress' presumed intent that the Act operate within constitutional bounds—an intent manifested throughout the statute, see 408 F. Supp., at 337 n. 15. The District Court thus interpreted § 102(d), and in particular the phrase "lawful use," as requiring that once appellant is notified of requested access by an executive official, see n. 7, *supra,* he be allowed to assert any constitutional right or privilege that in his view would bar access. See 408 F. Supp., at 338 n. 18. We agree with that interpretation.

libraries without any suggestion that such activity has in any way interfered with executive confidentiality. Indeed, in light of this consistent historical practice, past and present executive officials must be well aware of the possibility that, at some time in the future, their communications may be reviewed on a confidential basis by professional archivists. Appellant has suggested no reason why review under the instant Act, rather than the Presidential Libraries Act, is significantly more likely to impair confidentiality, nor has he called into question the District Court's finding that the archivists' "record for discretion in handling confidential material is unblemished." 408 F. Supp., at 347.

Moreover, adequate justifications are shown for this limited intrusion into executive confidentiality comparable to those held to justify the *in camera* inspection of the District Court sustained in *United States* v. *Nixon, supra.* Congress' purposes in enacting the Act are exhaustively treated in the opinion of the District Court. The legislative history of the Act clearly reveals that, among other purposes, Congress acted to establish regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes.[14] An incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current governmental obligations.[15] Nor should the American people's ability to recon-

---

[14] From its exhaustive survey of the legislative history, the District Court concluded that the public interests served by the Act could be merged under "the rubric of preservation of an accurate and complete historical record." *Id.,* at 348–349.

[15] S. Rep. No. 93–1181, pp. 3–5 (1974); H. R. Rep. No. 93–1507, p. 3 (1974); 120 Cong. Rec. 37904 (remarks of Rep. Abzug). See also § 102 (d) of the Act.

Presidents in the past have had to apply to the Presidential libraries of their predecessors for permission to examine records of past govern-

struct and come to terms with their history be truncated by an analysis of Presidential privilege that focuses only on the needs of the present.[16] Congress can legitimately act to rectify the hit-or-miss approach that has characterized past attempts to protect these substantial interests by entrusting the materials to expert handling by trusted and disinterested professionals.

Other substantial public interests that led Congress to seek to preserve appellant's materials were the desire to restore public confidence in our political processes by preserving the materials as a source for facilitating a full airing of the events leading to appellant's resignation, and Congress' need to understand how those political processes had in fact operated in order to gauge the necessity for remedial legislation. Thus by preserving these materials, the Act may be thought to aid the legislative process and thus to be within the scope of Congress' broad investigative power, see, e. g., *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491 (1975). And, of course, the Congress repeatedly referred to the importance of the materials to the Judiciary in the event that they shed light upon issues in civil or criminal litigation, a social

---

mental actions relating to current governmental problems. See 408 F. Supp., at 351–352. Although it appears that most such requests have been granted, Congress could legitimately conclude that the situation was unstable and ripe for change. It is clear from the face of the Act that making the materials available for the ongoing conduct of Presidential policy was at least one of the objectives of the Act. See § 102 (d).

[16] S. Rep. No. 93–1181, pp. 1, 3 (1974); H. R. Rep. No. 93–1507, pp. 2–3, 8 (1974); Hearing on GSA Regulations Implementing Presidential Recordings and Materials Preservation Act before the Senate Committee on Government Operations, 94th Cong., 1st Sess., 256 (1975); 120 Cong. Rec. 31549–31550 (1974) (remarks of Sen. Nelson); *id.,* at 33850–33851; *id.,* at 33863 (remarks of Sen. Ervin); *id.,* at 33874–33875 (remarks of Sen. Huddleston); *id.,* at 33875–33876 (remarks of Sen. Ribicoff); *id.,* at 33876 (remarks of Sen. Muskie); *id.,* at 33964–33965 (remarks of Sen. Nelson); *id.,* at 37900–37901 (remarks of Rep. Brademas). See also §§ 101 (b) (1), 104 (a) (7) of the Act.

interest that cannot be doubted. See *United States* v. *Nixon, supra.*[17]

In light of these objectives, the scheme adopted by Congress for preservation of the appellant's Presidential materials cannot be said to be overbroad. It is true that among the voluminous materials to be screened by archivists are some materials that bear no relationship to any of these objectives (and whose prompt return to appellant is therefore mandated by § 104 (a)(7)). But these materials are commingled with other materials whose preservation the Act requires, for the appellant, like his predecessors, made no systematic attempt to segregate official, personal, and private materials. 408 F. Supp., at 355. Even individual documents and tapes often intermingle communications relating to governmental duties, and of great interest to historians or future policymakers, with private and confidential communications. *Ibid.*

Thus, as in the Presidential libraries, the intermingled state of the materials requires the comprehensive review and classification contemplated by the Act if Congress' important objectives are to be furthered. In the course of that process, the archivists will be required to view the small fraction of the materials that implicate Presidential confidentiality, as well as personal and private materials to be returned to appellant. But given the safeguards built into the Act to prevent disclosure of such materials and the minimal nature of the intrusion into the confidentiality of the Presidency, we believe that the claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes.

---

[17] As to these several objectives of the legislature, see S. Rep. No. 93–1181, pp. 1, 3–4, 6 (1974); H. R. Rep. No. 93–1507, pp. 2–3, 8 (1974); 120 Cong. Rec. 31549–31550 (1974) (remarks of Sen. Nelson); *id.,* at 33849–33851; *id.,* at 37900–37901 (remarks of Rep. Brademas); *id.,* at 37905 (remarks of Rep. McKinney). See also §§ 102 (b), 104 (a) of the Act.

In short, we conclude that the screening process contemplated by the Act will not constitute a more severe intrusion into Presidential confidentiality than the *in camera* inspection by the District Court approved in *United States* v. *Nixon,* 418 U. S., at 706. We must, of course, presume that the Administrator and the career archivists concerned will carry out the duties assigned to them by the Act. Thus, there is no basis for appellant's claim that the Act "reverses" the presumption in favor of confidentiality of Presidential papers recognized in *United States* v. *Nixon.* Appellant's right to assert the privilege is specifically preserved by the Act. The guideline provisions on their face are as broad as the privilege itself. If the broadly written protections of the Act should nevertheless prove inadequate to safeguard appellant's rights or to prevent usurpation of executive powers, there will be time enough to consider that problem in a specific factual context. For the present, we hold, in agreement with the District Court, that the Act on its face does not violate the Presidential privilege.

## V

### *Privacy*

Appellant concedes that when he entered public life he voluntarily surrendered the privacy secured by law for those who elect not to place themselves in the public spotlight. See, *e. g., New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964). He argues, however, that he was not thereby stripped of all legal protection of his privacy, and contends that the Act violates fundamental rights of expression and privacy guaranteed to him by the First, Fourth, and Fifth Amendments.[18]

---

[18] Insofar as appellant argues a privacy claim based upon the First Amendment, see Part VI, *infra.* In joining this part of the opinion, MR. JUSTICE STEWART adheres to his views on privacy as expressed in his concurring opinion in *Whalen* v. *Roe,* 429 U. S. 589, 607 (1977).

The District Court treated appellant's argument as addressed only to the process by which the screening of the materials will be performed. "Since any claim by [appellant] that his privacy will be invaded by public access to private materials must be considered premature when it must actually be directed to the regulations once they become effective, we need not consider how the materials will be treated after they are reviewed." 408 F. Supp., at 358. Although denominating the privacy claim "[t]he most troublesome challenge that plaintiff raises . . . ," *id.*, at 357, the District Court concluded that the claim was without merit. The court reasoned that the proportion of the 42 million pages of documents and 880 tape recordings implicating appellant's privacy interests was quite small since the great bulk of the materials related to appellant's conduct of his duties as President, and were therefore materials to which great public interest attached. The touchstone of the legality of the archival processing, in the District Court's view, was its reasonableness. Balancing the public interest in preserving the materials touching appellant's performance of his official duties against the invasion of appellant's privacy that archival screening necessarily entails, the District Court concluded that the Act was not unreasonable and hence not facially unconstitutional:

> "Here, we have a processing scheme without which national interests of overriding importance cannot be served . . . ." *Id.*, at 364.

Thus, the Act "is a reasonable response to the difficult problem caused by the mingling of personal and private documents and conversations in the midst of a vastly greater number of nonprivate documents and materials related to government objectives. The processing contemplated by the Act—at least as narrowed by carefully tailored regulations—represents the least intrusive manner in which to provide an adequate level of promotion of government interests of over-

riding importance." *Id.*, at 367. We agree with the District Court that the Act does not unconstitutionally invade appellant's right of privacy.

One element of privacy has been characterized as "the individual interest in avoiding disclosure of personal matters . . . ." *Whalen* v. *Roe,* 429 U. S. 589, 599 (1977). We may agree with appellant that, at least when Government intervention is at stake, public officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity. Presidents who have established Presidential libraries have usually withheld matters concerned with family or personal finances, or have deposited such materials with restrictions on their screening. 408 F. Supp., at 360.[19] We may assume with the District

---

[19] The District Court, 408 F. Supp., at 360 n. 54, surveyed evidence in the record respecting depository restrictions for all Presidents since President Hoover. It is unclear whether President Hoover actually excluded any of his personal and private materials from the scope of his gift, although his offer to deposit materials in a Presidential library reserved the right to do so. President Franklin D. Roosevelt also indicated his intention to select certain materials from his papers to be retained by his family. Because of his death, this function was performed by designated individuals and by his secretary. Again the record is unclear as to how many materials were removed. A number of personal documents deemed to be personal family correspondence were turned over to the Roosevelt family library in 1948, later returned to the official library in 1954–1955, and have been on loan to the family since then. It is unclear to what extent these materials were reviewed by the library personnel.

President Truman withheld from deposit the personal file maintained in the White House by his personal secretary. This file was deposited with the library upon his death in 1974, although the terms of his will excluded a small number of items determined by the executors of his will to pertain to personal or business affairs of the Truman family. President Eisenhower's offer to deposit his Presidential materials excluded materials determined by him or his representative to be personal or private. President Kennedy's materials deposited with GSA did not include certain

Court, for the purposes of this case, that this pattern of *de facto* Presidential control and congressional acquiescence gives rise to appellant's legitimate expectation of privacy in such materials. *Katz* v. *United States,* 389 U. S. 347, 351–353 (1967).[20] This expectation is independent of the question of ownership of the materials, an issue we do not reach. See n. 8, *supra.* But the merit of appellant's claim of invasion of his privacy cannot be considered in the abstract; rather, the claim must be considered in light of the specific provisions of the Act, and any intrusion must be weighed against the public interest in subjecting the Presidential materials of appellant's administration to archival screening. *Camara* v. *Municipal Court,* 387 U. S. 523, 534–539 (1967); *Terry* v. *Ohio,* 392 U. S. 1, 21 (1968).[21] Under this test, the privacy interest asserted by appellant is weaker than that found wanting in the recent decision of *Whalen* v. *Roe, supra.* Emphasizing the precautions utilized by New York State to prevent the unwarranted disclosure of private medical information retained in a state computer bank system, *Whalen* rejected a constitutional objection to New York's program on privacy grounds. Not only does the Act challenged here mandate regulations similarly aimed at preventing undue dissemination of private materials but, unlike *Whalen,* the Government will not even retain long-term control over

materials relating to his private affairs, and some recordings of meetings involving President Kennedy, although physically stored in the Kennedy Library, have not yet been turned over to the library or reviewed by Government archivists. President Johnson's offer to deposit materials excluded items which he determined to be of special or private interest pertaining to personal or family affairs.

[20] Even if prior Presidents had declined to assert their privacy interests in such materials, their failure to do so would not necessarily bind appellant, for privacy interests are not solely dependent for their constitutional protection upon established practice of governmental toleration.

[21] We agree with the District Court that the Fourth Amendment's warrant requirement is not involved. 408 F. Supp., at 361–362.

such private information; rather, purely private papers and recordings will be returned to appellant under § 104 (a)(7) of the Act.

The overwhelming bulk of the 42 million pages of documents and the 880 tape recordings pertain, not to appellant's private communications, but to the official conduct of his Presidency. Most of the 42 million pages were prepared and seen by others and were widely circulated within the Government. Appellant concedes that he saw no more than 200,000 items, and we do not understand him to suggest that his privacy claim extends to items he never saw. See *United States* v. *Miller*, 425 U. S. 435 (1976). Further, it is logical to assume that the tape recordings made in the Presidential offices primarily relate to the conduct and business of the Presidency. And, of course, appellant cannot assert any privacy claim as to the documents and tape recordings that he has already disclosed to the public. *United States* v. *Dionisio*, 410 U. S. 1, 14 (1973); *Katz* v. *United States, supra,* at 351. Therefore, appellant's privacy claim embracing, for example, "extremely private communications between him and, among others, his wife, his daughters, his physician, lawyer, and clergyman, and his close friends, as well as personal diary dictabelts and his wife's personal files," 408 F. Supp., at 359, relates only to a very small fraction of the massive volume of official materials with which they are presently commingled.[22]

---

[22] Some materials are still in appellant's possession, as the Administrator has not yet attempted to act on his authority under § 101 (b)(1) to take custody of them. See Brief for Federal Appellees 4 n. 1. Moreover, the Solicitor General conceded at oral argument that there are certain purely private materials which "should be returned to [appellant] once . . identified." Tr. of Oral Arg. 58–59. The District Court enjoined the Government from "processing, disclosing, inspecting, transferring, or otherwise disposing of any materials . . . which might fall within the coverage of . . . the . . . Act. . . ." 408 F. Supp., at 375. As the District Court's stay is no longer in effect, the Government should now promptly disclaim any interest in materials conceded to be appellant's purely private communications and deliver them to him.

The fact that appellant may assert his privacy claim as to only a small fraction of the materials of his Presidency is plainly relevant in judging the reasonableness of the screening process contemplated by the Act, but this of course does not, without more, require rejection of his privacy argument. *Id.*, at 359. Although the Act requires that the regulations promulgated by the Administrator under § 104 (a) take into account appellant's legally and constitutionally based rights and privileges, presumably including his privacy rights, § 104 (a)(5), and also take into account the need to return to appellant his private materials, § 104 (a)(7),[23] the identity and separation of these purely private matters can be achieved, as all parties concede, only by screening all of the materials.

Appellant contends that the Act therefore is tantamount to a general warrant authorizing search and seizure of all of his Presidential "papers and effects." Such "blanket authority," appellant contends, is precisely the kind of abuse that the Fourth Amendment was intended to prevent, for " 'the real evil aimed at by the Fourth Amendment is the search itself, that invasion of a man's privacy which consists [in] rummaging about among his effects to secure evidence against him.' " Brief for Appellant 148, quoting *United States* v. *Poller*, 43 F. 2d 911, 914 (CA2 1930). Thus, his brief continues, at 150–151:

> "[Appellant's] most private thoughts and communications, both written and spoken, will be exposed to and reviewed by a host of persons whom he does not know and

---

[23] The Solicitor General implied at oral argument that the requirement of the guidelines directing the Administrator to consider the need to return to appellant "for his sole custody and use . . . materials which are not [Watergate related] . . . and are not otherwise of general historical significance," § 104 (a)(7), is further qualified by the requirement under §§ 102 (b) and 104 (a)(5), that the regulations promulgated by the Administrator take into account the need to protect appellant's rights. defenses, or privileges. Tr. of Oral Arg. 37–38.

did not select, and in whom he has no reason to place his confidence. This group will decide what is personal, to be returned to [him], and what is historical, to be opened for public review." [24]

Appellant principally relies on *Stanford* v. *Texas*, 379 U. S. 476 (1965), but that reliance is misplaced. *Stanford* invalidated a search aimed at obtaining evidence that an individual had violated a "sweeping and many-faceted law which, among other things, outlaws the Communist Party and creates various individual criminal offenses, each punishable by imprisonment for up to 20 years." *Id.*, at 477. The search warrant authorized a search of his private home for books, records, and other materials concerning illegal Communist activities. After spending more than four hours in Stanford's house, police officers seized half of his books which included works by Sartre, Marx, Pope John XXIII, Mr. Justice Hugo Black, Theodore Draper, and Earl Browder, as well as private documents including a marriage certificate, insurance policies, household bills and receipts, and personal correspondence. *Id.*, at 479–480. *Stanford* held this to be an unconstitutional general search.

The District Court concluded that the Act's provisions for

---

[24] Appellant argues that screening under the Act contrasts with the screening procedures followed by earlier Presidents who, "in donating materials to Presidential libraries, have been able . . . to participate in the selection of persons who would review the materials for classification purposes." Brief for Appellant 151 n. 68. We are unable to say that the record substantiates this assertion. The record is most complete with respect to President Johnson, who appears to have recommended the individual who was later selected as Director of the Johnson Library, but seems not to have played any role in the selection of the archivists actually performing the day-to-day processing. 408 F. Supp., at 365 n. 60. Moreover, we agree with the District Court that it is difficult to see how professional archivists performing a screening task under proper standards would be meaningfully affected in the performance of their duties by loyalty to individuals or institutions. *Ibid.*

custody and screening could not be analogized to a general search and that *Stanford,* therefore, did not require the Act's invalidation. 408 F. Supp., at 366–367, n. 63. We agree. Only a few documents among the vast quantity of materials seized in *Stanford* were even remotely related to any legitimate government interest. This case presents precisely the opposite situation: the vast proportion of appellant's Presidential materials are official documents or records in which appellant concedes the public has a recognized interest. Moreover, the Act provides procedures and orders the promulgation of regulations expressly for the purpose of minimizing the intrusion into appellant's private and personal materials. Finally, the search in *Stanford* was an intrusion into an individual's home to search and seize personal papers in furtherance of a criminal investigation and designed for exposure in a criminal trial. In contrast, any intrusion by archivists into appellant's private papers and effects is undertaken with the sole purpose of separating private materials to be returned to appellant from nonprivate materials to be retained and preserved by the Government as a record of appellant's Presidency.

Moreover, the screening will be undertaken by Government archivists with, as the District Court noted, "an unblemished record for discretion," 408 F. Supp., at 365. That review can hardly differ materially from that contemplated by appellant's intention to establish a Presidential library, for Presidents who have established such libraries have found that screening by professional archivists was essential. Although the District Court recognized that this contemplation of archival review would not defeat appellant's expectation of privacy, the court held that it does indicate that "in the special situation of documents accumulated by a President during his tenure and reviewed by professional government personnel, pursuant to a process employed by past Presidents, any intrusion into privacy interests is less substantial than it might appear at first." *Ibid.* (citation omitted).

The District Court analogized the screening process contemplated by the Act to electronic surveillance conducted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510 *et seq.* 408 F. Supp., at 363. We think the analogy is apt. There are obvious similarities between the two procedures. Both involve the problem of separating intermingled communications, (1) some of which are expected to be related to legitimate Government objectives, (2) some of which are not, and (3) for which there is no means to segregate the one from the other except by reviewing them all. Thus the screening process under the Act, like electronic surveillance, requires some intrusion into private communications unconnected with any legitimate governmental objectives. Yet this fact has not been thought to render surveillance under the Omnibus Act unconstitutional. Cf., *e. g., United States* v. *Donovan,* 429 U. S. 413 (1977); *Berger* v. *New York,* 388 U. S. 41 (1967). See also 408 F. Supp., at 363–364.

Appellant argues that this analogy is inappropriate because the electronic surveillance procedure was carefully designed to meet the constitutional requirements enumerated in *Berger* v. *New York, supra,* including (1) prior judicial authorization, (2) specification of particular offenses said to justify the intrusion, (3) specification "with particularity" of the conversations sought to be seized, (4) minimization of the duration of the wiretap, (5) termination once the conversation sought is seized, and (6) a showing of exigent circumstances justifying use of the wiretap procedure. Brief for Appellant 157. Although the parallel is far from perfect, we agree with the District Court that many considerations supporting the constitutionality of the Omnibus Act also argue for the constitutionality of this Act's materials screening process. For example, the Omnibus Act permits electronic surveillance only to investigate designated crimes that are serious in nature, 18 U. S. C. § 2516, and only when normal investigative techniques have failed or are likely to do so, § 2518 (3)(c). Similarly,

the archival review procedure involved here is designed to serve important national interests asserted by Congress, and the unavailability of less restrictive means necessarily follows from the commingling of the documents.[25]  Similarly, just as the Omnibus Act expressly requires that interception of non-relevant communications be minimized, § 2518 (5), the Act's screening process is designed to minimize any privacy intrusions, a goal that is further reinforced by regulations which must take those interests into account.[26]  The fact that apparently only a minute portion of the materials implicates appellant's privacy interests [27] also negates any conclusion that

[25] Appellant argues that, unlike electronic surveillance, where success depends upon the subject's ignorance of its existence, appellant could have been allowed to separate his personal from official materials.  But Congress enacted the Act in part to displace the Nixon-Sampson agreement that expressly provided for automatic destruction of the tape recordings in the event of appellant's death and that allowed appellant complete discretion in the destruction of materials after the initial three-year storage period.

Moreover, appellant's view of what constitutes official as distinguished from personal and private materials might differ from the view of Congress, the Executive Branch, or a reviewing court.  Not only may the use of disinterested archivists lead to application of uniform standards in separating private from nonprivate communications, but the Act provides for judicial review of their determinations.  This would not be the case as to appellant's determinations.

[26] The District Court found, 408 F. Supp., at 364 n. 58, and we agree, that it is irrelevant that Title III, unlike this Act, requires adherence to a detailed warrant requirement, 18 U. S. C. § 2518.  That requirement is inapplicable to this Act, since we deal not with standards governing a generalized right to search by law enforcement officials or other Government personnel but with a particularized legislative judgment, supplemented by judicial review, similar to condemnation under the power of eminent domain, that certain materials are of value to the public.

[27] The fact that the overwhelming majority of the materials is relevant to Congress' lawful objectives is in contrast to the experience under the Omnibus Crime Control Act.  A recent report on surveillance conducted under the Omnibus Act indicates that for the calendar year 1976 more than one-half of all wire intercepts authorized by judicial order

the screening process is an unreasonable solution to the problem of separating commingled communications.

In sum, appellant has a legitimate expectation of privacy in his personal communications. But the constitutionality of the Act must be viewed in the context of the limited intrusion of the screening process, of appellant's status as a public figure, of his lack of any expectation of privacy in the overwhelming majority of the materials, of the important public interest in preservation of the materials, and of the virtual impossibility of segregating the small quantity of private materials without comprehensive screening. When this is combined with the Act's sensitivity to appellant's legitimate privacy interests, see § 104 (a)(7), the unblemished record of the archivists for discretion, and the likelihood that the regulations to be promulgated by the Administrator will further moot appellant's fears that his materials will be reviewed by "a host of persons," [28] Brief for Appellant 150, we are compelled to agree with the District Court that appellant's privacy claim is without merit.

## VI

### *First Amendment*

During his Presidency appellant served also as head of his national political party and spent a substantial portion of

yielded only nonincriminating communications. Administrative Office of the U. S. Courts, Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications, Jan. 1, 1976, to Dec. 31, 1976, p. XII (Table 4).

[28] Throughout this litigation appellant has claimed that his privacy will necessarily be unconstitutionally invaded because the screening requires a staff of "over one hundred archivists, accompanied by lawyers, technicians and secretaries [who] will have a right to review word-by-word five and one-half years of a man's life . . . ." Tr. of Oral Arg. 16. The size of the staff is, of course, necessarily a function of the enormous quantity of materials involved. But clearly not all engaged in the screening will examine each document. The Administrator initially proposed that only one archivist examine most documents. See 408 F. Supp., at 365 n. 59.

his working time on partisan political matters. Records arising from his political activities, like his private and personal records, are not segregated from the great mass of materials. He argues that the Act's archival screening process therefore necessarily entails invasion of his constitutionally protected rights of associational privacy and political speech. As summarized by the District Court: "It is alleged that the Act invades the private formulation of political thought critical to free speech and association, imposing sanctions upon past expressive activity, and more significantly, limiting that of the future because individuals who learn the substance of certain private communications by [appellant]—especially those critical of themselves—will refuse to associate with him. The Act is furthermore said to chill [his] expression because he will be 'saddled' with prior positions communicated in private, leaving him unable to take inconsistent positions in the future." 408 F. Supp., at 367–368.

The District Court, viewing these arguments as in essence a claim that disclosure of the materials violated appellant's associational privacy, and therefore as not significantly different in structure from appellant's privacy claim, again treated the arguments as limited to the constitutionality of the Act's screening process. *Id.,* at 368. As was true with respect to the more general privacy challenge, only a fraction of the materials can be said to raise a First Amendment claim. Nevertheless, the District Court acknowledged that appellant would "appear . . . to have a legitimate expectation that he would have an opportunity to remove some of the sensitive political documents before any government screening took place." *Ibid.* The District Court concluded, however, that there was no reason to believe that the mandated regulations when promulgated would not adequately protect against public access to materials implicating appellant's privacy in political association, and that "any burden arising solely from review by professional and discreet archivists is not significant." The court therefore held that the Act does not signifi-

cantly interfere with or chill appellant's First Amendment rights. *Id.*, at 369. We agree with the District Court's conclusion.

It is, of course, true that involvement in partisan politics is closely protected by the First Amendment, *Buckley* v. *Valeo,* 424 U. S. 1 (1976), and that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.*, at 64. But a compelling public need that cannot be met in a less restrictive way will override those interests, *Kusper* v. *Pontikes,* 414 U. S. 51, 58–59 (1973); *United States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968); *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960), "particularly when the 'free functioning of our national institutions' is involved." *Buckley* v. *Valeo, supra,* at 66. Since no less restrictive way than archival screening has been suggested as a means for identification of materials to be returned to appellant, the burden of that screening is presently the measure of his First Amendment claim. *Id.*, at 84. The extent of any such burden, however, is speculative in light of the Act's terms protecting appellant from improper public disclosures and guaranteeing him full judicial review before any public access is permitted. §§ 104 (a)(5), 104 (a)(7), 105 (a).[29] As the District Court concluded, the First Amendment

---

[29] Appellant argues that *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–151 (1969); *Cox* v. *Louisiana,* 379 U. S. 536 (1965); *Staub* v. *Baxley,* 355 U. S. 313, 319–321 (1958); *Thomas* v. *Collins,* 323 U. S. 516, 538–541 (1945); and *Lovell* v. *Griffin,* 303 U. S. 444, 452–453 (1938), support his contention that "[a] statute which vests such broad authority [with respect to First Amendment rights] is unconstitutional on its face, and the party subjected to it may treat it as a nullity *even if its actual implementation would not harm him.*" Brief for Appellant 169. The argument is without merit. Those cases involved regulations that permitted public officials in their arbitrary discretion to impose prior restraints on expressional or associational activities. In contrast, the Act is concerned only with materials that record past activities and with a screening process guided by longstanding archival screening standards.

claim is clearly outweighed by the important governmental interests promoted by the Act.

For the same reasons, we find no merit in appellant's argument that the Act's scheme for custody and archival screening of the materials "necessarily inhibits [the] freedom of political activity [of future Presidents] and thereby reduces the 'quantity and diversity' of the political speech and association that the Nation will be receiving from its leaders." Brief for Appellant 168. It is significant, moreover, that this concern has not deterred President Ford from signing the Act into law, or President Carter from urging this Court's affirmance of the judgment of the District Court.

## VII

### *Bill of Attainder Clause*

### A

Finally, we address appellant's argument that the Act constitutes a bill of attainder proscribed by Art. I, § 9, of the Constitution.[30] His argument is that Congress acted on the premise that he had engaged in " 'misconduct,' " was an " 'unreliable custodian' " of his own documents, and generally was deserving of a *"legislative judgment* of blameworthiness," Brief for Appellant 132–133. Thus, he argues, the Act is pervaded with the key features of a bill of attainder: a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial. See *United States* v. *Brown*, 381

---

[30] Article I, § 9, applicable to Congress, provides that "[n]o Bill of Attainder or ex post facto Law shall be passed," and Art. I, § 10, applicable to the States, provides that "[n]o State shall . . . pass any Bill of Attainder, ex post facto Law . . . ." The linking of bills of attainder and *ex post facto* laws is explained by the fact that a legislative denunciation and condemnation of an individual often acted to impose retroactive punishment. See Z. Chafee, Jr., Three Human Rights in the Constitution of 1787, pp. 92–93 (1956).

U. S. 437, 445, 447 (1965); *United States* v. *Lovett,* 328 U. S. 303, 315–316 (1946); *Ex parte Garland,* 4 Wall. 333, 377 (1867); *Cummings* v. *Missouri,* 4 Wall. 277, 323 (1867).

Appellant's argument relies almost entirely upon *United States* v. *Brown, supra,* the Court's most recent decision addressing the scope of the Bill of Attainder Clause. It is instructive, therefore, to sketch the broad outline of that case. *Brown* invalidated § 504 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U. S. C. § 504, that made it a crime for a Communist Party member to serve as an officer of a labor union. After detailing the infamous history of bills of attainder, the Court found that the Bill of Attainder Clause was an important ingredient of the doctrine of "separation of powers," one of the organizing principles of our system of government. 381 U. S., at 442–443. Just as Art. III confines the Judiciary to the task of adjudicating concrete "cases or controversies," so too the Bill of Attainder Clause was found to "reflect . . . the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons." 381 U. S., at 445. *Brown* thus held that § 504 worked a bill of attainder by focusing upon easily identifiable members of a class—members of the Communist Party—and imposing on them the sanction of mandatory forfeiture of a job or office, long deemed to be punishment within the contemplation of the Bill of Attainder Clause. See, *e. g., United States* v. *Lovett, supra,* at 316; *Cummings* v. *Missouri, supra,* at 320.

*Brown, Lovett,* and earlier cases unquestionably gave broad and generous meaning to the constitutional protection against bills of attainder. But appellant's proposed reading is far broader still. In essence, he argues that *Brown* establishes that the Constitution is offended whenever a law imposes undesired consequences on an individual or on a class

that is not defined at a proper level of generality. The Act in question therefore is faulted for singling out appellant, as opposed to all other Presidents or members of the Government, for disfavored treatment.

Appellant's characterization of the meaning of a bill of attainder obviously proves far too much. By arguing that an individual or defined group is attainted whenever he or it is compelled to bear burdens which the individual or group dislikes, appellant removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment. His view would cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality.[31] Furthermore, every person or group made subject to legislation which he or it finds burdensome may subjectively feel, and can complain, that he or it is being subjected to unwarranted punishment. *United States* v. *Lovett, supra,* at 324 (Frankfurter, J., concurring).[32]

---

[31] In this case, for example, appellant faults the Act for taking custody of his papers but not those of other Presidents. Brief for Appellant 130. But even a congressional definition of the class consisting of all Presidents would have been vulnerable to the claim of being overly specific, since the definition might more generally include all members of the Executive Branch, or all members of the Government, or all in possession of Presidential papers, or all in possession of Government papers. This does not dispose of appellant's contention that the Act focuses upon him with the requisite degree of specificity for a bill of attainder, see *infra,* at 471–472, but it demonstrates that simple reference to the breadth of the Act's focus cannot be determinative of the reach of the Bill of Attainder Clause as a limitation upon legislative action that disadvantages a person or group. See, *e. g., United States* v. *Brown,* 381 U. S. 437, 474–475 (1965) (WHITE, J., dissenting); n. 34, *infra.*

[32] "The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed. But there may be reasons other than punitive for such deprivation."

However expansive the prohibition against bills of attainder, it surely was not intended to serve as a variant of the equal protection doctrine,[33] invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals.[34] In short, while the Bill of Attainder Clause serves as an important "bulwark against tyranny," *United States* v. *Brown*, 381 U. S., at 443, it does not do so by limiting Congress to the choice of legislating for the universe, or legislating only benefits, or not legislating at all.

Thus, in the present case, the Act's specificity—the fact that

[33] We observe that appellant originally argued that "for similar reasons" the Act violates both the Bill of Attainder Clause and equal protection of the laws. Jurisdictional Statement 27–28. He has since abandoned reliance upon the equal protection argument, apparently recognizing that mere underinclusiveness is not fatal to the validity of a law under the equal protection component of the Fifth Amendment, *New Orleans* v. *Dukes*, 427 U. S. 297 (1976); *Katzenbach* v. *Morgan*, 384 U. S. 641, 657 (1966), even if the law disadvantages an individual or identifiable members of a group, see, *e. g.*, *Williamson* v. *Lee Optical Co.*, 348 U. S. 483 (1955) (opticians); *Daniel* v. *Family Ins. Co.*, 336 U. S. 220 (1949) (insurance agents). "For similar reasons" the mere specificity of a law does not call into play the Bill of Attainder Clause. Cf. Comment, The Supreme Court's Bill of Attainder Doctrine: A Need for Clarification, 54 Calif. L. Rev. 212, 234–236 (1966); but see Comment, The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause, 72 Yale L. J. 330 (1962).

[34] *Brown* recognized this by making clear that conflict-of-interest laws, which inevitably prohibit conduct on the part of designated individuals or classes of individuals, do not contravene the bill of attainder guarantee. *Brown* specifically noted the validity of § 32 of the Banking Act of 1933, 12 U. S. C. § 78, which disqualified identifiable members of a group—officers and employees of underwriting organizations—from serving as officers of Federal Reserve banks, 381 U. S., at 453. Other valid federal conflict-of-interest statutes which also single out identifiable members of groups to bear burdens or disqualifications are collected, *id.*, at 467–468, n. 2 (WHITE, J., dissenting). See also *Regional Rail Reorganization Act Cases*, 419 U. S. 102 (1974) (upholding transfer of rail properties of eight railroad companies to Government-organized corporation).

it refers to appellant by name—does not automatically offend the Bill of Attainder Clause. Indeed, viewed in context, the focus of the enactment can be fairly and rationally understood. It is true that Title I deals exclusively with appellant's papers. But Title II casts a wider net by establishing a special commission to study and recommend appropriate legislation regarding the preservation of the records of future Presidents and all other federal officials. In this light, Congress' action to preserve only appellant's records is easily explained by the fact that at the time of the Act's passage, only his materials demanded immediate attention. The Presidential papers of all former Presidents from Hoover to Johnson were already housed in functioning Presidential libraries. Congress had reason for concern solely with the preservation of appellant's materials, for he alone had entered into a depository agreement, the Nixon-Sampson agreement, which by its terms called for the destruction of certain of the materials. Indeed, as the federal appellees argue, "appellant's depository agreement . . . created an imminent danger that the tape recordings would be destroyed if appellant, who had contracted phlebitis, were to die." Brief for Federal Appellees 41. In short, appellant constituted a legitimate class of one, and this provides a basis for Congress' decision to proceed with dispatch with respect to his materials while accepting the status of his predecessors' papers and ordering the further consideration of generalized standards to govern his successors.

Moreover, even if the specificity element were deemed to be satisfied here, the Bill of Attainder Clause would not automatically be implicated. Forbidden legislative punishment is not involved merely because the Act imposes burdensome consequences. Rather, we must inquire further whether Congress, by lodging appellant's materials in the custody of the General Services Administration pending their screening by Government archivists and the promulgation of further regulations, "inflict[ed] punishment" within the constitu-

tional proscription against bills of attainder. *United States* v. *Lovett*, 328 U. S., at 315; see also *United States* v. *Brown*, *supra*, at 456–460; *Cummings* v. *Missouri*, 4 Wall., at 320.

## B

### 1

The infamous history of bills of attainder is a useful starting point in the inquiry whether the Act fairly can be characterized as a form of punishment leveled against appellant. For the substantial experience of both England and the United States with such abuses of parliamentary and legislative power offers a ready checklist of deprivations and disabilities so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of Art. I; § 9. A statutory enactment that imposes any of those sanctions on named or identifiable individuals would be immediately constitutionally suspect.

In England a bill of attainder originally connoted a parliamentary Act sentencing a named individual or identifiable members of a group to death.[35] Article I, § 9, however, also

---

[35] See, for example, the 1685 attainder of James, Duke of Monmouth, for high treason: "WHEREAS James duke of Monmouth has in an hostile manner invaded this kingdom, and is now in open rebellion, levying war against the king, contrary to the duty of his allegiance; Be it enacted by the King's most excellent majesty, by and with the advice and consent of the lords spiritual and temporal, and commons in this parliament assembled, and by the authority of the same, That the said *James* duke of *Monmouth* stand and be convicted and attainted of high treason, and that he suffer pains of death, and incur all forfeitures as a traitor convicted and attainted of high treason." 1 Jac. 2, c. 2 (1685) (emphasis omitted).

The attainder of death was usually accompanied by a forfeiture of the condemned person's property to the King and the corruption of his blood, whereby his heirs were denied the right to inherit his estate. Blackstone traced the practice of *"corruption of blood"* to the Norman conquest He considered the practice an "oppressive mark of feudal

proscribes enactments originally characterized as bills of pains and penalties, that is, legislative Acts inflicting punishment other than execution. *United States* v. *Lovett, supra,* at 323–324 (Frankfurter, J., concurring); *Cummings* v. *Missouri, supra,* at 323; Z. Chafee, Jr., Three Human Rights in the Constitution of 1787, p. 97 (1956). Generally addressed to persons considered disloyal to the Crown or State, "pains and penalties" historically consisted of a wide array of punishments: commonly included were imprisonment,[36] banishment,[37] and the punitive confiscation of property by the sovereign.[38] Our country's own experience with bills of attainder resulted in the addition of another sanction to the list of impermissible legislative punishments: a legislative enactment barring designated individuals or groups from participation in specified employments or vocations, a mode of punishment commonly employed against those legislatively branded as disloyal. See, *e. g., Cummings* v. *Missouri, supra* (barring

---

tenure" and hoped that it "may in process of time be abolished by act of parliament." 4 W. Blackstone Commentaries *388. The Framers of the United States Constitution responded to this recommendation. Art. III, § 3.

[36] See, *e. g.,* 10 & 11 Will. 3, c. 13 (1701): "An Act for continuing the Imprisonment of *Counter* and others, for the late horrid Conspiracy to assassinate the Person of his sacred Majesty."

[37] See, *e. g., Cooper* v. *Telfair,* 4 Dall. 14 (1800) (" 'all and every the persons, named and included in the said act [declaring persons guilty of treason] are banished from the said state [Georgia]' "); 2 R. Wooddeson, A Systematical View of the Laws of England 638–639 (1792) (banishment of Lord Clarendon and the Bishop Atterbury). See *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 168, n. 23 (1963).

[38] Following the Revolutionary War, States often seized the property of alleged Tory sympathizers. See, *e. g., James's Claim,* 1 Dall. 47 (1780) ("*John Parrock* was attainted of *High Treason,* and his estate seized and advertised for sale"); *Respublica* v. *Gordon,* 1 Dall. 233 (1788) ("attainted of treason for adhering to the king of *Great Britain,* in consequence of which his estate was confiscated to the use of the commonwealth . . .").

clergymen from ministry in the absence of subscribing to a loyalty oath); *United States* v. *Lovett, supra* (barring named individuals from Government employment); *United States* v. *Brown, supra* (barring Communist Party members from offices in labor unions).

Needless to say, appellant cannot claim to have suffered any of these forbidden deprivations at the hands of the Congress. While it is true that Congress ordered the General Services Administration to retain control over records that appellant claims as his property,[39] § 105 of the Act makes provision for an award by the District Court of "just compensation." This undercuts even a colorable contention that the Government has punitively confiscated appellant's property, for the "owner [thereby] is to be put in the same position monetarily as he would have occupied if his property had not been taken." *United States* v. *Reynolds,* 397 U. S. 14, 16 (1970); accord, *United States* v. *Miller,* 317 U. S. 369, 373 (1943). Thus, no feature of the challenged Act falls within the historical meaning of legislative punishment.

### 2

But our inquiry is not ended by the determination that the Act imposes no punishment traditionally judged to be prohibited by the Bill of Attainder Clause. Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee. The Court, therefore, often has looked beyond mere historical experience and has applied a functional test of the existence of punishment, analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive

---

[39] In fact, it remains unsettled whether the materials in question are the property of appellant or of the Government. See n. 8, *supra.*

legislative purposes.[40]  *Cummings* v. *Missouri,* 4 Wall., at 319–320; *Hawker* v. *New York,* 170 U. S. 189, 193–194 (1898); *Dent* v. *West Virginia,* 129 U. S. 114, 128 (1889); *Trop* v. *Dulles,* 356 U. S. 86, 96–97 (1958) (plurality opinion); *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 168–169 (1963). Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers.

Application of the functional approach to this case leads to rejection of appellant's argument that the Act rests upon a congressional determination of his blameworthiness and a desire to punish him. For, as noted previously, see *supra,* at 452–454, legitimate justifications for passage of the Act are readily apparent. First, in the face of the Nixon-Sampson agreement which expressly contemplated the destruction of some of appellant's materials, Congress stressed the need to preserve "[i]nformation included in the materials of former President Nixon [that] is needed to complete the prosecutions

---

[40] In determining whether punitive or nonpunitive objectives underlie a law, *United States* v. *Brown* established that punishment is not restricted purely to retribution for past events, but may include inflicting deprivations on some blameworthy or tainted individual in order to prevent his future misconduct. 381 U. S., at 458–459. This view is consistent with the traditional purposes of criminal punishment, which also include a preventive aspect. See, *e. g.,* H. Packer, The Limits of the Criminal Sanction 48–61 (1968). In *Brown* the element of punishment was found in the fact that "the purpose of the statute before us is to purge the governing boards of labor unions of those whom Congress regards as guilty of subversive acts and associations and therefore unfit to fill [union] positions . . . ." 381 U. S., at 460. Thus, *Brown* left undisturbed the requirement that one who complains of being attainted must establish that the legislature's action constituted punishment and not merely the legitimate regulation of conduct. Indeed, just three Terms later, *United States* v. *O'Brien,* 391 U. S. 367, 383 n. 30 (1968), which, like *Brown,* was also written by Mr. Chief Justice Warren, reconfirmed the need to examine the purposes served by a purported bill of attainder in determining whether it in fact represents a punitive law.

of Watergate-related crimes." H. R. Rep. No. 93–1507, p. 2 (1974). Second, again referring to the Nixon-Sampson agreement, Congress expressed its desire to safeguard the "public interest in gaining appropriate access to materials of the Nixon Presidency which are of general historical significance. The information in these materials will be of great value to the political health and vitality of the United States." *Ibid.*[41] Indeed, these same objectives are stated in the text of the Act itself, § 104 (a), note following 44 U. S. C. § 2107 (1970 ed., Supp. V), where Congress instructs the General Services Administration to promulgate regulations that further these ends and at the same time protect the constitutional and legal rights of any individual adversely affected by the Administrator's retention of appellant's materials.

Evaluated in terms of these asserted purposes, the law plainly must be held to be an act of nonpunitive legislative policymaking. Legislation designed to guarantee the availability of evidence for use at criminal trials is a fair exercise of Congress' responsibility to the "due process of law in the fair administration of criminal justice," *United States* v. *Nixon,* 418 U. S., at 713, and to the functioning of our adversary legal system which depends upon the availability of relevant evidence in carrying out its commitments both to fair play and to the discovery of truth within the bounds set by law. *Branzburg* v. *Hayes,* 408 U. S. 665, 688 (1972); *Blackmer* v. *United States,* 284 U. S. 421, 438 (1932); *Blair* v. *United States,* 250 U. S. 273, 281 (1919). Similarly, Congress' in-

---

[41] The Senate pointed to these same objectives in nullifying the Nixon-Sampson agreement: "[1] To begin with, prosecutors, defendants, and the courts probably would be deprived of crucial evidence bearing on the defendants' innocence or guilt of the Watergate crimes for which they stand accused. [2] Moreover, the American people would be denied full access to all facts about the Watergate affair, and the efforts of Congress, the executive branch, and others to take measures to prevent a recurrence of the Watergate affair may be inhibited." S. Rep. No. 93–1181, p. 4 (1974).

terest in and expansive authority to act in preservation of monuments and records of historical value to our national heritage are fully established. *United States* v. *Gettysburg Electric R. Co.,* 160 U. S. 668 (1896); *Roe* v. *Kansas,* 278 U. S. 191 (1929).[42] A legislature thus acts responsibly in seeking to accomplish either of these objectives. Neither supports an implication of a legislative policy designed to inflict punishment on an individual.

### 3

A third recognized test of punishment is strictly a motivational one: inquiring whether the legislative record evinces a congressional intent to punish. See, *e. g., United States* v. *Lovett,* 328 U. S., at 308–314; *Kennedy* v. *Mendoza-Martinez, supra,* at 169–170. The District Court unequivocally found: "There is no evidence presented to us, nor is there any to be found in the legislative record, to indicate that Congress' design was to impose a penalty upon Mr. Nixon . . . as punishment for alleged past wrongdoings. . . . The legislative history leads to only one conclusion, namely, that the Act before us is regulatory and not punitive in character." 408 F. Supp., at 373 (emphasis omitted). We find no cogent reason for disagreeing with this conclusion.

First, both Senate and House Committee Reports, in formally explaining their reasons for urging passage of the Act, expressed no interest in punishing or penalizing appellant. Rather, the Reports justified the Act by reference to objectives that fairly and properly lie within Congress' legislative competence: preserving the availability of judicial evidence and

---

[42] These cases upheld exercises of the power of eminent domain in preserving historical monuments and like facilities for public use. The power of eminent domain, however, is not restricted to tangible property or realty but extends both to intangibles and to personal effects as involved here. See *Cincinnati* v. *Louisville & Nashville R. Co.,* 223 U. S. 390, 400 (1912); *Porter* v. *United States,* 473 F. 2d 1329 (CA5 1973).

of historically relevant materials. *Supra*, at 476–478. More specifically, it seems clear that the actions of both Houses of Congress were predominantly precipitated by a resolve to undo the recently negotiated Nixon-Sampson agreement, the terms of which departed from the practice of former Presidents in that they expressly contemplated the destruction of certain Presidential materials.[43] Along these lines, H. R. Rep. No. 93–1507, *supra*, at 2, stated: "Despite the overriding public interest in preserving these materials . . . [the] Administrator of General Services entered into an agreement . . . which, if implemented, could seriously limit access to these records and . . . result in the destruction of a substantial portion of them." See also S. Rep. No. 93–1181, p. 4 (1974). The relevant Committee Reports thus cast no aspersions on appellant's personal conduct and contain no condemnation of his behavior as meriting the infliction of punishment. Rather, they focus almost exclusively on the meaning and effect of an agreement recently announced by the General Services Administration which most Members of Congress perceived to be inconsistent with the public interest.

Nor do the floor debates on the measure suggest that Congress was intent on encroaching on the judicial function of punishing an individual for blameworthy offenses. When one of the opponents of the legislation, mischaracterizing the safeguards embodied in the bill,[44] stated that it is "one which partakes of the characteristics of a bill of attainder . . . ," 120

---

[43] Particularly troublesome was the provision of the agreement requiring the automatic destruction of tape recordings upon appellant's death.

[44] In condemning the enactment as a bill of attainder, Senator Hruska argued that the bill seizes appellant's papers and distributes them to litigants without affording appellant the opportunity judicially "to assert a defense or privilege to the production of the papers." 120 Cong. Rec. 33871 (1974). In fact, the Act expressly recognizes appellant's right to present all such defenses and privileges through an expedited judicial proceeding. See *infra*, at 481–482.

Cong. Rec. 33872 (1974) (Sen. Hruska), a key sponsor of the measure responded by expressly denying any intention of determining appellant's blameworthiness or imposing punitive sanctions:

> "This bill does not contain a word to the effect that Mr. Nixon is guilty of any violation of the law. It does not inflict any punishment on him. So it has no more relation to a bill of attainder . . . . than my style of pulchritude is to be compared to that of the Queen of Sheba." *Id.*, at 33959–33960 (Sen. Ervin).

In this respect, the Act stands in marked contrast to that invalidated in *United States* v. *Lovett,* 328 U. S., at 312, where a House Report expressly characterized individuals as "subversive . . . and . . . unfit . . . to continue in Government employment." H. R. Rep. No. 448, 78th Cong., 1st Sess., 6 (1943). We, of course, do not suggest that such a formal legislative announcement of moral blameworthiness or punishment is necessary to an unlawful bill of attainder. *United States* v. *Lovett, supra,* at 316. But the decided absence from the legislative history of any congressional sentiments expressive of this purpose is probative of nonpunitive intentions and largely undercuts a major concern that prompted the bill of attainder prohibition: the fear that the legislature, in seeking to pander to an inflamed popular constituency, will find it expedient openly to assume the mantle of judge—or, worse still, lynch mob. Cf. Z. Chafee, *supra,* at 161.[45] No such legislative overreaching is involved here.

---

[45] The Court in *United States* v. *Brown,* 381 U. S., at 444, referred to Alexander Hamilton's concern that legislatures might cater to the "momentary passions" of a " 'free people, in times of heat and violence . . . .' " In this case, it is obvious that the supporters of this Act steadfastly avoided inflaming or appealing to any "passions" in the community. Indeed, rather than seek expediently to impose punishment and to circumvent the courts, Congress expressly provided for access to the Judiciary for resolution of any constitutional and legal rights appellant might assert. S. Rep. No. 93–1181, pp. 2–6 (1974).

We also agree with the District Court that "specific aspects of the Act . . . just do not square with the claim that the Act was a punitive measure." 408 F. Supp., at 373. Whereas appellant complains that the Act has for some two years deprived him of control over the materials in question, Brief for Appellant 140, the Congress placed the materials under the auspices of the General Services Administration, § 101, note following 44 U. S. C. § 2107 (1970 ed., Supp. V), the same agency designated in the Nixon-Sampson agreement as depository of the documents for a minimum three-year period, App. 40. Whereas appellant complains that the Act deprives him of "ready access" to the materials, Brief for Appellant 140, the Act provides that "Richard M. Nixon, or any person whom he may designate in writing, shall at all times have access to the tape recordings and other materials . . . ," § 102 (c).[46] The District Court correctly construed this as safeguarding appellant's right to inspect, copy, and use the materials in issue, 408 F. Supp., at 375, paralleling the right to "make reproductions" contained in the Nixon-Sampson agreement, App. 40. And even if we assume that there is merit in appellant's complaint that his property has been confiscated, Brief for Appellant 140, the Act expressly provides for the payment of just compensation under § 105 (c); see *supra,* at 475.

Other features of the Act further belie any punitive interpretation. In promulgating regulations under the Act, the General Services Administration is expressly directed by Congress to protect appellant's or "any party's opportunity to assert any legally or constitutionally based right or privilege . . . ." § 104 (a)(5). More importantly, the Act preserves for appellant all of the protections that inhere in a judicial proceeding, for § 105 (a) not only assures district

---

[46] Regulations guaranteeing appellant's unrestricted access to the materials have been promulgated by the Administrator and have not been challenged. See 41 CFR § 105–63.3 (1976).

court jurisdiction and judicial review over all his legal claims, but commands that any such challenge asserted by appellant "shall have priority on the docket of such court over other cases." A leading sponsor of the bill emphasized that this expedited treatment is expressly designed "to protect Mr. Nixon's property, or other legal rights . . . ." 120 Cong. Rec. 33854 (1974) (Sen. Ervin). Finally, the Congress has ordered the General Services Administration to establish regulations that recognize "the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to" the articulated objectives of the Act, § 104 (a)(7). While appellant obviously is not set at ease by these precautions and safeguards, they confirm the soundness of the opinion given the Senate by the law division of the Congressional Research Service: "[B]ecause the proposed bill does not impose criminal penalties or other punishment, it would not appear to violate the Bill of Attainder Clause." 120 Cong. Rec. 33853 (1974).[47]

One final consideration should be mentioned in light of the unique posture of this controversy. In determining whether a legislature sought to inflict punishment on an individual, it is often useful to inquire into the existence of less burdensome alternatives by which that legislature (here Congress) could have achieved its legitimate nonpunitive objectives. Today, in framing his challenge to the Act, appellant contends that such an alternative was readily available:

> "If Congress had provided that the Attorney General or the Administrator of General Services could institute a civil suit in an appropriate federal court to enjoin disposi-

---

[47] In brief, the legislative history of the Act offers a paradigm of a Congress aware of constitutional constraints on its power and carefully seeking to act within those limitations. See generally Brest, The Conscientious Legislator's Guide to Constitutional Interpretation, 27 Stan. L. Rev. 585 (1975).

tion . . . of presidential historical materials . . . by any person who could be shown to be an 'unreliable custodian' or who had 'engaged in misconduct' or who 'would violate a criminal prohibition,' the statute would have left to judicial determination, after a fair proceeding, the factual allegations regarding Mr. Nixon's blameworthiness." Brief for Appellant 137.

We have no doubt that Congress might have selected this course. It very well may be, however, that Congress chose not to do so on the view that a full-fledged judicial inquiry into appellant's conduct and reliability would be no less punitive and intrusive than the solution actually adopted. For Congress doubtless was well aware that just three months earlier, appellant had resisted efforts to subject himself and his records to the scrutiny of the Judicial Branch, *United States* v. *Nixon,* 418 U. S. 683 (1974), a position apparently maintained to this day.[48] A rational and fairminded Congress, therefore, might well have decided that the carefully tailored law that it enacted would be less objectionable to appellant than the alternative that he today appears to endorse. To be sure, if the record were unambiguously to demonstrate that the Act represents the infliction of legislative punishment, the fact that the judicial alternative poses its own difficulties would be of no constitutional significance. But the record suggests the contrary, and the unique choice that Congress faced buttresses our conclusion that the Act cannot fairly be read to inflict legislative punishment as forbidden by the Constitution.

We, of course, are not blind to appellant's plea that we

---

[48] For example, in his deposition taken in this case, appellant refused to answer questions pertaining to the accuracy and reliability of his prior public statements as President concerning the contents of the tape recordings and other materials in issue. He invoked a claim of privilege and asserted that the questions were irrelevant to the judicial inquiry. See, *e. g.,* App. 586–590.

recognize the social and political realities of 1974. It was a period of political turbulence unprecedented in our history. But this Court is not free to invalidate Acts of Congress based upon inferences that we may be asked to draw from our personalized reading of the contemporary scene or recent history. In judging the constitutionality of the Act, we may only look to its terms, to the intent expressed by Members of Congress who voted its passage, and to the existence or non-existence of legitimate explanations for its apparent effect. We are persuaded that none of these factors is suggestive that the Act is a punitive bill of attainder, or otherwise facially unconstitutional. The judgment of the District Court is

*Affirmed.*

MR. JUSTICE STEVENS, concurring.

The statute before the Court does not apply to all Presidents or former Presidents. It singles out one, by name, for special treatment. Unlike all other former Presidents in our history, he is denied custody of his own Presidential papers; he is subjected to the burden of prolonged litigation over the administration of the statute; and his most private papers and conversations are to be scrutinized by Government archivists. The statute implicitly condemns him as an unreliable custodian of his papers. Legislation which subjects a named individual to this humiliating treatment must raise serious questions under the Bill of Attainder Clause.

Bills of attainder were typically directed at once powerful leaders of government. By special legislative Acts, Parliament deprived one statesman after another of his reputation, his property, and his potential for future leadership. The motivation for such bills was as much political as it was punitive— and often the victims were those who had been the most relentless in attacking their political enemies at the height of

their own power.[1]   In light of this history, legislation like that before us must be scrutinized with great care.

Our cases "stand for the proposition that legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States* v. *Lovett,* 328 U. S. 303, 315–316.  The concept of punishment involves not only the character of the deprivation, but also the manner in which that deprivation is imposed.  It has been held permissible for Congress to deprive Communist deportees, as a group, of their social security benefits, *Flemming* v. *Nestor,* 363 U. S. 603, but it would surely be a bill of attainder for Congress to deprive a single, named individual of the same benefit.  Cf. *id.,* at 614.  The very

---

[1] At the debate on the impeachment of the Earl of Danby, the Earl of Carnarvon recounted this history:

"My Lords, I understand but little of Latin, but a good deal of English, and not a little of the English history, from which I have learnt the mischiefs of such kind of prosecutions as these, and the ill fate of the prosecutors.  I shall go no farther back than the latter end of Queen Elizabeth's reign: At which time the Earl of Essex was run down by Sir Walter Raleigh, and your Lordships very well know what became of Sir Walter Raleigh.  My Lord Bacon, he ran down Sir Walter Raleigh, and your Lordships know what became of my Lord Bacon.  The Duke of Buckingham, he ran down my Lord Bacon, and your Lordships know what happened to the Duke of Buckingham.  Sir Thomas Wentworth, afterwards Earl of Strafford, ran down the Duke of Buckingham, and you all know what became of him.  Sir Harry Vane, he ran down the Earl of Strafford, and your Lordships know what became of Sir Harry Vane.  Chancellor Hyde, he ran down Sir Harry Vane, and your Lordships know what became of the Chancellor.  Sir Thomas Osborne, now Earl of Danby, ran down Chancellor Hyde; but what will become of the Earl of Danby, your Lordships best can tell.  But let me see that man that dare run the Earl of Danby down, and we shall soon see what will become of him."  (Footnote omitted.)   As quoted in Z. Chafee, Jr., Three Human Rights in the Constitution of 1787, p. 127 (1956).

specificity of the statute would mark it as punishment, for there is rarely any valid reason for such narrow legislation; and normally the Constitution requires Congress to proceed by general rulemaking rather than by deciding individual cases. *United States* v. *Brown,* 381 U. S. 437, 442–446.

Like the Court, however, I am persuaded that "appellant constituted a legitimate class of one . . . ." *Ante,* at 472. The opinion of the Court leaves unmentioned the two facts which I consider decisive in this regard. Appellant resigned his office under unique circumstances and accepted a pardon [2] for any offenses committed while in office. By so doing, he placed himself in a different class from all other Presidents. Cf. *Orloff* v. *Willoughby,* 345 U. S. 83, 90–91. Even though unmentioned, it would be unrealistic to assume that historic facts of this consequence did not affect the legislative decision.[3]

Since these facts provide a legitimate justification for the specificity of the statute, they also avoid the conclusion that this otherwise nonpunitive statute is made punitive by its specificity. If I did not consider it appropriate to take judicial notice of those facts, I would be unwilling to uphold the power of Congress to enact special legislation directed only at one former President at a time when his popularity was at its nadir. For even when it deals with Presidents or former Presidents, the legislative focus should be upon "the calling" rather than "the person." Cf. *Cummings* v. *Missouri,* 4 Wall. 277, 320. In short, in my view, this case will not be a precedent for future legislation which relates, not to the Office of President, but just to one of its occupants.

[2] See *Burdick* v. *United States,* 236 U. S. 79, 94.

[3] Cf. *Calder* v. *Bull,* 3 Dall. 386, 390:

"That Charles 1st. king of England, was beheaded; that Oliver Cromwell was Protecter of England; that Louis 16th, late King of France, was guillotined; are all facts, that have happened; but it would be nonsense to suppose, that the States were prohibited from making any law after either of these events, and with reference thereto."

Without imputing a similar reservation to the Court, I join its opinion with the qualification that these unmentioned facts have had a critical influence on my vote to affirm.

MR. JUSTICE WHITE, concurring in part and concurring in the judgment.

I concur in the judgment and, except for Part VII, in the Court's opinion. With respect to the bill of attainder issue, I concur in the result reached in Part VII; the statute does not impose "punishment" and is not, therefore, a bill of attainder. See *United States* v. *Brown*, 381 U. S. 437, 462 (1965) (WHITE, J., dissenting). I also append the following observations with respect to one of the many issues in this case.

It is conceded by all concerned that a very small portion of the vast collection of Presidential materials now in possession of the Administrator consists of purely private materials, such as diaries, recordings of family conversations, private correspondence—"personal property of any kind not involving the actual transaction of government business." Tr. of Oral Arg. 55. It is also conceded by the federal and other appellees that these private materials, once identified, must be returned to Mr. Nixon. *Id.,* at 38–40, 57–59. The Court now declares that "the Government [without awaiting a court order] should now promptly disclaim any interest in materials conceded to be appellant's purely private communications and deliver them to him." *Ante,* at 459 n. 22. I agree that the separation and return of these materials should proceed without delay. Furthermore, even if under the Act this process can occur only after the issuance of regulations under § 104 that are subject to congressional approval, surely regulations covering this narrow subject matter need not take long to effectuate.

Also, § 104 (a) (7) suggests that the private materials to be returned to Mr. Nixon are limited to those that "are not otherwise of general historical significance." But, as I see it, the validity of the Act would be questionable if mere historical

significance sufficed to withhold purely private letters or diaries; and in view of the other provisions of the Act, particularly § 104 (a)(5), it need not be so construed. Purely private materials, whether or not of historical interest, are to be delivered to Mr. Nixon. The federal and other appellees conceded as much at oral argument.*

---

*"QUESTION: Well now, suppose Mr. Nixon has prepared a diary every day and put down what, exactly what he did, and let's suppose that someone thought that was a purely personal account. Now, I can just imagine that someone might think that it nevertheless is of general historical significance.

"MR. McCREE: May I refer the Court to need No. 5? 'The need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials.'

"And I submit that this Act affords Richard M. Nixon the opportunity to assert the contention that this diary of his is personal and has not the kind of general historical significance that will permit his deprivation; and that would then have to be adjudicated in a court.

"QUESTION: Well, do—

"MR. McCREE: And ultimately this Court will answer that question.

"QUESTION: Well, how do you—so you would agree, then, that 104 must be construed—must be construed to sooner or later return to Mr. Nixon what we might call purely private papers?

"MR. McCREE: Indeed I do.

"QUESTION: Can you imagine any diary—thinking of Mr. Truman's diary, which, it is reported, was a result of being dictated every evening, after the day's work—can you conceive of any such material that would not be of general historical interest?

"MR. McCREE: I must concede, being acquainted with some historians, that it's difficult to conceive of anything that might not be of historical interest. But—

"[Laughter.]

"QUESTION: Yes. Archivists and historians, like journalists,—

"MR. McCREE: Indeed they are.

"QUESTION: —think that everything is.

"[Laughter.]

"MR. McCREE: But this legislation recognizes that a claim of privacy,

Similarly, although the Court relies to some extent on the statutory recognition of the constitutional right to compensation in the event it is determined that the Government has

a claim of privilege must be protected, and if the regulations are insufficient to do that, again a court will have an opportunity to address itself to a particular item such as the diary before it can be turned over.

"And for that reason, we suggest that the attack at this time is premature because the statute, in recognizing the right of privacy, is facially adequate. And the attack that was made the day after it became effective brought to this Court a marvelous opportunity to speculate about what might happen, but the regulations haven't even been promulgated and acquiesced in so that they have become effective." Tr. of Oral Arg. 38–40.

"[Mr. HERZSTEIN, for the private appellees:]

"But there's just no question about the return of personal diaries, Dictabelts, so long as they are not the materials involved in the transaction of government business.

"Now, the statute, I agree, could have been drafted a little more clearly, but we think there are several points which make it quite clear that his personal materials are to be returned to him.

"One is the fact that statute refers to the presidential historical materials of Richard Nixon, not to the person[al] or private materials.

"The second is that, as Judge McCree mentioned, criterion 7 calls for a return of materials to him, and if you read those two in conjunction with the legislative history, there are statements on the Floor of the Senate, on the Floor of the House, and in the Committee Reports, indicating the expectation that Nixon's personal records would be returned to him.

"QUESTION: Could you give us a capsule summary of the difference between what you have just referred to as Nixon's personal records, which will be returned, and the matter which will not be returned?

"MR. HERZSTEIN: Well, yes. Certainly any personal letters, among his family or friends, certainly a diary made at the end of the day, as it were, after the event—

"QUESTION: Even though the Dictabelt was paid for out of White House appropriations?

"MR. HERZSTEIN: That's right. That doesn't bother us. I think it's incidental now. But we do have a different view on the tapes, which actually recorded the transaction of government business by government

confiscated Mr. Nixon's property, I would question whether a mere historical interest in purely private communications would be a sufficient predicate for taking them for public use. Historical considerations are normally sufficient grounds for condemning property, *United States* v. *Gettysburg Electric R. Co.,* 160 U. S. 668 (1896); *Roe* v. *Kansas,* 278 U. S. 191

---

employees on government time and so on. The normal tapes that we've heard so much about.

"The Dictabelts, Mr. Nixon has said, are his personal diary. Instead of writing it down, in other words, he dictated it at the end of the day. And we think that's—

"QUESTION: I want to be sure about that concession, because this certainly is of historical interest.

"MR. HERZSTEIN: That's right, it is, but we do not feel it's covered by the statute. We have acknowledged that from the start.

"QUESTION: Is this concession shared by the Solicitor General, do you think?

"MR. HERZSTEIN: We believe it is.

"QUESTION: What about that?

"MR. McCREE: About the fact that the paper belongs to the government and so forth, we don't believe that makes a document a government documen[t]. We certainly agree with that.

"Beyond that, if the Court please—

"QUESTION: What about the Dictabelts representing his daily diary?

"MR. McCREE: I would think that's a personal matter that would be—should be returned to him once it was identified.

"QUESTION: Well, is there any problem about, right this very minute, of picking those up and giving them back to Mr. Nixon?

"MR. McCREE: I know of no problem. Whether it would have to await the adoption of the regulation, which has been stymied by Mr. Nixon's lawsuit, which has been delayed for three years,—

"QUESTION: How has that stymied the issuance of regulations, Mr. Solicitor General?

"MR. McCREE: One of the dispositions of the district court was to stay the effectiveness of regulations. Now, I think it held up principally the regulations for public access. The other regulations are not part of this record, and I cannot speak to the Court with any knowledge about them." *Id.,* at 57–59.

(1929); but whatever may be true of the great bulk of the materials in the event they are declared to be Mr. Nixon's property, I doubt that the Government is entitled to his purely private communications merely because it wants to preserve them and offers compensation.

Mr. Justice Blackmun, concurring in part and concurring in the judgment.

My posture in this case is essentially that of Mr. Justice Powell, *post*, p. 492. I refrain from joining his opinion, however, because I fall somewhat short of sharing his view, *post*, at 498 and 501–502, that the incumbent President's submission, made through the Solicitor General, that the Act serves rather than hinders the Chief Executive's Art. II functions, is *dispositive* of the separation-of-powers issue. I would be willing to agree that it is significant and that it is entitled to serious consideration, but I am not convinced that it is dispositive. The fact that President Ford signed the Act does not mean that he necessarily approved of its every detail. Political realities often guide a President to a decision not to veto.

One must remind oneself that our Nation's history reveals a number of instances where Presidential transition has not been particularly friendly or easy. On occasion it has been openly hostile. It is my hope and anticipation—as it obviously is of the others who have written in this case—that this Act, concerned as it is with what the Court describes, *ante*, at 472, as "a legitimate class of one," will not become a model for the disposition of the papers of each President who leaves office at a time when his successor or the Congress is not of his political persuasion.

I agree fully with my Brother Powell when he observes, *post*, at 503, that the "difficult constitutional questions lie ahead" for resolution in the future. Reserving judgment on

those issues for a more appropriate time—certainly not now— I, too, join the judgment of the Court and agree with much of its opinion. I specifically join Part VII of the Court's opinion.

MR. JUSTICE POWELL, concurring in part and concurring in the judgment.

I join the judgment of the Court and all but Parts IV and V of its opinion. For substantially the reasons stated by the Court, I agree that the Presidential Recordings and Materials Preservation Act (Act) on its face does not violate appellant's rights under the First, Fourth, and Fifth Amendments and the Bill of Attainder Clause.[1] For reasons quite different from those stated by the Court, I also would hold that the Act is consistent on its face with the principle of separation of powers.

I

The Court begins its analysis of the issues by limiting its inquiry to those constitutional claims that are addressed to "the facial validity of the provisions of the Act requiring the Administrator to take the recordings and materials into the Government's custody subject to screening by Government archivists." *Ante,* at 439. I agree that the inquiry must be limited in this manner, but I would add two qualifications that in my view further restrict the reach of today's decision.

First, Title I of Pub. L. 93–526 (the Act) does not purport to be a generalized provision addressed to the complex problem of disposition of the accumulated papers of Presidents or other federal officers. Unlike Title II of Pub. L. 93–526 (the Public Documents Act), which authorizes a study of that problem,

---

[1] Although I agree with much of Parts IV and V, I am unable to join those parts of the Court's opinion because of my uncertainty as to the reach of its extended discussion of the competing constitutional interests implicated by the Act.

Title I is addressed specifically and narrowly to the need to preserve the papers of former President Nixon after his resignation under threat of impeachment. It is legislation, as the Court properly observes, directed against "a legitimate class of one." *Ante*, at 472.

President Nixon resigned on August 9, 1974. Less than two weeks earlier, the House Judiciary Committee had voted to recommend his impeachment, H. R. Rep. No. 93–1305, pp. 10–11 (1974), including among the charges of impeachable offenses allegations that the President had obstructed investigation of the Watergate break-in and had engaged in other unlawful activities during his administration. *Id.*, at 1–4. One month after President Nixon's resignation, on September 8, 1974, President Ford granted him a general pardon for all offenses against the United States that he might have committed in his term of office.

On the same day, the Nixon-Sampson agreement was made public. The agreement provided for the materials to be deposited temporarily with the General Services Administration in a California facility, but gave the former President the right to withdraw or direct the destruction of any materials after an initial period of three years or, in the case of tape recordings, five years. During this initial period access would be limited to President Nixon and persons authorized by him, subject only to legal process ordering materials to be produced. Upon President Nixon's death, the tapes were to be destroyed immediately. 10 Weekly Comp. of Pres. Doc. 1104–1105 (1974).

Those who drafted and sponsored Title I in Congress uniformly viewed its provisions as emergency legislation, necessitated by the extraordinary events that led to the resignation and pardon and to the former President's arrangement for the disposition of his papers. Senator Nelson, for example, referred to the bill as "an emergency measure" whose prin-

cipal purpose was to assure "protective custody" of the materials. 120 Cong. Rec. 33848, 33850–33851 (1974).

"[T]here is an urgency in the situation now before us. Under the existing agreement between the GSA and Mr. Nixon, if Mr. Nixon died tomorrow, those tapes— if I read the agreement correctly—are to be destroyed immediately; it is also possible that the Nixon papers could be destroyed by 1977. This would be a catastroph[e] from an historical standpoint." *Id.,* at 33857.

Senator Ervin similarly remarked:

"This bill really deals with an emergency situation, because some of these documents are needed in the courts and by the general public in order that they might know the full story of what is known collectively as the Watergate affair." *Id.,* at 33855.

Efforts to apply the legislation more generally to all Presidents or to other federal officers were resisted on the Senate floor. Thus, speaking again of the unique needs created by the Nixon-Sampson agreement and the Watergate scandals, Senator Javits stressed that "we seek to deal in this particular legislation, only with this particular set of papers of this particular ex-President." *Id.,* at 33860. See generally S. Rep. No. 93–1181 (1974).

It is essential in addressing the constitutional issues before us not to lose sight of the limited justification for and objectives of this legislation. The extraordinary events that led to the resignation and pardon, and the agreement providing that the record of those events might be destroyed by President Nixon, created an impetus for congressional action that may—without overstatement—be termed unique. I therefore do not share my Brother REHNQUIST's foreboding that this Act "will daily stand as a veritable sword of Damocles over every succeeding President and his advisers." *Post,* at 545. If the study authorized by Title II should lead to

more general legislation, there will be time enough to consider its validity if a proper case comes before us.

My second reservation follows from the first. Because Congress acted in what it perceived to be an emergency, it concentrated on the immediate problem of establishing governmental custody for the purpose of safeguarding the materials. It deliberately left to the rulemaking process, and to subsequent judicial review, the difficult and sensitive task of reconciling the long-range interests of President Nixon, his advisors, the three branches of Government, and the American public, once custody was established. As the District Court observed:

> "The Act in terms merely directs GSA to take custody of the materials that fall within the scope of section 101, and to promulgate regulations after taking into consideration the seven factors listed in section 104 (a). Those factors provide broad latitude to the Administrator in establishing the processes and standards under which the materials will be reviewed and public access to them afforded. . . ." 408 F. Supp. 321, 335 (1976) (footnote omitted).

In view of the latitude that the Act gives to GSA in framing regulations, I agree with the District Court that the question to be resolved in this case is a narrow one: "Is the regulatory scheme enacted by Congress unconstitutional without reference to the content of any conceivable set of regulations falling within the scope of the Administrator's authority under section 104 (a)?" *Id.*, at 334–335.

No regulations have yet taken effect under § 104 (a). *Ante,* at 437. In these circumstances, I believe it is appropriate to address appellant's constitutional claims, as did the District Court, with an eye toward the kind of regulations and screening practices that would be consistent with the Act and yet that would afford protection to the important

constitutional interests asserted. Section 104 (a)(5) of the Act directs the Administrator to take into account

> "the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials."

The District Court observed that in considering this factor, the Administrator might well provide for meaningful participation by appellant in the screening process and in the selection of the archivists who would review the materials. The court also observed that procedures might be adopted that would minimize any intrusion into private materials and that would permit appellant an opportunity to obtain administrative and judicial review of all proposed classifications of the materials. 408 F. Supp., at 339–340.[2] Finally,

---

[2] By way of illustration, the District Court observed that the following archival practices might be adopted to limit invasion of appellant's constitutionally protected interests:

"1. A practice of requiring archivists to make the minimal intrusion necessary to classify material. Identification by signature, the file within which material is found, general nature (as with diaries, or dictabelts serving the same function), a cursory glance at the contents, or other means could significantly limit infringement of plaintiff's interests without undermining the effectiveness of screening by governmental personnel. Participation by Mr. Nixon in preliminary identification of material that might be processed without word-by-word review would facilitate such a procedure.

"2. A practice of giving Mr. Nixon some voice in the designation of the personnel who will review the materials, perhaps by selecting from a body of archivists approved by the government.

"3. A practice of giving Mr. Nixon notice of all proposed classifications of materials and an opportunity to obtain administrative and judicial review of them, on constitutional or other grounds, before they are effectuated." 408 F. Supp., at 339–340 (footnotes omitted).

I agree with the views expressed by MR. JUSTICE WHITE, ante, at 487–491, on the need to return private materials to appellant.

the court noted that substantive restrictions on access might be adopted, consistent with traditional restrictions placed on access to Presidential papers, and that such restrictions could forbid public disclosure of any confidential communications between appellant and his advisors "for a fixed period of years, or until the death of Mr. Nixon and others participating in or the subject of communications." *Id.*, at 338.[3]

I have no doubt that procedural safeguards and substantive restrictions such as these are within the authority of the Administrator to adopt under the broad mandate of § 104 (a). While there can be no positive assurance that such protections will in fact be afforded, we nonetheless may assume, in reviewing the facial validity of the Act, that all constitutional and legal rights will be given full protection. Indeed, that assumption is the basis on which I join today's judgment

---

[3] The District Court noted the existence of:

"a basic set of donor-imposed access restrictions that was first formulated by Herbert Hoover [and] followed by Presidents Eisenhower, Kennedy, and Johnson. Under this scheme the following materials would be restricted:

"1) materials that are security-classified;

"2) materials whose disclosure would be prejudicial to foreign affairs;

"3) materials containing statements made by or to a President in confidence;

"4) materials relating to the President's family, personal, or business affairs or to such affairs of individuals corresponding with the President;

"5) materials containing statements about individuals that might be used to embarrass or harass them or members of their families;

"6) such other materials as the President or his representative might designate as appropriate for restriction.

"President Franklin Roosevelt imposed restrictions very similar to numbers 1, 2, 4, and 5, and in addition restricted (a) investigative reports on individuals, (b) applications and recommendations for positions, and (c) documents containing derogatory remarks about an individual. President Truman's restrictions were like those of Hoover, Eisenhower, Kennedy, and Johnson, except that he made no provision, like number 6 above, for restriction merely at his own instance." 408 F. Supp., at 338–339 n. 19 (citations omitted).

upholding the facial validity of the Act. As the Court makes clear in its opinion, the Act plainly requires the Administrator, in designing the regulations, to "consider the need to protect the constitutional rights of appellant and other individuals against infringement by the processing itself or, ultimately, by public access to the materials retained." *Ante,* at 436.

## II

I agree that the Act cannot be held unconstitutional on its face as a violation of the principle of separation of powers or of the Presidential privilege that derives from that principle. This is not a case in which the Legislative Branch has exceeded its enumerated powers by assuming a function reserved to the Executive under Art. II. *E. g., Buckley* v. *Valeo,* 424 U. S. 1 (1976); *Myers* v. *United States,* 272 U. S. 52 (1926). The question of governmental power in this case is whether the Act, by mandating seizure and eventual public access to the papers of the Nixon Presidency, impermissibly interferes with the President's power to carry out his Art. II obligations. In concluding that the Act is not facially invalid on this ground, I consider it dispositive in the circumstances of this case that the incumbent President has represented to this Court, through the Solicitor General, that the Act serves rather than hinders the Art. II functions of the Chief Executive.

I would begin by asking whether, putting to one side other limiting provisions of the Constitution, Congress has acted beyond the scope of its enumerated powers. Cf. *Reid* v. *Covert,* 354 U. S. 1, 70 (1957) (Harlan, J., concurring). Apart from the legislative concerns mentioned by the Court, *ante,* at 476–478, I believe that Congress unquestionably has acted within the ambit of its broad authority to investigate, to inform the public, and, ultimately, to legislate against suspected corruption and abuse of power in the Executive Branch.

This Court has recognized inherent power in Congress to pass appropriate legislation to "preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." *Burroughs* v. *United States,* 290 U. S. 534, 545 (1934). Congress has the power, for example, to restrict the political activities of civil servants, *e. g., CSC* v. *Letter Carriers,* 413 U. S. 548 (1973); to punish bribery and conflicts of interest, *e. g., Burton* v. *United States,* 202 U. S. 344 (1906); to punish obstructions of lawful governmental functions, *Haas* v. *Henkel,* 216 U. S. 462 (1910); and—with important exceptions—to make executive documents available to the public, *EPA* v. *Mink,* 410 U. S. 73 (1973). The Court also has recognized that in aid of such legislation Congress has a broad power "to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins* v. *United States,* 354 U. S. 178, 200 n. 33 (1957). See also *Buckley* v. *Valeo, supra,* at 137–138; *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491 (1975).

The legislation before us rationally serves these investigative and informative powers. Congress legitimately could conclude that the Nixon-Sampson agreement, following the recommendation of impeachment and the resignation of President Nixon, might lead to destruction of those of the former President's papers that would be most likely to assure public understanding of the unprecedented events that led to the premature termination of the Nixon administration. Congress similarly could conclude that preservation of the papers was important to its own eventual understanding of whether that administration had been characterized by deficiencies susceptible of legislative correction. Providing for retention of the materials by the Administrator and for the selection of appropriate materials for eventual disclosure to the public was a rational means of serving these legitimate congressional objectives.

Congress still might be said to have exceeded its enumerated powers, however, if the Act could be viewed as an assumption by the Legislative Branch of functions reserved exclusively to the Executive by Art. II. In *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952), for example, the Court buttressed its conclusion that the President had acted beyond his power under Art. II by characterizing his seizure of the steel mills as an exercise of a "legislative" function reserved exclusively to Congress by Art. I. 343 U. S., at 588–589. And last Term we reaffirmed the fundamental principle that the appointment of executive officers is an "Executive" function that Congress is without power to vest in itself. *Buckley* v. *Valeo, supra,* at 124–141. But the Act before us presumptively avoids these difficulties by entrusting the task of ensuring that its provisions are faithfully executed to an officer of the Executive Branch.[4]

I therefore conclude that the Act cannot be held invalid on the ground that Congress has exceeded its affirmative grant of power under the Constitution. But it is further argued that Congress nonetheless has contravened the limitations on legislative power implicitly imposed by the creation of a coequal Executive Branch in Art. II. It is said that by opening up the operations of a past administration to eventual public scrutiny, the Act impairs the ability of present and future Presidents to obtain unfettered information and candid advice and thereby limits executive power in contravention of Art. II and the principle of separation of powers. I see no material distinction between such an argument and the collateral claim that the Act violates the Presidential privilege in confidential communications.

In *United States* v. *Nixon,* 418 U. S. 683 (1974) (*Nixon I*),

---

[4] The validity of the provision of § 104 (b) for possible disapproval of the Administrator's regulations by either House of Congress is not before us at this time. See 408 F. Supp., at 338 n. 17; Brief for Federal Appellees 26, and n. 11.

we recognized a presumptive, yet qualified, privilege for confidential communications between the President and his advisors. Observing that "those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process," *id.*, at 705, we recognized that a President's generalized interest in confidentiality is "constitutionally based" to the extent that it relates to "the effective discharge of a President's powers." *Id.*, at 711. We held nonetheless that "[t]he generalized assertion of privilege must yield to the demonstrated, specified need for evidence in a pending criminal trial." *Id.*, at 713.

Appellant understandably relies on *Nixon I.* Comparing the narrow scope of the judicial subpoenas considered there with the comprehensive reach of this Act—encompassing all of the communications of his administration—appellant argues that there is no "demonstrated, specific need" here that can outweigh the extraordinary intrusion worked by this legislation. On the ground that the result will be to destroy "the effective discharge of the President's powers," appellant urges that the Act be held unconstitutional on its face.

These arguments undoubtedly have considerable force, but I do not think they can support a decision invalidating this Act on its face. Section 1 of Art. II vests all of the executive power in the sitting President and limits his term of office to four years. It is his sole responsibility to "take Care that the Laws be faithfully executed." Art. II, § 3. Here, as previously noted, President Carter has represented to this Court through the Solicitor General that the Act is consistent with "the effective discharge of the President's powers":

> "Far from constituting a breach of executive autonomy, the Act . . . is an appropriate means of ensuring that the Executive Branch will have access to the materials necessary to the performance of its duties." Brief for Federal Appellees 29.

This representation is similar to one made earlier on behalf of President Ford, who signed the Act. Motion of Federal Appellees to Affirm 15. I would hold that these representations must be given precedence over appellant's claim of Presidential privilege. Since the incumbent President views this Act as furthering rather than hindering effective execution of the laws, I do not believe it is within the province of this Court to hold otherwise.

This is not to say that a former President lacks standing to assert a claim of Presidential privilege. I agree with the Court that the former President may raise such a claim, whether before a court or a congressional committee. In some circumstances the intervention of the incumbent President will be impractical or his views unknown, and in such a case I assume that the former President's views on the effective operation of the Executive Branch would be entitled to the greatest deference. It is uncontroverted, I believe, that the privilege in confidential Presidential communications survives a change in administrations. I would only hold that in the circumstances here presented the incumbent, having made clear in the appropriate forum his opposition to the former President's claim, alone can speak for the Executive Branch.[5]

---

[5] There is at least some risk that political, and even personal, antagonisms could motivate Congress and the President to join in a legislative seizure and public exposure of a former President's papers without due regard to the long-range implications of such action for the Art. II functions of the Chief Executive. Even if such legislation did not violate the principle of separation of powers, it might well infringe individual liberties protected by the Bill of Attainder Clause or the Bill of Rights. But this is not the case before us. In passing this legislation, Congress acted to further legitimate objectives in circumstances that were wholly unique in the history of our country. The legislation was approved by President Ford, personally chosen by President Nixon as his successor, and is now also supported by President Carter. In view of the circumstances leading to its passage and the protection it provides for " 'any . . . consti-

I am not unmindful that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803). As we reiterated in *Nixon I:*

> " 'Deciding whether a matter has in any measure been committed by the Constitution to another branch of government . . . is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.' " 418 U. S., at 704, quoting *Baker* v. *Carr,* 369 U. S. 186, 211 (1962).

My position is simply that a decision to waive the privileges inhering in the Office of the President with respect to an otherwise valid Act of Congress is the President's alone to make under the Constitution.[6]

### III

The difficult constitutional questions lie ahead. The President no doubt will see to it that the interests in confidentiality so forcefully urged by THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST in their dissenting opinions are taken into account in the final regulations that are promulgated under

tutionally based right or privilege,' " *supra,* at 496, this Act on its face does not violate the personal constitutional rights asserted by appellant.

[6] Cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635–637 (1952) (Jackson, J., concurring):

"When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. . . ." (Footnote omitted.) See also *Williams* v. *Suffolk Insurance Co.,* 13 Pet. 415, 420 (1839):

"[T]his Court ha[s] laid down the rule, that the action of the political branches of the government in a matter that belongs to them, is conclusive."

§ 104 (a). While the incumbent President has supported the constitutionality of the Act as it is written, there is no indication that he will oppose appellant's assertions of Presidential privilege as they relate to the rules that will govern the screening process and the timing of disclosure, and particularly the restrictions that may be placed on certain documents and recordings. I emphasize that the validity of such assertions of Presidential privilege is not properly before us at this time.

Similarly, difficult and important questions concerning individual rights remain to be resolved. At stake are not only the rights of appellant but also those of other individuals whose First, Fourth, and Fifth Amendment interests may be implicated by disclosure of communications as to which a legitimate expectation of privacy existed. I agree with the Court that even in the councils of Government an individual "has a legitimate expectation of privacy in his personal communications," *ante,* at 465, and also that compelled disclosure of an individual's political associations, in and out of Government, can be justified only by "a compelling public need that cannot be met in a less restrictive way," *ante,* at 467. Today's decision is limited to the facial validity of the Act's provisions for retention and screening of the materials. The Court's discussion of the interests served by those provisions should not foreclose in any way the search that must yet be undertaken for means of assuring eventual access to important historical records without infringing individual rights protected by the First, Fourth, and Fifth Amendments.

Mr. Chief Justice Burger, dissenting.

In my view, the Court's holding is a grave repudiation of nearly 200 years of judicial precedent and historical practice. That repudiation arises out of an Act of Congress passed in the aftermath of a great national crisis which culminated in the resignation of a President. The Act (Title I of Pub. L. 93–526) violates firmly established constitutional principles in several respects.

I find it very disturbing that fundamental principles of constitutional law are subordinated to what seem the needs of a particular situation. That moments of great national distress give rise to passions reminds us why the three branches of Government were created as separate and coequal, each intended as a check, in turn, on possible excesses by one or both of the others. The Court, however, has now joined a Congress, in haste to "do something," and has invaded historic, fundamental principles of the separate powers of coequal branches of Government. To "punish" one person, Congress—and now the Court—tears into the fabric of our constitutional framework.

Any case in this Court calling upon principles of separation of powers, rights of privacy, and the prohibitions against bills of attainder, whether urged by a former President—or any citizen—is inevitably a major constitutional holding. Mr. Justice Holmes, speaking of the tendency of "[g]reat cases like hard cases [to make] bad law," went on to observe the dangers inherent when

> "some accident of immediate overwhelming interest . . . appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." *Northern Securities Co.* v. *United States*, 193 U. S. 197, 400–401 (1904) (dissenting opinion).

Well-settled principles of law are bent today by the Court under that kind of "hydraulic pressure."

## I

### *Separation of Powers*

Appellant urges that Title I is an unconstitutional intrusion by Congress into the internal workings of the Office of the President, in violation of the constitutional principles of separation of powers. Three reasons support that conclusion.

The well-established principles of separation of powers, as developed in the decisions of this Court, are violated if Congress compels or coerces the President, in matters relating to the operation and conduct of his office.[1]  Next, the Act is an exercise of executive—not legislative—power by the Legislative Branch.  Finally, Title I works a sweeping modification of the constitutional privilege and historical practice of confidentiality of every Chief Executive since 1789.

## A

As a threshold matter, we should first establish the standard of constitutional review by which Title I is to be judged.  In the usual case, of course, legislation challenged in this Court benefits from a presumption of constitutionality.  To survive judicial scrutiny a statutory enactment need only have a reasonable relationship to the promotion of an objective which the Constitution does not independently forbid, unless the legislation trenches on fundamental constitutional rights.

But where challenged legislation implicates fundamental constitutional guarantees, a far more demanding scrutiny is required.  For example, this Court has held that the presumption of constitutionality does not apply with equal force where the very legitimacy of the composition of representative institutions is at stake.  *Reynolds* v. *Sims*, 377 U. S. 533 (1964).  Similarly, the presumption of constitutionality is lessened when the Court reviews legislation endangering fundamental constitutional rights, such as freedom of speech, or denying persons governmental rights or benefits because of race.  Legislation touching substantially on these areas comes here bearing a heavy burden which its proponents must carry.

Long ago, this Court found the ordinary presumption of constitutionality inappropriate in measuring legislation directly impinging on the basic tripartite structure of our Government.

---

[1] Later, I will discuss the importance of the legislation's applicability to only one ex-President.

In *Kilbourn* v. *Thompson,* 103 U. S. 168, 192 (1881), Mr. Justice Miller observed for the Court that encroachments by Congress posed the greatest threat to the continued independence of the other branches.[2] Accordingly, he cautioned that the exercise of power by one branch directly affecting the potential independence of another "should be watched with vigilance, and when called in question before any other tribunal . . . should receive *the most careful scrutiny.*" *Ibid.* (Emphasis supplied.) See also *Buckley* v. *Valeo,* 424 U. S. 1 (1976).

Our role in reviewing legislation which touches on the fundamental structure of our Government is therefore akin to that which obtains when reviewing legislation touching on other fundamental constitutional guarantees. Because separation of powers is the base framework of our governmental system and the means by which all our liberties depend, Title I can be upheld only if it is necessary to secure some overriding governmental objective, and if there is no reasonable alternative which will trench less heavily on separation-of-powers principles.

B

Separation of powers is in no sense a formalism. It is the characteristic that distinguished our system from all others conceived up to the time of our Constitution. With federalism, separation of powers is "one of the two great structural principles of the American constitutional system . . . ." E. Corwin, The President 9 (1957). See also *Griswold* v. *Connecticut,* 381 U. S. 479, 501 (1965) (Harlan, J., concurring in judgment).

---

[2] In this, Mr. Justice Miller was but expressing the earlier opinion of Madison, who declared in The Federalist No. 48, p. 334 (J. Cooke ed., 1961):

"The legislative department derives a superiority in our governments from other circumstances. Its constitutional powers being at once more extensive and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments."

508

In pursuit of that principle, executive power was vested in the President; no other offices in the Executive Branch, other than the Presidency and Vice Presidency, were mandated by the Constitution. Only two Executive Branch offices, therefore, are creatures of the Constitution; all other departments and agencies, from the State Department to the General Services Administration, are creatures of the Congress and owe their very existence to the Legislative Branch.[3]

The Presidency, in contrast, stands on a very different footing. Unlike the vast array of departments which the President oversees, the Presidency is in no sense a creature of the Legislature. The President's powers originate not from statute, but from the constitutional command to "take Care that the Laws be faithfully executed . . . ." These independent, constitutional origins of the Presidency have an important bearing on determining the appropriate extent of congressional power over the Chief Executive or his records and workpapers. For, although the branches of Government are obviously not divided into "watertight compartments," *Springer* v. *Philippine Islands,* 277 U. S. 189, 211 (1928) (Holmes, J., dissenting), the office of the Presidency, as a constitutional equal of Congress, must as a general proposition be free from Congress' *coercive* powers.[4] This is not simply an abstract proposition

---

[3] Statutes relating to departments or agencies created by Congress frequently are phrased in mandatory terms. For example, in the 1949 legislation creating the General Services Administration, Congress provided as follows:

"The Administrator is authorized *and directed* to coordinate and provide for the . . . efficient purchase, lease and maintenance of . . . equipment by Federal agencies." 40 U. S. C. § 759 (a).

Even with respect to international relations, Congress has affirmatively imposed certain *requirements* on the Secretary of State:

"The Secretary of State *shall furnish* to the Public Printer a correct copy of every treaty between the United States and any foreign government . . . ." 22 U. S. C. § 2660.

[4] Cf. MR. JUSTICE WHITE's discussion in *United States* v. *Brewster,* 408 U. S. 501, 558 (1972) (dissenting opinion), where he spoke of the

of political philosophy; it is a fundamental prohibition plainly established by the decisions of this Court.

A unanimous Court, including Mr. Chief Justice Taft, Mr. Justice Holmes, and Mr. Justice Brandeis stated:

> "The general rule is that neither department ·[of Government] may . . . control, direct or restrain the action of the other." *Massachusetts* v. *Mellon,* 262 U. S. 447, 488 (1923).

Similarly, in *O'Donoghue* v. *United States,* 289 U. S. 516, 530 (1933), the Court emphasized the need for each branch of Government to be free from the coercive influence of the other branches:

> "[E]ach department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that the acts of each shall never be controlled by, or subjected, *directly or indirectly,* to, the coercive influence of either of the other departments."

In *Humphrey's Executor* v. *United States,* 295 U. S. 602, 629–630 (1935), the Court again held:

> "The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, *direct or indirect,* of either of the others, has often been · stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers . . . ." (Emphasis supplied.)

Consistent with the principle of noncoercion, the unbroken practice since George Washington with respect to congressional demands for White House papers has been, in Mr. Chief Justice Taft's words, that "while either house [of Congress]

---

"evil" of "executive *control* of legislative behavior . . . ." (Emphasis supplied.)

may request information, it cannot compel it . . . ." W. Taft, The Presidency 110 (1916). President Washington established the tradition by declining to produce papers requested by the House of Representatives relating to matters of foreign policy:

> "To admit, then, a right in the House of Representatives to demand and to have as a matter of course all the papers respecting a negotiation with a foreign power would be to establish a dangerous precedent." 1 Messages and Papers of the Presidents 195 (J. Richardson comp., 1899).

In noting the first President's practice, this Court stated in *United States* v. *Curtiss-Wright Corp.*, 299 U. S. 304, 320 (1936), that Washington's historic precedent was "a refusal the wisdom of which was recognized by the House itself and has never since been doubted." [5]

Part of our constitutional fabric, then, from the beginning has been the President's freedom from control or coercion by Congress, including attempts to procure documents that, though clearly pertaining to matters of important governmental interests, belong and pertain to the President. This freedom from Congress' coercive influence, in the words of *Humphrey's Executor,* "is implied in the very fact of the separation of the powers . . . ." 295 U. S., at 629–630. Moreover, it is not constitutionally significant that Congress has not directed that the papers be turned over to it for examination or retention, rather than to GSA. Separation of powers is fully implicated simply by Congress' mandating what disposition is to be made of the papers of another branch.

This independence of the three branches of Government, including control over the papers of each, lies at the heart of

---

[5] This Presidential prerogative has not been limited to foreign affairs, where, of course, secrecy and confidentiality may be of the utmost importance. See A. Bickel, The Morality of Consent 79 (1975); W. Taft, The Presidency 110 (1916).

this Court's broad holdings concerning the immunity of *congressional* papers from outside scrutiny. The Constitution, of course, expressly grants immunity to Members of Congress as to any "Speech or Debate in either House . . ."; yet the Court has refused to confine that Clause literally "to words spoken in debate." *Powell* v. *McCormack,* 395 U. S. 486, 502 (1969). Congressional papers, including congressional reports, have been held protected by the Clause in order " 'to prevent intimidation [of legislators] by the executive and accountability before a possibly hostile judiciary.' " *Ibid.* In a word, to preserve the constitutionally rooted independence of each branch of Government, each branch must be able to control its own papers.

Title I is an unprecedented departure from the constitutional tradition of noncompulsion. The statute commands the head of a *legislatively* created department to take and maintain custody of appellant's Presidential papers, including many purely personal papers wholly unrelated to any operations of the Government. Title I does not concern itself in any way with materials belonging to departments of the Executive Branch created and controlled by Congress.

The Court brushes aside the fundamental principle of noncompulsion, abandoning outright the careful, previously unchallenged holdings of this Court in *Mellon, O'Donoghue* and *Humphrey's Executor.* In place of this firmly established doctrine,[6] the Court substitutes, without analysis, an ill-defined

---

[6] The Court's references to the historical understanding of separation-of-powers principles omit a crucial part of that history. Madison's statements in The Federalist No. 47 as to one department's exercising the *"whole* power" of another department do not purport to be his total treatment of the subject. The Federalist No. 48, two days later, states the central theme of Madison's view:

"It is equally evident, that neither [department] ought to possess directly or indirectly, an overruling influence over the others in the *administration of their respective powers."* The Federalist No. 48, p. 332 (J. Cooke ed. 1961). (Emphasis supplied.)

Indeed, Madison expressly warned at length in No. 48 of the inevitable

"pragmatic, flexible approach." *Ante,* at 442. Recasting, for the immediate purposes of this case, our narrow holding in *United States* v. *Nixon,* 418 U. S. 683 (1974), see *infra,* at 515–516, the Court distills separation-of-powers principles into a simplistic rule which requires a "potential for disruption" or an "unduly disruptive" intrusion, before a measure will be held to trench on Presidential powers.[7]

The Court's approach patently ignores *Buckley* v. *Valeo,* where, only one year ago, we *unanimously* found a separation-of-powers violation without any allegation, much less a showing, of "undue disruption." There, we held that Congress could not impinge, even to the modest extent of six appointments to the Federal Election Commission, on the appointing powers of the President. We reached this conclusion in the face of the fact that President Ford had signed the bill into law.[8]

---

dangers of "encroachments" by the Legislative Branch upon the coordinate departments of Government.

But aside from the Court's highly selective discussion of the Framers' understanding, the Court cannot obscure the fact that this Court has never required, in order to show a separation-of-powers violation, that Congress usurped *the whole* of executive power. Any such requirement was rejected by the Court in *Buckley* v. *Valeo,* 424 U. S. 1 (1976). There, we held that Congress could not constitutionally exercise the President's appointing powers, even though under that statute the President had the power to appoint one-fourth of the Federal Election Commission members, and even though the President had "approved" the statute when he signed the bill into law.

[7] Nowhere is the standard clarified in the majority's opinion. We are left to guess whether only a "potential for disruption" is required or whether "undue disruption," whatever that may be, is required.

[8] The federal parties filed three briefs in *Buckley.* The main brief, styled the "Brief for the Attorney General as Appellee and for the United States as *Amicus Curiae,*" explicitly stated that the method of appointment of four of the members of the Commission was unconstitutional. See pp. 6–7, 110–120. The Attorney General signed this portion of the brief as a party (see pp. 2, 103 n. 65). The Executive Branch therefore made it clear that, in its view, the statute was unconstitutional to the extent it reposed appointing powers in Congress. The second brief, styled the "Brief for

But even taking the "undue disruption" test as postulated, the Court engages in a facile analysis, as MR. JUSTICE REHNQUIST so well demonstrates. We are told, under the Court's view, that no "undue disruption" arises because GSA officials have taken custody of appellant's Presidential papers, and since, for the time being, only GSA and other Executive Branch officials will have access to them. *Ante,* at 443–444.

This analysis is superficial in the extreme. Separation-of-powers principles are no less eroded simply because *Congress* goes through a "minuet" of directing Executive Department employees, rather than the Secretary of the Senate or the Doorkeeper of the House, to possess and control Presidential papers. Whether there has been a violation of separation-of-powers principles depends, not on the identity of the custodians, but upon which branch has commanded the custodians to act. Here, Congress has given the command.

If separation-of-powers principles can be so easily evaded, then the constitutional separation is a sham.

Congress' power to regulate *Executive Department documents,* as contrasted with *Presidential papers,* under such measures as the Freedom of Information Act, 5 U. S. C. § 552 (1970 ed. and Supp. V), does not bear on the question. No one challenges Congress' power to provide for access to records of the Executive Departments which Congress itself created. But the Freedom of Information Act, the Privacy Act of 1974, and similar measures never contemplated mandatory production of Presidential papers. What is instructive, by contrast, is the nonmandatory, noncoercive manner in which Congress has previously legislated with respect to Presidential papers, by providing for Presidential libraries *at the option* of every

the Attorney General and the Federal Election Commission," generally defended the Act but took no position concerning the method of appointing the Commission. See p. 1 n. 1. The third brief was filed by the Commission on its own behalf only; it defended the appointment procedures, but it was not joined by the Attorney General and did not express the view of the President or of any other portion of the Executive Branch.

former President. Title I, however, breaches the nonmandatory tradition that has long been a vital incident of separation of powers.

## C

The statute, therefore, violates separation-of-powers principles because it exercises a coercive influence by another branch over the Presidency. The legislation is also invalid on another ground pertaining to separation of powers; it is an attempt by Congress to exercise powers vested exclusively in the President—the power to control files, records, and papers of the office, which are comparable to the internal workpapers of Members of the House and Senate.

The general principle as to this aspect of separation of powers was stated in *Kilbourn* v. *Thompson*:

> "[E]ach [branch] shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.
>
> .     .     .     .     .
>
> "[A]s a general rule . . . the powers confided by the Constitution to one of these departments cannot be exercised by another." 103 U. S., at 191.

Madison also expressed this:

> "For this reason that Convention which passed the ordinance of government, laid its foundation on this basis, that the legislative, executive and judiciary departments should be separate and distinct, so that no person should exercise the powers of more than one of them at the same time." The Federalist No. 48, p. 335 (J. Cooke ed. 1961) (quoting Jefferson).

In the 1975 Term, in the face of a holding by a Court of Appeals that the separation-of-powers challenge was meritless, we unanimously invalidated an attempt by Congress to exercise appointing powers constitutionally vested in the Chief Executive. *Buckley* v. *Valeo,* 424 U. S., at 109–143.

The Constitution does not speak of Presidential papers, just as it does not speak of workpapers of Members of Congress or of judges.[9] But there can be no room for doubt that, up to now, it has been the implied prerogative of the President—as of Members of Congress and of judges—to memorialize matters, establish filing systems, and provide unilaterally for disposition of his workpapers. Control of Presidential papers is, obviously, a natural and necessary incident of the broad discretion vested in the President in order for him to discharge his duties.[10]

To be sure, we recognized a narrowly limited exception to Presidential control of Presidential papers in *United States* v. *Nixon,* 418 U. S. 683 (1974). But that case permits compulsory judicial intrusions only when a vital constitutional function, *i. e.,* the conduct of criminal proceedings, would be impaired *and* when the President makes no more "than a generalized claim of . . . public interest . . . ," *id.,* at 707, in maintaining complete control of papers and in preserving confidentiality. That case, in short, was essentially a conflict between the Judicial Branch and the President, where the effective functioning of both branches demanded an accommodation and where the prosecutorial and judicial demands upon the President were very narrowly restricted with great

[9] As to congressional papers, see *supra,* at 510–511. Despite the Constitution's silence as to the *papers* of the Legislative Branch, this Court had no difficulty holding those papers to be protected from control by other branches. See also MR. JUSTICE BRENNAN's dissenting opinion in *United States* v. *Brewster,* 408 U. S. 501, 532–533 (1972), where he quotes approvingly from *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881), and *Coffin* v. *Coffin,* 4 Mass. 1 (1808). In both of those cases, *written* materials by legislators were deemed to be protected by legislative immunity from intrusion or seizure.

[10] This discretion was exercised, as we have seen, by President Washington in the face of a congressional demand for production of his workpapers.

Obviously, *official documents* fall into an entirely different category and are not involved in this case.

specificity "to a limited number of conversations. . . ." Moreover, the request for production there was limited to materials that might themselves contain evidence of criminal activity of persons then under investigation or indictment. Finally, the intrusion was carefully limited to an *in camera* examination, under strict limits, by a single United States District Judge. That case does not stand for the proposition that the Judiciary is at liberty to order *all* papers of a President into custody of United States Marshals.[11]

*United States* v. *Nixon,* therefore, provides no authority for Congress' mandatory regulation of Presidential papers simply "to promote the general Welfare" which, of course, is a generalized purpose. No showing has been made, nor could it, that Congress' functions will be impaired by the former President's being allowed to control his own Presidential papers.[12] Without any threat whatever to its own functions, Congress has by this statute, as in *Buckley* v. *Valeo,* exercised authority entrusted to the Executive Branch.[13]

---

[11] Appellees, of course, would view that sort of intrusion as an intra-branch confrontation, since United States Marshals are officials of the Executive Branch, at least so long as the District Judge simply ordered the Marshals to take custody of and to review the documents without turning them over to the court. This is, of course, sheer sophistry.

[12] Of course, *United States* v. *Nixon* pertained only to the setting of Judicial-Executive conflict. Nothing in our holding suggests that, even if Congress needed Presidential documents in connection with its legislative functions, the constitutional tradition of Presidential control over Presidential documents in the face of legislative demands could be abrogated. We expressly stated in *Nixon* that "[w]e are not here concerned with the balance between . . . the confidentiality interest and congressional demands for information . . . ." 418 U. S., at 712 n. 19.

[13] In his concurring opinion, MR. JUSTICE POWELL concludes that Title I was addressed essentially to an "emergency" situation in the wake of appellant's resignation. But his opinion does not present any analysis as to whether this particular legislation, not *some* other legislation, is necessary to achieve that end. Since Title I commands confiscation of

## D

Finally, in my view, the Act violates principles of separation of powers by intruding into the confidentiality of Presidential communications protected by the constitutionally based doctrine of Presidential privilege. A unanimous Court in *United States* v. *Nixon* could not have been clearer in holding that the privilege guaranteeing confidentiality of such communications derives from the Constitution, subject to compelled disclosure only in narrowly limited circumstances:

> "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." 418 U. S., at 708.

President Lyndon Johnson expressed the historic view of Presidential confidentiality in even stronger terms in a letter to the GSA Administrator: "[S]ince the President . . . is the recipient of many confidences from others, and since the inviolability of such confidence is essential to the functioning of the constitutional office of the Presidency, it will be necessary to withhold from public scrutiny certain papers and

---

all materials of an entire Presidential administration, Title I was simply not drafted to meet the specific emergency it purports to address. Besides omitting any discussion justifying the need for Title I, MR. JUSTICE POWELL's opinion relies entirely on the possibly limiting regulations to be promulgated at some future point by the GSA Administrator, which will protect "all constitutional and legal rights . . . ." *Ante*, at 497. This conclusion, of course, begs the precise question before us, which is whether the act of congressionally mandated seizure of all Presidential materials of one President violates the Constitution.

classes of papers for varying periods of time. Therefore . . . I hereby reserve the right to restrict the use and availability of any materials . . . for such time as I, in my sole discretion, may . . . specify . . . ." Hearing before a Subcommittee of the House Committee on Government Operations, on H. J. Res. 632, 89th Cong., 1st Sess., 17 (1965).

As a constitutionally based prerogative, Presidential privilege inures to the President himself; it is personal in the same sense as the privilege against compelled self-incrimination. Presidential privilege would therefore be largely illusory unless it could be interposed by the President against the countless thousands of persons in the Executive Branch, and most certainly if the executive officials are acting, as this statute contemplates, at the command of a different branch of Government.[14]

This statute requires that persons not designated or approved by the former President will review all Presidential papers. Even if the Government agents, in culling through the materials, follow the "advisory" suggestions offered by the District Court, the fact remains that their function abrogates the Presidential privilege. Congress has, in essence, commanded them to review and catalog thousands of papers and recordings that are undoubtedly privileged. Given that fact, it is clear that the Presidential privilege of one occupant of that office will have been rendered a nullity.[15]

---

[14] Civil service statutes aside, we know now that an executive official cannot replace all of his underlings on the basis of a patronage system. Thus, as a matter of constitutional law, a Chief Executive would not be at liberty to replace all Executive Branch officials with persons who, for political reasons, enjoy the President's trust and confidence. *Elrod* v. *Burns,* 427 U. S. 347 (1976).

[15] I cannot accept the argument pressed by appellees that review is rendered harmless by the fact that many of the documents *may* not be protected by Presidential privilege. How "harmless" review justifies manifestly "harmful" review escapes me.

## E

There remains another inquiry under the issue of separation of powers. Does the fact that the Act applies only to a former President, described as "a legitimate class of one," *ante*, at 472, after he has left office, justify what would otherwise be unconstitutional if applicable to an incumbent President?

On the face of it, congressional regulation of the papers of a former President obviously will have less disruptive impact on the operations of an incumbent President than an effort at regulation or control over the same papers of an incumbent President. But this "remoteness" does not eliminate the separation-of-powers defects. First, the principle that a President must be free from coercion should apply to a former President, so long as Congress is inquiring or acting with respect to operations of the Government while the former President was in office.[16]

To the extent Congress is empowered to coerce a *former* President, every future President is at risk of denial of a large measure of the autonomy and independence contemplated by the Constitution and of the confidentiality attending it. *Myers* v. *United States,* 272 U. S. 52 (1926). Indeed, the President, if he is to have autonomy while in office, needs the assurance that Congress will not immediately be free to coerce him to open all his files and records and give an account of Presidential actions at the instant his successor is sworn in.[17] Absent the validity of the expectation of

---

[16] President Truman, for one, objected to Congress' efforts to coerce him after he was no longer in office in connection with matters pertaining to his administration. See *infra,* at 522.

[17] It would be the height of impertinence, after all, to serve a legislative subpoena on an outgoing President as he is departing from the inauguration of his successor. So too, the people would rightly be offended, and more important, so would the Constitution, by a congressional resolution, designed to ensure the smooth functioning of the Executive Branch, requiring a former President, upon leaving office, to remain in

privacy of such papers (save for a subpoena under *United States* v. *Nixon*), future Presidents and those they consult will be well advised to take into account the possibility that their most confidential correspondence, workpapers, and diaries may well be open to congressionally mandated review, with no time limit, should some political issue give rise to an interbranch conflict.

### The Need for Confidentiality

The consequences of this development on what a President expresses to others in writing and orally are incalculable; perhaps even more crucial is the inhibiting impact on those to whom the President turns for information and for counsel, whether they are officials in the Government, business or labor leaders, or foreign diplomats and statesmen. I have little doubt that Title I—and the Court's opinion—will be the subject of careful scrutiny and analysis in the foreign offices of other countries whose representatives speak to a President on matters they prefer not to put in writing, but which may be memorialized by a President or an aide. Similarly, Title I may well be a "ghost" at future White House conferences, with conferees choosing their words more cautiously because of the enlarged prospect of compelled disclosure to others. A unanimous Court carefully took this into account in *United States* v. *Nixon:*

> "The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." 418 U. S., at 708.

---

Washington, D. C., in order to be available for consultations with his successor for a prescribed period of time.

In this same vein, MR. JUSTICE POWELL argues that President Carter's representation to the Court through the Solicitor General that Title I enhances the efficiency of the Executive Branch is dispositive of appellant's separation-of-powers claim. This deference to the views of one administration, expressed approximately 100 days after its inception, as to the permanent structure of our Government is not supported by precedent and conflicts with 188 years of history. First, there is no principled basis for limiting this unique deference. If and when the one-House veto issue, for example, comes before us, are we to accept the opinion of the Department of Justice as to the effects of that legislative device on the Executive Branch's operations? Second, if Title I is thus efficacious, why did the President who signed this bill into law decide to establish a Presidential library in Ann Arbor, Mich., rather than turn all of his Presidential materials over to GSA for screening and retention in Washington, D. C., where the materials would be readily accessible to officials of the Executive Branch? And why, suddenly, is Congress' acquiescence in President Ford's actions consistent with the supposed foundation of Title I?

Third, as pointed out by MR. JUSTICE BLACKMUN, *ante*, at 491: "Political realities often guide a President to a decision not to veto" or, indeed, a decision not to challenge in court the actions of Congress. See n. 18, *infra*. Finally, it is perhaps not inappropriate to note that, on occasion, Presidents disagree with their predecessors on issues of policy. Some have believed in "Congressional Government"; others adhered to expansive notions of Presidential power. It is, I respectfully submit, a unique idea that this Court accept as controlling the representations of any administration on a constitutional question going to the permanent structure of Government.

Title I is also objectionable on separation-of-powers grounds, despite its applicability only to a former President, because compelling the disposition of all of a former President's papers

522

is a legislative exercise of what have historically been regarded as executive powers. Presidential papers do not, after all, instantly lose their nature quadrennially at high noon on January 20. Moreover, under Title I it is now the Congress, not the incumbent President,[18] that has decided what to do with *all* the papers of one entire administration.

Finally, the federal appellees concede that Presidential privilege, a vital incident of our separation-of-powers system, does not terminate instantly upon a President's departure from office. They candidly acknowledge that "the privilege survives the individual President's tenure," Brief for Federal Appellees 33, because of the vital public interests underlying the privilege. This principle, as all parties concede, finds explicit support in history; former President Truman in 1953 refused to provide information to the Congress on matters occurring during his administration, advising Congress:

> "It must be obvious to you that if the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, *it must be equally applicable to a President after his term of office has expired* when he is sought to be examined with respect to any acts occurring while he [was] President." 120 Cong. Rec. 33419 (1974). (Emphasis supplied.) [19]

---

[18] The fact that the President signs a bill into law, and thereafter defends it, without more, does not mean, of course, that the policy embodied in the legislation is that of the President, nor does it even mean that the President personally approves of the measure. When signing a bill into law, numerous Presidents have actually expressed disagreement with the legislation but felt constrained for a variety of reasons to permit the bill to become law. President Franklin D. Roosevelt repudiated the "Lovett Rider" later struck down by this Court in *United States* v. *Lovett,* 328 U. S. 303, 325 (1946) (Frankfurter, J., concurring). President Ford did not request this legislation in order to assure the effective functioning of the Executive Branch.

[19] Since by definition the concern is with former Presidents, I see no distinction in Congress' seeking to compel the appearance and testimony

To ensure institutional integrity and confidentiality, Presidents and their advisers must have assurance, as do judges and Members of Congress, that their internal communications will not become subject to retroactive legislation mandating intrusions into matters as to which there was a well-founded expectation of privacy when the communications took place. Just as Mr. Truman rejected congressional efforts to inquire of him, after he left office, as to his activities while President, this Court has always assumed that the immunity conferred by the Speech or Debate Clause is available to a Member of Congress after he leaves office. *United States* v. *Brewster*, 408 U. S. 501 (1972). It would therefore be illogical to conclude that the President loses all immunity from legislative coercion as to his Presidential papers from the moment he leaves office.

The Court correctly concedes that a former President retains the Presidential privilege after leaving office, *ante,* at 448–449; but it then concludes that several considerations cut against recognition of the privilege as to one former President. First, the Court places great emphasis on the fact that neither President Ford nor President Carter "supports appellant's claim . . . ." *Ante,* at 449. The relevance of that fact is not immediately clear. The validity of one person's constitutional privilege does not depend on whether some other holder of the same privilege supports his claim.[20] The fact that an *incumbent* President has signed or supports a particular measure cannot defeat a *former* President's claim of privilege. If the Court is correct today, it was wrong one year ago in *Buckley* v. *Valeo,* when we unanimously held that Presidential approval of the Federal Election Cam-

of a former President and in, alternatively, seeking to compel the production of Presidential papers over the former President's objection.

[20] Clients asserting the attorney-client privilege have not, up to now, been foreclosed from interposing the privilege unless a similarly situated client is willing to support the particular claim.

paign Act could not validate an unconstitutional invasion of Presidential appointing authority.

Second, the Court suggests that many of the papers are unprivileged. Of the great volume of pages, appellant estimated that he saw only about 200,000 items while he was President. Several points are relevant in this regard. We do not know how many pages the 200,000 items represent; the critical factor is that all papers are presumptively privileged. Regardless of the number of pages, the fact remains that the 200,000 items that the President personally reviewed or prepared while in office obviously have greater historical value than the mass of routine papers coming to the White House. Mountains of Government reports tucked away in Presidential files will not likely engage the interest of archivists or historians, since most such reports are not historically important and are, in any event, available elsewhere. Rather, archivists and historians will want to find and preserve the materials that reflect the President's internal decisionmaking processes. Those are precisely the papers which will be subjected to the most intensive review and which have always been afforded absolute protection. The Court's analytically void invocation of sheer numbers cannot mask the fact that the targets of the review are privileged papers, diaries, and conversations.

I agree that, under *United States* v. *Nixon,* the Presidential privilege is qualified. From that premise, however, the Court leaps to the conclusion that future regulations governing *public access* to the materials are sufficient to protect that qualified privilege. The Act does indeed provide for a number of safeguards before the public at large obtains access to the materials. See § 104 (a). But the Court cannot have it both ways. The opinion expressly recognizes again and again that *public access is not now the issue.* The constitutionality of a statute cannot rest on the presumed validity of regulations not yet issued; moreover, no regulations governing public access can remedy the statute's basic flaw of

permitting Congress to seize the confidential papers of a President.

## F

In concluding that Title I on its face violates the principle of separation of powers, I do not address the issue whether some circumstances might justify legislation for the disposition of Presidential papers without the President's consent. Here, nothing remotely like the *particularized need* we found in *United States* v. *Nixon* has been shown with respect to these Presidential papers. No one has suggested that Congress will find its own "core" functioning impaired by lack of the impounded papers, as we expressly found the judicial function would be impaired by lack of the material subpoenaed in *United States* v. *Nixon.*

I leave to another day the question whether, under exigent circumstances, a *narrowly defined* congressional demand for Presidential materials might be justified. But Title I fails to satisfy either the required narrowness demanded by *United States* v. *Nixon* or the requirement that the coequal powers of the Presidency not be injured by congressional legislation.

## II

### *Privacy*

The discussion of separation of powers concerns, of course, the structure of government, not the rights of the sole individual ostensibly affected by this legislation. But Title I touches not only upon the independence of a coordinate branch of government, it also affects, in the most direct way, the basic rights of one named individual. The statute provides, as we have seen, for governmental custody over—and review of—all of the former President's written and recorded materials at the time he left office, including diary recordings and conversations in his private residences outside Washington, D. C. § 101 (a)(2).

The District Court was deeply troubled by this admittedly

unprecedented intrusion. Its opinion candidly acknowledged that the personal-privacy claim was the "most troublesome" point raised by this unique statute.[21] In addition to communications and memoranda reflecting the President's confidential deliberations, the District Court admitted that the materials subject to GSA review included highly personal communications.

"Among all of the papers and tape recordings falling within the Act, however, are some papers and materials containing extremely private communications between [Mr. Nixon] and, among others,. his wife, his daughters, his physician, lawyer, and clergyman, and his close friends, as well as personal diary dictabelts and his wife's personal files. . . . Segregating those that are private from those that are not private requires rather comprehensive screening, and archivists entrusted with that duty will be required to read or listen to private communications." 408 F. Supp. 321, 359 (DC 1976).

A

Given this admitted intrusion, the legislation before us must be subjected to the most searching kind of judicial scrutiny.[22] Statutes that trench on fundamental liberties, like

[21] The District Court concluded its discussion of the privacy challenge as follows: "We would be less than candid were we to state that we find it as easy to dispose of Mr. Nixon's privacy claims as his claim of presidential privilege." 408 F. Supp., at 367.

[22] Although the District Court expressly concluded that the former President had a "legitimate expectation" that his Presidential materials would not be subject to "comprehensive review by government personnel without his consent," id., at 361, the Court nonetheless deemed the compulsory intrusion permissible given the constitutionality of the federal wiretap statute, 18 U. S. C. §§ 2510–2520, which of course permits substantial governmental intrusions into the privacy of individuals. Not only is this analogy imperfect, as the District Court itself admitted, 408 F. Supp., at 364, but this analysis fails to apply the "exacting scrutiny" called for by our decisions. Above all, the present statute fails to provide any of the

those affecting significantly the structure of our government, are not entitled to the same presumption of constitutionality we normally accord legislation. *Moore* v. *East Cleveland,* 431 U. S. 494, 499 (1977). The burden of justification is reversed; the burden rests upon government, not on the individual whose liberties are affected, to justify the measure. *Abood* v. *Detroit Board of Education,* 431 U. S. 209, 263–264 (1977) (POWELL, J., concurring in judgment). We recently reaffirmed the standard of review in such cases as one of "exacting scrutiny."

> "We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest . . . . [W]e have required that the subordinating interests of the State must survive exacting scrutiny." *Buckley* v. *Valeo,* 424 U. S., at 64.

### B

Constitutional analysis must, of course, take fully into account the nature of the Government's interests underlying challenged legislation. Once those interests are identified, we must then focus on the nature of the individual interests affected by the statute. *Id.,* at 14–15. Finally, we must decide whether the Government's interests are of sufficient weight to subordinate the individual's interests, and, if so, whether the Government has nonetheless employed unnecessarily broad means for achieving its purposes. *Lamont* v. *Postmaster General,* 381 U. S. 301, 310 (1965) (BRENNAN, J., concurring).

Two governmental interests are asserted as the justification for this statute: to ensure the general efficiency of the Execu-

---

stringent safeguards, including a warrant, mandated by Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Indeed, the District Court flatly admitted as much. *Ibid.*

tive Branch's operations [23] and to preserve historically significant papers and tape recordings for posterity.[24] Both these purposes are legitimate and important. Yet, there was no serious suggestion by Congress that the operations of the Executive Branch would actually be impaired unless, contrary to nearly 200 years' past practice, all Presidential papers of the one named incumbent were required by law to be impounded in the sole control of Government agents. The statute on its face, moreover, does not purport to address a particularized need, such as the need to secure Presidential papers concerning the Middle East, the SALT talks, or problems in Panama.[25] Indeed, the congressionally perceived "need" is a

---

[23] Administrative efficiency is obviously a highly desirable goal. See, *e. g.*, *Dixon* v. *Love*, 431 U. S. 105, 114 (1977); *Mathews* v. *Eldridge*, 424 U. S. 319, 347–349 (1976). However, I am constrained to recall that "administrative efficiency" has not uniformly been regarded as of "overriding importance." Indeed, claims of administrative efficiency have been swiftly dismissed at times as mere "bald assertion[s]." *Richardson* v. *Wright*, 405 U. S. 208, 223 (1972) (BRENNAN, J., dissenting). Numerous other opinions have held that individual interests, including the right to welfare payments, "clearly outweigh" government interests in promoting "administrative efficiency," *Goldberg* v. *Kelly*, 397 U. S. 254 (1970) (opinion of BRENNAN, J.). And, MR. JUSTICE MARSHALL in *Shapiro* v. *Thompson*, 394 U. S. 618, 634 (1969), stated that when "fundamental" rights are at stake, such as the "right to travel," government must demonstrate a *"compelling"* interest, not merely a "rational relationship between [the underlying statute] and [the] . . . admittedly permissible state objectives . . . ."

[24] The initial interest in preserving the materials for judicial purposes has diminished substantially. Since the Special Prosecutor has disclaimed any further interest in the materials for purposes of possible criminal investigations, the only conceivably remaining judicial need is to preserve the materials for possible use in civil litigation between *private parties*. The admittedly important interests in the enforcement of the criminal law, recognized in *United States* v. *Nixon*, are no longer pressed by the Government.

[25] If there were a particularized need, the statute suffers from greater overbreadth than others we have invalidated.

far more "generalized need" than that rejected in *United States* v. *Nixon* by a unanimous Court.

As to the interest in preserving historical materials, there is nothing whatever in our national experience to suggest that existing mechanisms, such as the 20-year-old Presidential Libraries Act, were insufficient to achieve that purpose.[26] In any event, the interest in preserving "historical materials" cannot justify seizing, without notice or hearing, private papers preliminary to a line-by-line examination by Government agents.

In contrast to Congress' purposes underlying the statute, this Act intrudes significantly on two areas of traditional privacy interests of Presidents. One embraces Presidential papers relating to his decisions, development of policies, appointments, and communications in his role as leader of a political party; the other encompasses purely private matters of family, property, investments, diaries, and intimate conversations. Both interests are of the highest order, with perhaps some primacy for family papers.[27] Cf. *Moore* v. *East Cleveland, supra,* at 499.

Title I thus touches directly on what MR. JUSTICE POWELL once referred to as the "intimate areas of an individual's personal affairs," *California Bankers Assn.* v. *Shultz,* 416 U. S.

---

[26] At the time Title I was passed, appellant had made tentative arrangements with the University of Southern California in Los Angeles for the establishment of a Presidential library, under the terms of the Presidential Libraries Act. App. 167–168. That has now ripened into a formal agreement so that in the event Title I is invalidated, appellant's historical materials will be housed in a facility on the USC campus under terms applicable to other Presidential libraries of past Presidents.

[27] The Court's refusal to afford constitutional protection to such commercial matters as bank records, *California Bankers Assn.* v. *Shultz,* 416 U. S. 21 (1974), or drug prescription records, *Whalen* v. *Roe,* 429 U. S. 589 (1977), only serves to emphasize the importance of truly private papers or communications, such as a personal diary or family correspondence. These private papers lie at the core of First and Fourth Amendment interests.

21, 78 (1974) (concurring opinion). The papers in both of these areas—family and political decisionmaking—are of the most private nature, enjoying the highest status under our law. MR. JUSTICE BRENNAN recently put it this way: "Personal letters constitute an integral aspect of a person's private enclave." *Fisher v. United States,* 425 U. S. 391, 427 (1976) (concurring in judgment). An individual's papers, he said, are "an extension of his person." *Id.,* at 420. MR. JUSTICE MARSHALL made the same point: "Diaries and personal letters that record only their author's personal thoughts lie at the heart of our sense of privacy." *Couch v. United States,* 409 U. S. 322, 350 (1973) (dissenting opinion). In discussing private papers, he referred even more emphatically to the "deeply held belief on the part of the Members of this Court throughout its history that there are certain documents *no person ought to be compelled to produce at the Government's request." Fisher v. United States, supra,* at 431–432 (emphasis supplied) (concurring in judgment). This echoes Lord Camden's oft-quoted description of personal papers as a man's "dearest property." *Boyd v. United States,* 116 U. S. 616, 628 (1886).

One point emerges clearly: The papers here involve the most fundamental First and Fourth Amendment interests. Since the Act asserts *exclusive* Government custody over *all* papers of a former President, the Fourth Amendment's prohibition against unreasonable searches and seizures is surely implicated.[28] Indeed, where papers or books are the subject

---

[28] The fact that GSA initially secured possession of the Presidential papers through the agreement with the former President does not change the fact that the agency was commanded by Congress to take exclusive custody of *and retain* all Presidential historical materials. Moreover, everyone admits that the Act contemplates a careful screening process by Government agents. The fact that the governmental intrusion is non-criminal in nature does not, of course, render the Fourth Amendment's prohibitions inapplicable. See *South Dakota v. Opperman,* 428 U. S. 364 (1976).

of a government intrusion, our cases uniformly hold that the Fourth Amendment prohibition against a general search requires that warrants contain descriptions reflecting "the most scrupulous exactitude . . . ," *Stanford* v. *Texas,* 379 U. S. 476, 485 (1965). Those cases proscribe general language in a warrant—or a statute—of "indiscriminate sweep . . . ." *Id.,* at 486. Title I, commanding seizure followed by permanent control of all materials having "historical or commemorative value," evidences the "indiscriminate sweep" we have long denounced. This "broad broom" statute provides virtually no standard at all to guide the Government agents combing through the papers; the agents are left to roam at large through confidential materials, something to which no other President and no Member of Congress or of the Judicial Branch has been subjected.

The Court, while recognizing that Government agents will necessarily be reviewing the most private kinds of communications covering a period of five and one-half years, tells us that *Stanford* is inapposite. Several reasons are given. The Court suggests that, unlike the instant case, the seizure in *Stanford* included vast quantities of materials unrelated to any legitimate government objective; in addition, the *Stanford* intrusion constituted an invasion of the home in connection with a criminal investigation. That last consideration relied on by the Court can be disposed of quickly, for by its terms, just as in *Stanford,* Title I commands seizure and review of papers from appellant's *private residences* within and outside Washington, D. C., § 101 (a), for the purpose, among others, of criminal proceedings brought by the Special Prosecutor, § 102 (b), and to make the materials available more broadly "for use in judicial proceedings." § 104 (a)(2). Title I is not needed for this purpose, since a narrowly defined subpoena can accomplish those purposes under *United States* v. *Nixon.* Title I is in effect a "legislative warrant" reminiscent of the odious general warrants of the colonial era.

As to the Court's first consideration, its "quantity" test is fallacious. The intrusion in *Stanford* was unlawful not because the State had an interest in only part of many items in Stanford's home, but rather because the warrant failed to describe the objects of seizure with the "most scrupulous exactitude." *Stanford* is not a "numbers" test, the protection of which vanishes if unprotected materials outnumber protected materials; it is, rather, a test designed to ensure *that protected materials are not seized at all.* Title I on its face commands that protected materials be seized wherever found—including the private residences mentioned—reviewed, and returned only if the Government agents decide that certain protected materials lack historical significance. The Act plainly accomplishes exactly what *Stanford* expressly forbids.

In addition to Fourth Amendment considerations, highly important First Amendment interests pervade all Presidential papers, since they include expressions of privately held views about politics, diplomacy, or people of all walks of life, within and outside this country. Appellant's freedom of association is also implicated, since his recordings and papers will likely reveal much about his relationships with both individuals and organizations. In *NAACP* v. *Alabama,* 357 U. S. 449, 462 (1958), the Court said:

> "This Court has recognized the vital relationship between freedom to associate and privacy in one's associations."

Accordingly, in passing on a statute compelling disclosure of political contributions, the Court, in *Buckley* v. *Valeo,* imposed the strict standard of "exacting scrutiny" because of the significant impact on First Amendment rights.

The fact that the former President was an important national and world political figure obviously does not diminish the traditional privacy interest in his papers. Forced disclosure of private information, even to Government officials, is by no means sanctioned by this Court's decisions, except for

the most compelling reasons. Cf. *Whalen* v. *Roe,* 429 U. S. 589 (1977). I do not think, for example, that this Court would readily sustain, as a condition to holding public office, a requirement that a candidate reveal publicly membership in every organization whether religious, social, or political. After all, our decision in *NAACP* v. *Alabama, supra,* was presumably intended to protect from compelled disclosure members of the organization who were actively involved in public affairs or who held public office in Alabama.

The Court's reliance on *Whalen* v. *Roe, supra,* in rejecting appellant's privacy claim is surprising. That case dealt with the State's undoubted police power to regulate dispensing of dangerous drugs, the very use or possession of which the State could forbid. 429 U. S., at 603, and 597 n. 20. Hence, we had no difficulty whatever in reaching a unanimous holding that the public interest in regulating *dangerous drugs* outweighed any privacy interest in reporting to the State all prescriptions, those reports being made confidential by statute. No personal, private business, or political confidences were involved.

C

In short, a former President up to now has had essentially the same expectation of privacy with respect to his papers and records as every other person. This expectation is soundly based on two factors: first, under our constitutional traditions, Presidential papers have been, for more than 180 years, deemed by the Congress to belong to the President. Congress ratified this tradition by specific Acts: (a) congressional appropriations following authorization to purchase Presidential papers; (b) congressional enactment of a non-mandatory system of Presidential libraries; and (c) statutes permitting, until 1969, a charitable-contribution deduction for papers of Presidents donated to the United States or to nonprofit institutions.

534

Second, in the absence of any legislation to the contrary, there was no reason whatever for a President to take time from his official duties to ensure that there was no "commingling" of "public" and "private" papers. Indeed, the fact that the former President commingled Presidential and private family papers, absent any then-existing laws to the contrary, points strongly to the conclusion that he did in fact have an expectation of privacy with respect to both categories of papers.

On the basis of this Court's holdings, I cannot understand why the former President's privacy interests do not outweigh the generalized, undifferentiated goals sought to be achieved by Title I. Without a more carefully defined focus, these legislative goals do not represent "paramount Government interests," nor is this particular piece of legislation needed to achieve those goals, even if we assume, *arguendo*, that they are of a "compelling" or "overriding" nature. But even if other Members of the Court strike the balance differently, the Government has nonetheless failed to choose narrowly tailored means of carrying out its purposes so as not unnecessarily to invade important First and Fourth Amendment liberties. The Court demanded no less in *Buckley* v. *Valeo*, and nothing less will do here. Cf. *Hynes* v. *Mayor of Oradell*, 425 U. S. 610, 620 (1976).

The federal appellees point to two factors as mitigating the effects of this admitted intrusion: first, in their view, most of the President's papers and conversations relate to the business of Government, rather than to personal, family, or political matters; second, it is said that the intrusion is limited as much as possible, since the review will be carried out by specially trained Government agents.

Even accepting the Government's interest in identifying and preserving governmentally related papers in order to preserve them for historical purposes, that interest cannot justify a seizure and search of *all* the papers taken here.

Since compulsory review of personal and family papers and tape recordings is an admittedly improper invasion of privacy, no constitutional principle justifies an intrusion into indisputably protected areas in order to carry out the "generalized" statutory objectives.

Second, the intrusion cannot be saved by the credentials, however impeccable, of the Government agents. The initial problem with this justification is that no one knows whether these agents are, as the federal appellees contend, uniformly discreet. Despite the lip service paid by the District Court and appellees to the record of archivists generally, there is nothing before us to justify the conclusion that each of the more than 100 persons who apparently will have access to, and will monitor and examine, the materials is indeed reliably discreet.

The Act, furthermore, provides GSA with no meaningful standards to minimize the extent of intrusions upon appellant's privacy. We are thus faced with precisely the same standardless discretion vested in governmental officials which this Court has unhesitatingly struck down in other First Amendment areas. See, e. g., *Hynes* v. *Mayor of Oradell*, *supra*. In the absence of any meaningful statutory standards, which might help secure the privacy interests at stake, I question whether we can assume, as a matter of law, that Government agents will be able to formulate for themselves constitutionally valid standards of review in examining, segregating, and cataloging the papers of the former President.

Nor does the possibility that, had Title I not been passed, appellant would perhaps use Government specialists to help classify and catalog his papers eliminate the objections to this intrusion. Had appellant, like all his recent predecessors, been permitted to deposit his papers in a Presidential library, Government archivists would have been working directly under appellant's guidance and direction, not solely that of Congress or GSA. He, not Congress, would have established standards

for preservation, to ensure that his privacy would be protected. Similarly, he would have been able to participate personally in the reviewing process and could thus assure that any governmental review of purely personal papers was minimized or entirely eliminated. He, not Congress, would have controlled the selection of which experts, if any, would have access to his papers. Finally, and most important, the "intrusion" would have been consented to, eliminating any constitutional question. But the *possibility* of a consent intrusion cannot, under our law, justify a nonconsensual invasion. Actual consent is required, cf. *Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973), not the mere possibility of consent under drastically different circumstances.

Finally, even if the Government agents are completely discreet, they are still Government officials charged with reviewing highly private papers and tape recordings. Unless we are to say that a police seizure and examination of private papers is justified by the "impeccable" record of a discreet police officer, I have considerable difficulty understanding how a compulsory review of admittedly private papers, in which there is no conceivable governmental interest, by Government agents is constitutionally permissible.

## III

### Bill of Attainder

#### A

Under Art. I, § 9, cl. 3, as construed and applied by this Court since the time of Mr. Chief Justice Marshall, Title I violates the Bill of Attainder Clause. In contrast to Title II of Pub. L. 93–526, the Public Documents Act, which establishes a National Study Commission to study questions concerning the preservation of records of *all* federal officials, Title I commands the Administrator to seize all tape recordings "involv[ing] former President Richard M. Nixon" and all "Presidential historical materials of Richard M. Nixon . . . ."

§§ 101 (a)(1), (b)(1). By contrast with Title II, which is general legislation, Title I is special legislation singling out one individual as the target.

Although the prohibition against bills of attainder has been addressed only infrequently by this Court, it is now settled beyond dispute that a bill of attainder, within the meaning of Art. I, is by no means the same as a bill of attainder at common law. The definition departed from the common-law concept very early in our history, in a most fundamental way. At common law, the bill was a death sentence imposed by legislative Act. Anything less than death was not a bill of attainder, but was, rather, "a bill of pains and penalties." This restrictive definition was recognized tangentially in *Marbury* v. *Madison,* 1 Cranch 137, 179 (1803),[29] but the Court soon thereafter rejected conclusively any notion that only a legislative death sentence or even incarceration imposed on named individuals fell within the prohibition. Mr. Chief Justice Marshall firmly settled the matter in 1810, holding that legislative punishment in the form of a deprivation of property was prohibited by the Bill of Attainder Clause:

> "A bill of attainder may affect the life of an individual, *or may confiscate his property,* or may do both."
> *Fletcher* v. *Peck,* 6 Cranch 87, 138. (Emphasis supplied.)

The same point was made 17 years later in *Ogden* v. *Saunders,* 12 Wheat. 213, 286, where the Court stated:

> "By classing bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts together, the

---

[29] "The constitution declares that 'no bill of attainder or *ex post facto* law shall be passed.'

"If, however, such a bill should be passed and a person should be prosecuted under it; must the court condemn to death those victims whom the constitution endeavors to preserve?" *Marbury* v. *Madison,* 1 Cranch, at 179.

general intent becomes very apparent; *it is a general provision against arbitrary and tyrannical legislation over existing rights, whether of person or property."* (Emphasis supplied.)

More than 100 years ago this Court struck down statutes which had the effect of preventing defined categories of persons from practicing their professions. *Cummings* v. *Missouri,* 4 Wall. 277 (1867) (a priest); *Ex parte Garland,* 4 Wall. 333 (1867) (a lawyer). Those two cases established more broadly that "punishment" for purposes of bills of attainder is not limited to criminal sanctions; rather, "[t]he deprivation of *any rights, civil* or political, *previously enjoyed,* may be punishment . . . ." *Cummings, supra,* at 320.

Mr. Chief Justice Warren pointed out that the Constitution, in prohibiting bills of attainder, did not envision "a narrow, technical (and therefore soon to be outmoded) prohibition . . . ." *United States* v. *Brown,* 381 U. S. 437, 442 (1965). To the contrary, the evil was a *legislatively imposed* deprivation of existing rights, including property rights, directed at named individuals. Mr. Justice Black, in *United States* v. *Lovett,* 328 U. S. 303, 315–316 (1946), stated:

"[The cases] stand for the proposition that legislative acts, *no matter what their form,* that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." (Emphasis supplied.)

The only "punishment" in *Lovett,* in fact, was the deprivation of Lovett's salary as a Government employee—an indirect punishment for his "bad" associations.

Under our cases, therefore, bills of attainder require two elements: first, a specific designation of persons or groups as subjects of the legislation, and, second, a *Garland-Cummings-Lovett-Brown*-type arbitrary deprivation, including depriva-

tion of property rights, without notice, trial, or other hearing.[30]
No one disputes that Title I suffers from the first infirmity,
since it applies only to one former President. The issue that
remains is whether there has been a legislatively mandated
deprivation of an existing right.

## B

Since George Washington's Presidency, our constitutional
tradition, without a single exception, has treated Presidential
papers as the President's personal property. This view has
been congressionally and judicially ratified, both as to the
ownership of Presidential papers, *Folsom* v. *Marsh*, 9 F. Cas.
342 (No. 4,901) (CC Mass. 1841) (Story, J., sitting as Circuit
Justice), and, by the practice of Justices as to ownership of
their judicial papers.

Congress itself has consistently legislated on this assump-
tion. I have noted earlier that appropriation legislation has
been enacted on various occasions providing for Congress'
*purchase* of Presidential papers. See Hearing before a Special
Subcommittee of the House Committee on Government Opera-
tions on H. J. Res. 330, 84th Cong., 1st Sess., 28 (1955).
Those hearings led Congress to establish a *nonmandatory* sys-

---

[30] Title I fails to provide any procedural due process safeguards, either
before or after seizure of the Presidential materials. There is no provision
whatever permitting appellant to be heard in the decisionmaking process
by which GSA employees will determine, with no statutory standards to
guide them, whether particular materials have "general historical value."
No time restraints are placed upon GSA's decisionmaking process, even
though this Court has consistently recognized that, when dealing with First
Amendment interests, the timing of governmental decisionmaking is cru-
cial. *E. g*, *Freedman* v. *Maryland*, 380 U. S. 51 (1965); *Marcus* v.
*Search Warrant*, 367 U. S. 717 (1961) Under those holdings, any statute
which separates an individual, against his will, from First Amendment
protected materials must be strictly limited within a time frame. Title I,
in contrast, places no limits with respect to GSA's retention of custody
over appellant's papers; three years have already elapsed since seizure
of the papers in question.

tem of Presidential libraries, again explicitly recognizing that Presidential papers were the personal property of the Chief Executive. In the floor debate on that measure, Congressman John Moss, a supporter of the legislation, stated: "Finally, it should be remembered that Presidential papers belong to the President . . . ." 101 Cong. Rec. 9935 (1955). Indeed, in 1955 in testimony pertaining to this proposed legislation, the Archivist of the United States confirmed:

"The papers of the Presidents have always been considered to be their personal property, both during their incumbency and afterward. This has the sanction of law and custom and has never been authoritatively challenged." Hearing on H. J. Res. 330, *supra,* at 32.

Similarly, the GSA Administrator testified:

"As a matter of ordinary practice, the President has removed his papers from the White House at the end of his term. This has been in keeping with the tradition *and the fact that the papers are the personal property of the retiring Presidents." Id.,* at 14. (Emphasis supplied.)

In keeping with this background, it was not surprising that the Attorney General stated in an opinion in September 1974:

"To conclude that such materials are not the property of former President Nixon would be to reverse what has apparently been the almost unvaried understanding of all three branches of the Government since the beginning of the Republic, and to call into question the practices of our Presidents since the earliest times." 43 Op. Atty. Gen. No. 1, pp. 1–2 (1974).

I see no escape, therefore, from the conclusion that, on the basis of more than 180 years' history, the appellant has been deprived of a property right enjoyed by all other Presidents

after leaving office, namely, the control of his Presidential papers.

Even more starkly, Title I deprives only one former President of the right *vested by statute* in other former Presidents by the 1955 Act—the right to have a Presidential library at a facility of his own choosing for the deposit of such Presidential papers as he unilaterally selects. Title I did not purport to repeal the Presidential Libraries Act; that statute remains in effect, available to present and future Presidents, and has already been availed of by former President Ford. The operative effect of Title I, therefore, is to exclude, by name, one former President and deprive him of what his predecessors—and his successor—have already been allowed. This invokes what Mr. Justice Black said in *Lovett*, could not be constitutionally done:

> "Those who wrote our Constitution well knew the danger inherent in *special legislative acts* which take away the life, liberty, or property of particular named persons because the legislature thinks them guilty of conduct which deserves punishment. They intended to safeguard the people of this country from punishment without trial by duly constituted courts." 328 U. S., at 317. (Emphasis supplied.)

But apart from Presidential papers generally, Title I on its face contemplates that even the former President's purely family and personal papers and tape recordings are likewise to be taken into custody for whatever period of time is required for review. Some items, such as the originals of tape recordings of the former President's conversations, will never be returned to him under the Act.

I need not, and do not, inquire into the motives of Congress in imposing this deprivation on only one named person. Our cases plainly hold that retribution and vindictiveness are not requisite elements of a bill of attainder. The Court

appears to overlook that Mr. Chief Justice Warren in *United States* v. *Brown, supra,* concluded that retributive motives on the part of Congress were irrelevant to bill-of-attainder analysis. To the contrary, he said flatly: "It would be archaic to limit the definition of punishment to 'retribution.'" Indeed, he expressly noted that bills of attainder had historically been enacted for regulatory or preventive purposes:

> "Historical considerations by no means compel restriction of the bill of attainder ban to instances of retribution. A number of English bills of attainder were enacted for preventive purposes—that is, the legislature made a judgment, undoubtedly based largely on past acts and associations . . . that a given person or group was likely to cause trouble . . . and therefore inflicted deprivations upon that person or group in order to keep it from bringing about the feared event." 381 U. S., at 458–459.

Under the long line of our decisions, therefore, the Court has the heavy burden of demonstrating that legislation which singles out one named individual for deprivation—without any procedural safeguards—of what had for nearly 200 years been treated by all three branches of Government as private property, can survive the prohibition of the Bill of Attainder Clause. In deciding this case, the Court provides the basis for a future Congress to enact yet another Title I, directed at some future former President, or a Member of the House or the Senate because the individual has incurred public disfavor and that of the Congress. Cf. *Powell* v. *McCormack,* 395 U. S. 486 (1969). As in *United States* v. *Brown,* Title I, in contrast to Title II, does "not set forth a generally applicable rule," 381 U. S., at 450; it is beyond doubt special legislation doing precisely the evil against which the prohibitions of the "bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts . . ." were aimed. *Ogden* v. *Saunders,* 12 Wheat., at 286.

The concurring opinions make explicit what is implicit throughout the Court's opinion, *i. e.*, (a) that Title I would be unconstitutional under separation-of-powers principles if it applied to any other President; (b) that the Court's holding rests on appellant's being a "legitimate class of one," *ante,* at 472; and (c) that the Court's holding "will not be a precedent." *Ante,* at 486.

Nothing in our cases supports the analysis of MR. JUSTICE STEVENS, *ibid.* Under his view, appellant's resignation and subsequent acceptance of a pardon set him apart as a " 'legitimate class of one.' " The two events upon which he relies, however, are beside the point. Correct analysis under the Bill of Attainder Clause focuses solely upon the nature of the measure adopted by Congress, not upon the actions of the target of the legislation. Even if this approach were analytically sound, the two events singled out are relevant only to two possible theories: first, that appellant is culpably deserving of punishment by virtue of his resignation and pardon; or second, that appellant's actions were so unique as to justify legislation confiscating his Presidential materials but not those of any other President. The first point can be disposed of quickly, since the Bill of Attainder Clause was, of course, intended to prevent legislatively imposed deprivations of rights upon persons whom the Legislature thought to be culpably deserving of punishment.

The remaining question, then, is whether appellant's "uniqueness" permits individualized legislation of the sort passed here. It does not. The point is not that Congress is powerless to act as to exigencies arising during or in the immediate aftermath of a particular administration; rather, the point is that Congress cannot *punish* a particular individual on account of his "uniqueness." If Congress had declared forfeited appellant's retirement pay to which he otherwise would be entitled, instead of confiscating his Presidential materials, it would not avoid the bill-of-attainder prohibition to say that appellant was guilty of unprecedented actions

setting him apart from his predecessors in office. In short, appellant's uniqueness does not justify serious deprivations of existing rights, including the statutory right abrogated by Title I to establish a Presidential library.

The novel arguments advanced in the several concurring opinions serve to emphasize how clearly Title I violates the Bill of Attainder Clause; MR. JUSTICE STEVENS although finding no violation of the Clause, admirably states the case which, for me, demonstrates the unconstitutionality of Title I:

> "The statute before the Court does not apply to all Presidents or former Presidents. It singles out one, by name, for special treatment. Unlike all former Presidents in our history, he is denied custody of his own Presidential papers; he is subjected to the burden of prolonged litigation over the administration of the statute; and his most private papers and conversations are to be scrutinized by Government archivists. The statute implicitly condemns him as an unreliable custodian of his papers. Legislation which subjects a named individual to this humiliating treatment must raise serious questions under the Bill of Attainder Clause." *Ante,* at 484.

## IV

The immediate consequences of the Court's holding may be discounted by some on the ground it is justified by the uniqueness of the circumstances—in short, that the end justifies the means—and that, after all, the Court's holding is really not to be regarded as precedent. Yet the reported decisions of this Court reflect other instances in which unique situations confronted the Judicial Branch—for example, the alleged treason of one of the Founding Fathers. *United States* v. *Burr,* 25 F. Cas. 187 (No. 14,694) (CC Va. 1807). Burr may or may not have been blameless; Father Cummings and Lawyer Garland, in common with hundreds of thousands of others, may have been technically guilty of "carrying on

rebellion" against the United States. But this Court did not weigh the culpability of Cummings, Garland, or of Lovett or Brown in according to each of them the full measure of the protection guaranteed by the literal language of the Constitution. For nearly 200 years this Court has not viewed either a "class" or a "class of one" as "legitimate" under the Bill of Attainder Clause.

It may be, as three Justices intimate in their concurring opinions, that today's holding will be confined to this particular "class of one"; if so, it may not do great harm to our constitutional jurisprudence but neither will it enhance the Court's credit in terms of adherence to *stare decisis*. Only with future analysis, in perspective, and free from the "hydraulic pressure" Holmes spoke of, will we be able to render judgment on whether the Court has today enforced the Constitution or eroded it.

MR. JUSTICE REHNQUIST, dissenting.

Appellant resigned the Office of the Presidency nearly three years ago, and if the issue here were limited to the right of Congress to dispose of his particular Presidential papers, this case would not be of major constitutional significance. Unfortunately, however, today's decision countenances the power of any future Congress to seize the official papers of an outgoing President as he leaves the inaugural stand. In so doing, it poses a real threat to the ability of future Presidents to receive candid advice and to give candid instructions. This result, so at odds with our previous case law on the separation of powers, will daily stand as a veritable sword of Damocles over every succeeding President and his advisers. Believing as I do that the Act is a clear violation of the constitutional principle of separation of powers, I need not address the other issues considered by the Court.[1]

---

[1] While the entire substance of this dissent is devoted to the constitutional principle of separation of powers, and not to the other issues that

My conclusion that the Act violates the principle of separa-
tion of powers is based upon three fundamental propositions.
First, candid and open discourse among the President, his

the Court addresses separately, it seems to me that the Court is too facile
in separating appellant's "privacy" claims from his "separation of powers"
claims, as if they were two separate and wholly unrelated attacks on the
statute. The concept of "privacy" can be a coat of many colors, and
quite differing kinds of rights to "privacy" have been recognized in the
law. Property may be "private," in the sense that the Fifth Amendment
prohibits the Government from seizing it without paying just compensa-
tion. A dictabelt tape or diary may be "private" in that sense, but may
also be "private" in the sense that the Fourth Amendment would prohibit
an unreasonable seizure of it even though in making such a seizure the
Government agreed to pay for the fair value of the diary so as not to run
afoul of the Eminent Domain Clause of the Fifth Amendment. Many
states have recognized a common-law "right of privacy" first publicized
in the famous Warren and Brandeis article, The Right to Privacy, 4 Harv.
L. Rev. 193 (1890). Privileges, such as the executive privilege embodied
in the Constitution as a result of the separation of powers, *United States* v.
*Nixon*, 418 U. S. 683 (1974), and the attorney-client privilege, recognized
under case and statutory law in most jurisdictions, protect still a different
form of privacy. The invocation of such privileges has the effect of pro-
tecting the privacy of a communication made confidentially to the Presi-
dent or by a client to an attorney; the purpose of the privilege, in each
case, is to assure free communication on the part of the confidant and of
the client, respectively.

The Court states, *ante*, at 459, that "it is logical to assume that the tape
recordings made in the Presidential offices primarily relate to the conduct
and business of the Presidency." Whatever the merits of this argument
may be against a claim based on other types of privacy, it makes crystal
clear that the Act is a serious intrusion upon the type of "privacy" that
is protected by the principle of executive privilege. The Court's complete
separation of its discussion of the executive-privilege claim from the
privacy claim thus enables it to take inconsistent positions in the different
sections of its opinion.

The Court's position with respect to the appellant's individual privacy
heightens my concern regarding the privacy interest served by executive
privilege. In attempting to minimize the Act's impact upon appellant's
privacy, the Court concludes that "purely private papers and recordings
will be returned to appellant under § 104 (a) (7) of the Act." *Ibid*. How-

advisers, foreign heads of state and ambassadors, Members of Congress, and the others who deal with the White House on a sensitive basis is an absolute prerequisite to the effective discharge of the duties of that high office. Second, the effect of the Act, and of this Court's decision upholding its constitutionality, will undoubtedly restrain the necessary free flow of information to and from the present President and future Presidents. Third, any substantial intrusion upon the effective discharge of the duties of the President is sufficient to violate the principle of separation of powers, and our prior cases do not permit the sustaining of an Act such as this by "balancing" an intrusion of substantial magnitude against the interests assertedly fostered by the Act.

ever, this conclusion raises more questions than answers. Under § 104 (a) (7), the return of papers to the appellant is conditioned on their being "not otherwise of general historical significance." Given the expansive nature of this phrase, see Tr. of Oral Arg. 39, it is quite conceivable that virtually none of the papers will be returned, and the Court's representation is an empty gesture. See also § 104 (a)(6). What is meant by *"purely* private papers"? Is a personal letter to or from the President, but concerning the duties of the President considered "private," or is a document replete with personal communications, but containing some reference to the affairs of state, "purely private"? The dictabelts of the President's personal recollections, dictated in diary form at the end of each day, are assumedly private, and are to be returned. See Tr. of Oral Arg. 59. But the dictabelt dictation is also recorded on the voice-activated White House taping system, and those tapes will be retained and reviewed. Hence, appellant's privacy interest will not be served by the return of the dictabelts, and the retention of the tapes will seriously erode Presidential communications, as discussed *infra*, at 553–558. By approaching these issues in compartmentalized fashion the Court obscures the fallacy of its result.

I fully subscribe to most of what is said respecting the separation of powers in the dissent of THE CHIEF JUSTICE. Indeed, it is because I so thoroughly agree with his observation that the Court's holding today is a "grave repudiation of nearly 200 years of judicial precedent and historical practice" that I take this opportunity to write separately on the subject, thinking that its importance justifies such an opinion.

With respect to the second point, it is of course true that the Act is directed solely at the papers of former President Nixon.[2] Although the terms of the Act, therefore, have no direct application to the present occupant or future occupants of the Office, the effect upon candid communication to and from these future Presidents depends, in the long run, not upon the limited nature of the present Act, but upon the precedential effect of today's decision. Unless the authority of Congress to seize the papers of this appellant is limited only to him in some principled way, future Presidents and their advisers will be wary of a similar Act directed at their papers out of pure political hostility.

We are dealing with a privilege, albeit a qualified one, that both the Court and the Solicitor General concede may be asserted by an ex-President. It is a privilege which has been relied upon by Chief Executives since the time of George Washington. See, e. g., the dissenting opinion of THE CHIEF JUSTICE, ante, at 509–510. Unfortunately, the Court's opinion upholding the constitutionality of this Act is obscure, to say the least, as to the circumstances that will justify Congress in seizing the papers of an ex-President.[3] A potpourri of reasons is advanced as to why the Act is not an unconstitutional

---

[2] I am not unmindful of the excesses of Watergate, and of the impetus it gave to this legislation. However, the Court's opinion does not set forth a principled distinction that would limit the constitutionality of an Act such as this to President Nixon's papers. Absent such a distinction:

"The emotional aspects of the case make it difficult to decide dispassionately, but do not qualify our obligation to apply the law with an eye to the future as well as with concern for the result in the particular case before us." *Brewer* v. *Williams,* 430 U. S. 387, 415 (1977) (STEVENS, J., concurring).

[3] Indeed, there is nothing in the Court's logic which would invalidate such an Act if it applied to an *incumbent* President *during* his term of office. It is of course not likely that an incumbent would sign such a measure, but a sufficiently determined Congress could pass it over his veto nonetheless.

infringement upon the principle of separation of powers,[4] but the weight to be attached to any of the factors is left wholly unclear.

The Court speaks of the need to establish procedures to preserve Presidential materials, to allow a successor President access to the papers of the prior President, to grant the American public historical access, and to rectify the present "hit-or-miss" approach by entrusting the materials to the expert handling of the archivists. *Ante,* at 452–453. These justifications are equally applicable to each and every future President, and other than one cryptic paragraph, *ante,* at 453–454, the Court's treatment contains no suggestion that Congress might not permissibly seize the papers of any outgoing future President. The unclear scope of today's opinion will cause future Presidents and their advisers to be uneasy over

---

[4] In my view, the Court's decision itself, by not offering any principled basis for distinguishing appellant's case from that of any future President, has a present and future impact on the functioning of the Office of the Presidency. Hence the validity of the reasons asserted by the Court for upholding this particular Act is a subject which I find it unnecessary to address in detail. I feel bound to observe, however, that the Court, in emphasizing, *e. g., ante,* at 443–444, the fact that the seized papers are to be lodged with the General Services Administration, an agency created by Congress but housed in the Executive Branch of the Government, relies upon a thin reed indeed.

Control and management of an agency such as the General Services Administration is shared between the incumbent President, by virtue of his authority to nominate its officials, and Congress, by virtue of its authority to enact substantive legislation defining the functions of the agency. But the physical placement of the seized Presidential papers with such an agency does not solve the separation-of-powers problem. The principle of separation of powers is infringed when, by Act of Congress, Presidential communications are impeded because the President no longer has exclusive control over the release of his confidential papers. The fact that this Act places physical custody in the hands of the General Services Administration, rather than a congressional committee, makes little difference so far as divestiture of Presidential control is concerned.

the confidentiality of their communications, thereby restraining those communications.

The position of my Brothers POWELL and BLACKMUN is that today's opinion will not result in an impediment to future Presidential communications since this case is "unique" [5]— appellant resigned in disgrace from the Presidency during events unique in the history of our Nation. MR. JUSTICE POWELL recognizes that this position is quite different from that of the Court. *Ante,* at 492–498. Unfortunately his concurring view that the authority of Congress is limited to the situation he describes does not itself change the expansive scope of the Court's opinion, and will serve as scant consolation to future Presidential advisers. For so long as the Court's opinion represents a threat to confidential communications, the concurrences of MR. JUSTICE POWELL and MR. JUSTICE BLACKMUN, I fear, are based on no more than wishful thinking.

Were the Court to advance a principled justification for affirming the judgment solely on the facts surrounding appellant's fall from office, the effect of its decision upon future Presidential communications would be far less serious. But the Court does not advance any such justification.

## A

It would require far more of a discourse than could profitably be included in an opinion such as this to fully describe the pre-eminent position that the President of the United States occupies with respect to our Republic. Suffice it to say that the President is made the sole repository of the executive powers of the United States, and the powers entrusted to him as well as the duties imposed upon him

---

[5] My Brother STEVENS, *ante,* at 486–487, seeks to attribute a similar uniqueness to the precedential value of this case, but his observations are directed to appellant's bill-of-attainder claim, rather than to the separation-of-powers claim.

are awesome indeed.[6]   Given the vast spectrum of the deci-
sions that confront him—domestic affairs, relationships with
foreign powers, direction of the military as Commander in

---

[6] Article II empowers him "by and with the Advice and Consent of the
Senate" to make treaties, to appoint numerous other high officials of the
Federal Government, to receive ambassadors and other public ministers,
and to commission all the officers of the United States.   That Article en-
joins him to "take Care that the Laws be faithfully executed," and au-
thorizes him to "give to the Congress Information of the State of the
Union, and recommend to their Consideration such Measures as he shall
judge necessary and expedient."   It is difficult to imagine a public office
whose occupant would be more dependent upon the confidentiality of
the advice which he received, and the confidentiality of the instructions
which he gave, for the successful execution of his duties.   This is par-
ticularly true in the area of foreign affairs and international relations; in
*United States* v. *Curtiss-Wright Corp.*, 299 U. S. 304, 319 (1936), this
Court stated:

"Not only, as we have shown, is the federal power over external affairs
in origin and essential character different from that over internal affairs,
but participation in the exercise of the power is significantly limited.   In
this vast external realm, with its important, complicated, delicate and
manifold problems, the President alone has the power to speak or listen
as a representative of the nation.   He *makes* treaties with the advice and
consent of the Senate; but he alone negotiates.   Into the field of negotia-
tion the Senate cannot intrude; and Congress itself is powerless to invade
it.   As Marshall said in his great argument of March 7, 1800, in the
House of Representatives, 'The President is the sole organ of the nation
in its external relations, and its sole representative with foreign nations.'
Annals, 6th Cong., col. 613.   The Senate Committee on Foreign Relations
at a very early day in our history (February 15, 1816), reported to the
Senate, among other things, as follows:

" 'The President is the constitutional representative of the United States
with regard to foreign nations.   He manages our concerns with foreign
nations and must necessarily be most competent to determine when, how,
and upon what subjects negotiation may be urged with the greatest
prospect of success.   For his conduct he is responsible to the Constitution.
The committee consider this responsibility the surest pledge for the faith-
ful discharge of his duty.   They think the interference of the Senate in
the direction of foreign negotiations calculated to diminish that respon-

Chief—it is by no means an overstatement to conclude that current, accurate, and absolutely candid information is essential to the proper performance of his office. Nor is it an overstatement to conclude that the President must be free to give frank and candid instructions to his subordinates. It cannot be denied that one of the principal determinants of the quality of the information furnished to the President will be the degree of trust placed in him by those who confide in him. The Court itself, *ante,* at 448–449, cites approvingly the following language of the Solicitor General:

> " 'Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submission of facts and opinions upon which effective discharge of his duties depends.' " See Brief for Federal Appellees 33.

The public papers of Dwight D. Eisenhower, who had the advantage of discharging executive responsibilities first as the Commander in Chief of the United States forces in Europe during the Second World War and then as President of the United States for two terms, attest to the critical importance of this trust in the President's discretion:

> "And if any commander is going to get the free, unprejudiced opinions of his subordinates, he had better protect what they have to say to him on a confidential basis." Public Papers of the Presidents of the United States: Dwight D. Eisenhower, 1955, p. 674 (1959).

The effect of a contrary course likewise impressed President Eisenhower:

> "But when it comes to the conversations that take place

---

sibility and thereby to impair the best security for the national safety. The nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends on secrecy and dispatch.' U. S. Senate, Reports, Committee on Foreign Relations, vol. 8, p. 24."

between any responsible official and his advisers or exchange of little, mere slips of this or that, expressing personal opinions on the most confidential basis, those are not subject to investigation by anybody; *and if they are, will wreck the Government." Ibid.* (Emphasis added.)

There simply can be no doubt that it is of the utmost importance for sensitive communications to the President to be viewed as confidential, and generally unreachable without the President's consent.

B

In order to fully understand the impact of this Act upon the confidential communications in the White House, it must be understood that the Act will affect not merely former President Nixon, but the present President and future Presidents. As discussed above, while this Act itself addresses only the papers of former President Nixon, today's decision upholding its constitutionality renders uncertain the constitutionality of future congressional action directed at any ex-President. Thus Presidential confidants will assume, correctly, that any records of communications to the President could be subject to "appropriation" in much the same manner as the present Act seized the records of confidential communications to and from President Nixon. When advice is sought by future Presidents, no one will be unmindful of the fact that, as a result of the uncertainty engendered by today's decision, all confidential communications of any ex-President could be subject to seizure over his objection, as he leaves the inaugural stand on January 20.

And Presidential communications will undoubtedly be impeded by the recognition that there is a substantial probability of public disclosure of material seized under this Act, which, by today's decision, is a constitutional blueprint for future Acts. First, the Act on its face requires that 100-odd Government archivists study and review Presidential papers,

heretofore accessible only with the specific consent of the President. Second, the Act requires that public access is to be granted by future regulations consistent with "the need to provide public access to those materials which have general historical significance . . . ." § 104 (a) (6). Either of these provisions is sufficient to detract markedly from the candor of communications to and from the President.

In brushing aside the fact that the archivists are empowered to review the papers, the Court concludes that the archivists will be discreet. *Ante*, at 451–452. But there is no foundation for the Court's assumption that there will be no leaks. Any reviews that the archivists have made of Presidential papers in the past have been done only after authorization by the President, and after the President has had an opportunity to cull the most sensitive documents. It strikes me as extremely naive, and I daresay that this view will be shared by a large number of potential confidants of future Presidents, to suppose that each and every one of the archivists who might participate in a similar screening by virtue of a future Act would remain completely silent with respect to those portions of the Presidential papers which are extremely newsworthy. The Solicitor General, supporting the constitutionality of the Act, candidly conceded as much in oral argument:

> "Question: . . . I now ask you a question that may sound frivolous, but do you think if a hundred people know anything of great interest in the City of Washington, it will remain a secret?
> "[Laughter.]
> "Mr. McCree: MR. JUSTICE POWELL, I have heard that if two people have heard it, it will not." Tr. of Oral Arg. 46.

It borders on the absurd for the Court to cite our recent decision in *Whalen* v. *Roe,* 429 U. S. 589 (1977), as a precedent for the proposition that Government officials will invariably

honor provisions in a law dedicated to the preservation of privacy. It is quite doubtful, at least to my mind, that columnists or investigative reporters will be avidly searching for what doctor prescribed what drug for what patient in the State of New York, which was the information required to be furnished in *Whalen* v. *Roe*. But with respect to the advice received by a President, or the instructions given by him, on highly sensitive matters of great historical significance, the case is quite the opposite. Hence, at the minimum, today's decision upholding the constitutionality of this Act, mandating review by archivists, will engender the expectation that future confidential communications to the President may be subject to leaks or public disclosure without his consent.

In addition to this review by archivists, Presidential papers may now be seized and shown to the public if they are of "general historical significance." The Court attempts to avoid this problem with the wishful expectation that the regulations regarding public access, when promulgated, will be narrowly drawn. However, this assumes that a Presidential adviser will speak candidly based upon this same wishful assumption that the regulations, when ultimately issued and interpreted, will protect his confidences. But the current Act is over two and one-half years old and no binding regulations have yet been promulgated. And it is anyone's guess as to how long it will take before such ambiguous terms as "historical significance" are definitively interpreted, and as to whether some future Administrator as yet unknown might issue a broader definition. Thus, the public access required by this Act will at the very least engender substantial uncertainty regarding whether future confidential communications will, in fact, remain confidential.

The critical factor in all of this is not that confidential material might be disclosed, since the President himself might choose to "go public" with it. The critical factor is that the determination as to whether to disclose is wrested by the

Act from the President. When one speaks in confidence to a President, he necessarily relies upon the President's discretion not to disclose the sensitive. The President similarly relies on the discretion of a subordinate when instructing him. Thus it is no answer to suggest, as does the Court, *ante,* at 450–451, that the expectation of confidentiality has always been limited because Presidential papers have in the past been turned over to Presidential libraries or otherwise subsequently disclosed. In those cases, ultimate reliance was upon the discretion of the President to cull the sensitive ones before disclosure. But when, as is the case under this Act, the decision whether to disclose no longer resides in the President, communication will inevitably be restrained.

The Court, as does MR. JUSTICE POWELL, seeks to diminish the impact of this Act on the Office of the President by virtue of the fact that neither President Ford nor President Carter supports appellant's claim. *Ante,* at 441, 502 n. 5. It is quite true that President Ford signed the Act into law, and that the Solicitor General, representing President Carter, supports its constitutionality. While we must give due regard to the fact that these Presidents have not opposed the Act, we must also give due regard to the unusual political forces that have contributed to making this situation "unique." *Ante,* at 494 (POWELL, J., concurring). MR. JUSTICE POWELL refers to the stance of the current Executive as "dispositive," *ante,* at 498, and the Court places great emphasis upon it. I think this analysis is mistaken.

The current occupant of the Presidency cannot by signing into law a bill passed by Congress waive the claim of a successor President that the Act violates the principle of separation of powers. We so held in *Myers* v. *United States,* 272 U. S. 52 (1926). And only last Term we unanimously held in *Buckley* v. *Valeo,* 424 U. S. 1 (1976), that persons with no connection with the Executive Branch of the Government may attack the constitutionality of a law signed by the President on the

ground that it invaded authority reserved for the Executive Branch under the principle of separation of powers. This principle, perhaps the most fundamental in our constitutional framework, may not be signed away by the temporary incumbent of the office which it was designed to protect.

MR. JUSTICE POWELL's view that the incumbent President must join the challenge of the ex-President places Presidential communications in limbo, since advisers, at the time of the communication, cannot know who the successor will be or what his stance will be regarding seizure by Congress of his predecessor's papers. Since the advisers cannot be sure that the President to whom they are communicating can protect their confidences, communication will be inhibited. MR. JUSTICE POWELL's view, requiring an ex-President to depend upon his successor, blinks at political and historical reality. The tripartite system of Government established by the Constitution has on more than one occasion bred political hostility not merely between Congress and a lameduck President, but between the latter and his successor. To substantiate this view one need only recall the relationship at the time of the transfer to the reins of power from John Adams to Thomas Jefferson, from James Buchanan to Abraham Lincoln, from Herbert Hoover to Franklin Roosevelt, and from Harry Truman to Dwight Eisenhower. Thus while the Court's decision is an invitation for a hostile Congress to legislate against an unpopular lameduck President, MR. JUSTICE POWELL's position places the ultimate disposition of a challenge to such legislation in the hands of what history has shown may be a hostile incoming President. I cannot believe that the Constitution countenances this result. One may ascribe no such motives to Congress and the successor Presidents in this case, without nevertheless harboring a fear that they may play a part in some succeeding case.

The shadow that today's decision casts upon the daily operation of the Office of the President during his entire

four-year term sharply differentiates it from our previous separation-of-powers decisions, which have dealt with much more specific and limited intrusions. These cases have focused upon unique aspects of the operation of a particular branch of Government, rather than upon an intrusion, such as the present one, that permeates the entire decisionmaking process of the Office of the President. For example, in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952) (*Steel Seizure Cases*), this Court held that the President could not by Executive Order seize steel mills in order to prevent a work stoppage when Congress had provided other methods for dealing with such an eventuality. In *Myers* v. *United States, supra,* the Court struck down an 1876 statute which had attempted to restrict the President's power to remove postmasters without congressional approval. In *Buckley* v. *Valeo, supra,* the Court struck down Congress' attempt to vest the power to appoint members of the Federal Election Commission in persons other than the President.

To say that these cases dealt with discrete instances of governmental action is by no means to disparage their importance in the development of our constitutional law. But it does contrast them quite sharply with the issue involved in the present case. To uphold the Presidential Recordings and Materials Preservation Act is not simply to sustain or invalidate a particular instance of the exercise of governmental power by Congress or by the President; it has the much more far-reaching effect of significantly hampering the President, during his entire term of office, in his ability to gather the necessary information to perform the countless discrete acts which are the prerogative of his office under Art. II of the Constitution.

## C

It thus appears to me indisputable that this Act is a significant intrusion into the operations of the Presidency. I do not think that this severe dampening of free communi-

cation to and from the President may be discounted by the Court's adoption of a novel "balancing" test for determining whether it is constitutional.[7]  I agree with the Court that the three branches of Government need not be airtight, *ante,* at 443, and that the separate branches are not intended to operate

[7] As a matter of original inquiry, it might plausibly be claimed that the concerns expressed by the Framers of the Constitution during their debates, and similar expressions found in the Federalist Papers, by no means require the conclusion that the Judicial Branch is the ultimate arbiter of whether one branch has transgressed upon powers constitutionally reserved to another.  It could have been plausibly maintained that the Framers thought that the Constitution itself had armed each branch with sufficient political weapons to fend off intrusions by another which would violate the principle of separation of powers, and that therefore there was neither warrant nor necessity for judicial invalidation of such intrusion. But that is not the way the law has developed in this Court.

*Marbury* v. *Madison,* 1 Cranch 137 (1803), not only established the authority of this Court to hold an Act of Congress unconstitutional, but the particular constitutional question which it decided was essentially a "separation of powers" issue: whether Congress was empowered under the Constitution to expand the original jurisdiction conferred upon this Court by Art. III of the Constitution.

Any argument that *Marbury* is limited to cases involving the powers of the Judicial Branch and that the Court had no power to intervene in any dispute relating to separation of powers between the other two branches has been rejected in *Myers* v. *United States,* 272 U. S. 52 (1926); *Humphrey's Executor* v. *United States,* 295 U. S. 602 (1935); and *Buckley* v. *Valeo,* 424 U. S. 1 (1976).  In so doing, these cases are entirely consistent with the following language from *United States* v. *Nixon,* 418 U. S. 683 (1974):

"In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others. The President's counsel, as we have noted, reads the Constitution as providing an absolute privilege of confidentiality for all Presidential communications.  Many decisions of this Court, however, have unequivocally reaffirmed the holding of *Marbury* v. *Madison,* 1 Cranch 137 (1803), that '[i]t is emphatically the province and duty of the judicial department to say what the law is.' *Id.,* at 177." *Id.,* at 703.

with absolute independence, *United States* v. *Nixon,* 418
U. S. 683, 707 (1974). But I find no support in the Consti-
tution or in our cases for the Court's pronouncement that
the operations of the Office of the President may be severely
impeded by Congress simply because Congress had a good
reason for doing so.

Surely if ever there were a case for "balancing," and
giving weight to the asserted "national interest" to sustain
governmental action, it was in the *Steel Seizure Cases, supra.*
There the challenged Presidential Executive Order recited,
without contradiction by its challengers, that "American fight-
ing men and fighting men of other nations of the United
Nations are now engaged in deadly combat with the forces of
aggression in Korea"; that "the weapons and other materials
needed by our armed forces and by those joined with us
in the defense of the free world are produced to a great
extent in this country, and steel is an indispensable compo-
nent of substantially all of such weapons and materials";
and that a work stoppage in the steel industry "would im-
mediately jeopardize and imperil our national defense and
the defense of those joined with us in resisting aggression, and
would add to the continuing danger of our soldiers, sailors, and
airmen engaged in combat in the field." 343 U. S., at 590–591
(App. to opinion). Although the "legislative" actions by the
President could have been quickly overridden by an Act of
Congress, *id.,* at 677 (Vinson, C. J., dissenting), this Court
struck down the Executive Order as violative of the separation-
of-powers principle with nary a mention of the national inter-
est to be fostered by what could have been characterized as a
relatively minimal and temporary intrusion upon the role of
Congress. The analysis was simple and straightforward:
Congress had exclusive authority to legislate; the President's
Executive Order was an exercise of legislative power that
impinged upon that authority of Congress, and was therefore
unconstitutional. *Id.,* at 588–589. See also *Buckley* v. *Valeo.*[8]

---

[8] For the reasons set forth by THE CHIEF JUSTICE, *ante,* at 512, it is

I think that not only the Executive Branch of the Federal Government, but the Legislative and Judicial Branches as well, will come to regret this day when the Court has upheld an Act of Congress that trenches so significantly on the functioning of the Office of the President.   I dissent.

clear that the circumstances in *United States* v. *Nixon,* involving a narrow request for specified documents in connection with a criminal prosecution, provide no support for the Court's use of a balancing test in a case such as this where the seizure is a broad and undifferentiated intrusion into the daily operations of the Office of the President.